**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **CARLOS VEGA** | : | |
| **and** | : | |
| **JOSEPH WHITEHEAD** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| **v.** | : | **No. 2:19-cv-04039** |
| | : | |
| **CITY OF PHILADELPHIA AND** | : | |
| **LAWRENCE KRASNER** | : | |
| **Defendants.** | : | |
| | : | |

**DEFENDANTS CITY OF PHILADELPHIA AND
<u>LAWRENCE KRASNER'S PRETRIAL MEMORANDUM</u>**

## I.      NATURE OF THE ACTION

Defendant Lawrence S. Krasner was elected as the Philadelphia County District Attorney on November 7, 2017 and took office on January 2, 2018. Mr. Krasner made a number of personnel changes in the first few weeks of his administration, including the termination of 33 employees in the District Attorney's office ("DAO"). Plaintiffs Carlos Vega and Joseph Whitehead were among those whose employment was terminated and who have asserted age discrimination claims under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). However, there is no evidence that Defendant Krasner's legitimate non-discriminatory reasons for terminating Plaintiffs were false or a pretext for discrimination.

## II.     COUNTER-STATEMENT OF FACTS

The DAO attorneys are at-will employees who serve at the pleasure of the District Attorney. That gave Mr. Krasner the right to pick his own team. In the first few weeks of his

administration, Mr. Krasner made a number of personnel changes, including the termination 30 attorneys. An additional 13 attorneys were not asked to leave but resigned instead.

In making termination decisions, Mr. Krasner considered his own experiences with and knowledge of individual DAO attorneys and sought input from trusted advisors and colleagues regarding the past conduct, reputations and criminal justice philosophies of many others. Mr. Krasner's overarching goal in making termination and retention decisions (i.e., picking his team) was whether each attorney had the skills, dedication and sense of justice needed to support and promote his progressive vision of criminal justice. Although personnel files were made available, Mr. Krasner did not review them because he did not have confidence that the files contained complete, reliable, or helpful information.  Mr. Krasner also did not seek formal input from supervisors in the outgoing administration or talk to those employees he was considering for termination, because he viewed the office as "tribal" and overly "self-protective."

At the time he took office, Mr. Krasner was 56 years old.  Nineteen (19) of the 30 attorneys terminated on January 5, 2018 were under the age of 50, including nine (9) attorneys in their thirties and one attorney in her twenties.

| Age Bracket | Attorneys Terminated on January 5, 2018 |
|---|---|
| Under 40 | 10 |
| Between 40 and 49 | 9 |
| Over 50 | 11 |

In his first week in office and over the next 30 days, Mr. Krasner hired fifteen (15) attorneys, including ten (10) attorneys over 40. Four (4) of these new hires were older than

Plaintiffs. In fact, the data shows that the number of attorneys in the office over the age of 40 (not including Mr. Krasner) did not materially change during this period.

| Age Bracket | DAO Attorney Count as of January 1, 2018 | January 5, 2018 DAO Attorney Terminations | January 2018 Voluntary DAO Attorney Departures | DAO Attorney Hires within 30 days of January 5, 2018 | Net Change |
|---|---|---|---|---|---|
| Under 40 | 198 | -10 | -7 | +4 | -13 |
| Over 40 | 98 | -20 | -5 | +10 | -15 |

By the end of July 2018, Mr. Krasner had hired twenty-two (22) attorneys over the age of 40, including the following:

- Nine (9) attorneys that were 64 or older: Hon. Carolyn Temin (83); Richard Glazer (75); Ronald Simon (70); Charles Cunningham (69); Robert Listenbee (69); Paul George (67); Flo Messier (65); Raymond Roberts (64); and Michael Giampietro (64);

- Four (4) attorneys between the ages of 58 and 59: Vincent Corrigan (59); Patricia McKinney (59); Nancy Winkelman (59); Jeffrey Lindy (58); and

- Nine (9) attorneys between the ages of 40 and 54: Anthony Voci (54); Patricia Cummings (51); Crystal Powell (50); Paul Reddel (47); Joseph Green (46); Noel Ann DeSantis (43); Carrie Wood (41); Varghese Kurian (41); and Tracey Tripp (41).

These attorneys took on a variety of roles in the new administration, ranging from policy-level and supervisory roles to staff attorney unit assignments, including the major trial unit, the special investigations unit, the waiver unit, the conviction integrity unit, the pre-trial unit, and the juvenile unit.

**Plaintiff Carlos Vega**

Plaintiff Carlos Vega, an attorney in the Homicide Unit, was one of the 30 DAO attorneys whose employment was terminated on January 5, 2018. At the time of his termination, he was 61 years old (five years older than Mr. Krasner).

Mr. Krasner has known Mr. Vega for over thirty years, and recently had tried the *Scott/Muhammed* case to verdict against him. Mr. Krasner's negative opinions regarding Mr. Vega's ethics and trustworthiness were established during the *Scott/Muhammed* case, and formed the basis for his decision to terminate Mr. Vega.

The *Scott/Muhammed* case was a "gut-wrenching" capital homicide case that went to trial, after five years of litigation, in December 2016. Mr. Krasner represented Ibrahim Muhammed with co-counsel Anthony Voci. Mr. Vega's conduct that Mr. Krasner deemed unacceptable included:

- ***Mr. Vega's abusive behavior during pretrial discovery***. Mr. Krasner testified that Mr. Vega behaved in a petty, abusive, and disrespectful way to him and his staff during pretrial discovery and made it very difficult to obtain copies of discovery materials.

- ***Mr. Vega's contacts with defense witnesses during trial and his misrepresentations to the Court regarding those witness contacts***. Mr. Krasner testified that Mr. Vega lied to him and the Court about his interviews with defense witnesses Amber Creamer and Jajal Aljuwaie in the corridor outside the courtroom, during which, according to Mr. Vega, they suddenly became able to identify the defendant. In addition, Mr. Vega told those defense witnesses that they could leave before testifying.

- ***Mr. Vega's attempt to renege on a prior agreement regarding witness identification testimony and to "ambush" the defense at trial***. At trial, Mr. Krasner told the court that Mr. Vega's proposed witness identification testimony

was the "typical ambush we've had the entire trial" and that Mr. Vega was reneging on his prior agreement not to present identification testimony.

- ***The late disclosure of mitigation evidence in the death penalty phase***.   Mr. Krasner testified that the prosecution did not turn over critical mitigation evidence until the very end of trial and "far too late for us to give them to our experts to be adequately prepared to testify."

The transcript of the *Scott/Muhammed* trial confirms Mr. Krasner's testimony and includes his co-counsel Mr. Voci's argument to the Court in the *Scott/Muhammed* case demonstrating the dishonesty of Mr. Vega's representation that detectives were with him when he spoke with two defense witnesses.

Mr. Voci has also testified regarding Mr. Vega's conduct during the *Scott/Muhammed* trial and stated his view that Mr. Vega's conduct was unacceptable and unethical.[1]   "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  And Mr. Vega's conduct throughout the course of the Commonwealth versus Ibrahim Muhammad and Scott violated the spirit and the letter of Rule 3.8 in a very significant way.  It was the antithesis of what Rule 3.8 requires of a prosecutor."

Jack McMahon, who represented the co-defendant Nalik Scott, also testified that he was outraged by Mr. Vega' "disgraceful" conduct in the *Scott/Muhammed* trial.  He stated that "all the way through the trial" he believed that Mr. Vega was "playing fast and loose with the rules"

---

[1] Mr. Vega's counsel objected to Mr. Voci's testimony regarding Mr. Vega's conduct during the *Scott-Muhammed* trial at Mr. Voci's October 30, 2020 deposition on the grounds of "surprise." The facts relating to Mr. Vega's conduct at the *Scott/Muhammed* trial were covered extensively in Mr. Krasner's September 16, 2020 deposition, Mr. Vega's October 15, 2020 deposition and Mr. McMahon's October 22, 2020 deposition.  Indeed, Mr. Voci's statements to Judge Bronson in the *Scott/Muhammed* had already been covered in detail at Mr. McMahon's October 22, 2020 deposition during which Mr. Vega's counsel specifically acknowledged that "Mr. Voci made the statements."  Although Defendants' Rule 701 Disclosures had inadvertently omitted Mr. Voci from the list of lay opinion witnesses regarding Mr. Vega  (which was immediately corrected), Mr. Vega's counsel was well aware of Mr. Voci's role in the *Scott/Muhammed* trial and had a full and fair opportunity to question Mr. Voci at the October 30, 2020 deposition.

and that Mr. Vega's conduct was particularly disturbing in a death penalty case. Notably, when Mr. McMahon read in the newspaper that Mr. Vega had sued Mr. Krasner and the City of Philadelphia for age discrimination in 2019, Mr. McMahon sent Mr. Krasner a text which read: "What he did to us in Scott / Mohammad was a disgrace. Plus, he lied directly to the court. Knowing directly the methods of Carlos it would have been a dereliction of duty to keep him."

Michael Giampietro is a Philadelphia attorney whose opinion is valued by Mr. Krasner. Mr. Krasner consulted with him regarding individual DAO attorneys prior to the January 5, 2018 terminations. Mr. Giampietro testified during his deposition that he was aware that Mr. Krasner had had "a very negative experience with Carlos in a case involving him and Jack McMahon."

Mr. Vega does not deny that the *Scott/Muhammed* trial was contentious. He does not believe that he acted unethically during the litigation. Rather, during his deposition, he criticized Mr. Krasner's performance during the trial, questioning his legal aptitude.

**Plaintiff Joseph Whitehead**

Plaintiff Joseph Whitehead was one of the 30 DAO attorneys terminated on January 5, 2018.  At the time of his termination, he was 64 years old.  He had numerous assignments over the course of his tenure in the DAO.  He joined the Homicide Unit in November 2014, but by 2016 was assigned to devote most of his time to the resentencing of juvenile lifers under the terms of *Miller v. Alabama*.

Over the years, Mr. Krasner formed a negative view of Mr. Whitehead's prosecutorial judgment based on his own experiences and Mr. Whitehead's reputation in the criminal justice community. "I [] kn[e]w him to be extreme in his approach to prosecution.  And what I mean by that is extreme in wanting the highest charge, extreme in wanting the longest sentence, extreme in trying to make sure that no one ever got a break.  Kind of an incapacity to separate the wheat

from the chaff." From Mr. Krasner's perspective, Mr. Whitehead had a "profoundly different philosophy" that was entirely inconsistent with what Mr. Krasner was trying to do in the office.

Mr. Giampietro testified that he discussed Mr. Whitehead with Mr. Krasner prior to the January 5, 2018 employment terminations and that he told Mr. Krasner: "I wouldn't keep him." Mr. Giampietro also described several personal experiences with Mr. Whitehead's which, in his opinion, demonstrated rigidity and lack of judgment.

In addition, Brian Zarallo, Mr. Whitehead's supervisor and a member of the juvenile resentencing committee in 2017 freely acknowledged that Mr. Whitehead had a reputation for seeking "heavier" sentences under that prior administration's sentencing standards.

Mr. Whitehead's extreme mindset is demonstrated in juvenile resentencing memoranda he prepared in October/November 2017.  Although Mr. Krasner did not have access to these memoranda when he made the decision to terminate Mr. Whitehead, Mr. Whitehead's sentencing recommendations confirm Mr. Whitehead's reputation for seeking heavy sentences and validate Mr. Krasner's opinions regarding Mr. Whitehead's prosecutorial judgment.

- Mr. Giampietro, who participates in the juvenile resentencing committee in the Krasner administration, testified that he observed further evidence of Mr. Whitehead's rigidity and lack of judgment in his juvenile resentencing work, commenting that Mr. Whitehead's sentencing recommendations were "just obscene."

- Mr. Whitehead's juvenile resentencing recommendations were not only materially longer than the Krasner administration ultimately recommended, but also materially longer than even the prior administration was willing to accept. By way of example, in October 2017, Mr. Whitehead prepared a resentencing

memorandum for a juvenile lifer (age 14 when charged), *recommending a sentence of 60 years to life*. The sentencing recommendation approved in the prior administration was ***20 years lower*** (40 years to life). The sentencing recommendation approved in the Krasner administration ***was 38 years lower*** (22 years to life).

- Robert Listenbee, one of Mr. Krasner's First Assistants and a nationally-recognized juvenile justice attorney, is a member of the juvenile resentencing committee in Mr. Krasner's administration.  Mr. Listenbee testified that he reviewed sentencing memoranda prepared by Mr. Whitehead and that some of Mr. Whitehead's recommendations were "harsh" and "cruel" and did not properly take into account the factors mandated by the United States Supreme Court such as adolescent development.

## Mr. Krasner's Public Statements Regarding Institutional Change

In the absence of any actual evidence of age bias, Plaintiffs rely on certain public statements by Mr. Krasner to demonstrate that he "has a strong bias against and stereotypical views of older Prosecutors" and an "unwavering preference and affinity for young Prosecutors." Plaintiffs identified articles and interviews which they assert support their sweeping and unsupported conclusions about Mr. Krasner.

In their Complaint, Plaintiffs quote snippets from an interview of Mr. Krasner, which was conducted before he won the primary and published in the Intercept on May 16, 2017, highlighting certain language. The language quoted in the Complaint omits a more extended discussion that includes Mr. Krasner's statement that the office **"*already contains the dissent, meaning people who have been there for years but might have been frustrated for years. I***

***know some of these folks because some of them would call me and tell me what they knew about corrupt cops, but couldn't do anything about it from the inside. Those people need to stay, and in supervisor positions, because they represent the kind of change that should come.***" Mr. Krasner's full answer, with the language omitted by Plaintiffs reads:

> If you have a truly progressive DA, there's going to be a certain portion of the DA's office who can't stand the idea of change. They're going to leave. There are other people who are going to be made to leave because you cannot bring about real change and leave people in place who are going to fight change every step of the way. The ones who will leave will tend to be my generation, people who started in this business 30 years ago, which means they'll also tend to be white and male. That results in more openings, opportunities for greater diversity, and if we are to judge by what's happened in other jurisdictions, the office will become a tremendous magnet for new talent, because there are a ton of people who are either coming out of law school or who are mid-career who would love to work in a truly progressive DA's office but haven't been able to find any.
>
> ***That means you have really committed, dedicated, talented people who are coming into an organization that already contains the dissent, meaning people who have been there for years but might have been frustrated for years. I know some of these folks because some of them would call me and tell me what they knew about corrupt cops, but couldn't do anything about it from the inside. Those people need to stay, and in supervisor positions, because they represent the kind of change that should come***. And there are a lot of just malleable, mostly younger attorneys who did what they were told, and always wanted to do the right thing, and with proper training will do the right thing. I think real cultural change is possible.

Mr. Krasner testified he was discussing the challenges of effecting institutional change in his public statements and that he wanted the office to be a "destination for all talent," regardless of chronological age, who wanted to see reforms in the criminal justice system. Specifically, he stated:

> The reality is that what you have had in the Philadelphia DA's office for my entire career is you have had a particular philosophy. And when you have that particular philosophy, which is the same philosophy that has made this country the most incarcerated county in the world, and in many ways has torn apart all of the different things

> that we try to do to prevent crime, when you have that philosophy it
> hires people who share that philosophy. It trains people to follow that.
> It advances people who follow it.  It turns into supervisors who follow
> it. And unfortunately it is a recipe for things to become more and more
> tribal. That is what happened in that office.

Mr. Krasner further testified that his desire to disrupt the DAO's institutional culture did

not reflect a preference for younger attorneys, and that he sought out and hired mid- to late-

career and retirement-age attorneys who shared his criminal justice philosophy including Judge

Carolyn Engle Temin (83 years old) and Bob Listenbee (69 years old) who serve as his First

Assistants and many others, including: Richard Glazer (75); Ronald Simon (70); Charles

Cunningham (69); Robert Listenbee (69); Paul George (67); Flo Messier (65); Raymond Roberts

(64); Michael Giampietro (64); Vincent Corrigan (59); Patricia McKinney (59); Nancy

Winkelman (59); Jeffrey Lindy (58); Anthony Voci (54); Patricia Cummings (51); Crystal

Powell (50); Paul Reddel (47); Joseph Green (46); Noel Ann  DeSantis (43); Carrie Wood (41);

Varghese Kurian (41); and Tracey Tripp (41). Mr. Krasner further explained

> When I hired Carolyn [Engel] Temin who was well past a mandatory
> retirement age as a judge after having been a prosecutor, a public
> defender, a judge, an international human rights judge, I was hiring
> someone at 83 years of age who very clearly is not brand new and who
> is progressive. Same thing when I hired Bob Listenbee, Barack
> Obama's head of juvenile justice for the United States of America at
> an age that was close to 70. The same is true when I asked Chip Junod,
> who had been [in] this office, the DA's office for many years, to come
> back to the DA's office from other employment. And he was
> considerably older than me and has now retired. The same thing when
> I asked Guy Garant, who was in the office for many years, [and] had
> already retired. And I asked Mr. Garant who is around my age or a bit
> older, I asked him to come back. He didn't do it only because basically
> his, he would be working for free giv[en] the situation with his
> pension. I have repeatedly, repeatedly asked people who are not,
> quote, young, unquote, to come into this office. I have attracted many
> of them. Our Chief of the Conviction Integrity Unit was hired from
> Austin, Texas at about 50 years of age, one of many, many, many
> examples. Giampietro is a senior person. You know, it is not typical
> that senior people in prosecution, because of the culture, because of

the legislation that was passed, it is not typical that they have progressive views. But it is a fact that there are many senior people who have exactly what we are looking for. And it's not just that we say we would hire them, we have hired them.

Plaintiffs also present out-of-context portions of their own transcriptions of an October 7, 2017 radio interview in which Mr. Krasner used the term "old guard":

> [T]here is no question that the old guard in that [DA's] office is in control and the old guard in that office is not desiring change at all. In fact, one of them went out of his way to say that 'there is nothing wrong with this ship, the ship does not need to be righted and we do not need an outsider telling us what to do.' Well that crowd needs to go.
>
> They need to get out of the way and let people who are ex-Prosecutors who have been on the other side, let people who have a real moral compass about justice and, you know, let people who are sophisticated and modern and  understanding of the mistakes that have been made in the last fifty years. Let them run the show. And if we can really do that, then I think there are those Prosecutors who are open to those ideas and that vision then there are new Prosecutors who are going to be coming mid-career or straight out of law school.
>
> There is an old guard there [in the DA's Office] who actually thinks Lynne Abraham for 19 years was doing the right thing when frankly, she almost never did the right thing at all. You know, there's that crew, they're very loyal to a particular way of doing things. Which is very authoritarian, very unscientific, very political and they are not only going to resist, they are you might say in the throes of trying to resist even now. Those folks got to go. I mean some of them are leaving already which is a good choice and some of them are going to go.
>
> So, yes, there will be turnover . . . and people whose vision is incompatible with the progressive vision of the next District Attorney in Philadelphia, and I hope that person will be me . . . I mean they will be well-served to find another place to work.

The language misleadingly quoted in the Complaint omits the context in which the comments were made:

> ***There are a lot of prosecutors, especially these days, who I think are really fair minded people who absolutely want to do the right thing***

***and have always wanted that in a way that is, you know, directed
towards justice and equality and sees the bigger picture***, ***but*** there is
no question that the old guard in that office is in control and the old
guard in that office is not desiring change at all.

. . .

Well that crowd needs to go.  They need to get out of the way ***and let
people who are ex prosecutors who have been on the other side, let
people who have a real moral compass about justice*** and, you know,
let people who are sophisticated and modern and understanding of the
mistakes that have been made in the last fifty years.  Let them run the
show.  And if we can really do that, then ***I think there are those
prosecutors who are open to those ideas*** and that vision, then there are
new prosecutors who are going to be coming mid-career or straight out
of law school who have heard the phrase "mass incarceration" who
take seriously the idea of crime prevent as opposed to the DA's office
being a political springboard.

. . .

As I said, I think there is an old guard, ***it certainly isn't [] everyone
above a certain age, that's not the case []***, but [there] is an old guard
there.

Moreover, Mr. Krasner testified that his use of the term "old guard" in this and other

interviews has nothing to do with chronological age.

Q: When you said the old guard needs to go, what did you mean?

A: The reference [is] to the French revolution. Are you not aware of it?
Have you looked up what old guard means? It means entrenched . . . It
means the entrenched people who have been in control and who are
resistant to change. The old guard, Napoleon's guard, were not
necessarily old, they were soldiers. In fact, they were rather vigorous
soldiers and had to be of a fairly reasonable age in order to fight. That
is what old guard refers to. It refers to the people who come from an
older philosophy who are in control. They might be senior. They might
be young. But either way they are [adherents] to a philosophy and they
are unwilling to change.

[W]hen you have any organization that has taken power and that
entrenches that power over a period of time there will be some people
among them who are older. But it is a question of philosophy. It's not
in and of itself just a question of age. As you see cultural shift, as you
see a move, for example, from racial segregation in the south to the

> beginnings of racial integration in the south to more general integration in the south to new attitudes about race, what you are seeing are generational shifts. There are young white supremacists right now who want to go back and refight the Civil War. They're called the Boogaloo Boys. They are old guard. They might be 16 years old but they are old guard.

Mr. Krasner testified that he is committed to retaining and recruiting attorneys, regardless of age, who are committed to criminal justice reform. He has hired numerous people who are older from the outside and fired people who are younger. Mr. Krasner testified that he wants the office "to be a destination for all talent." He further explained that "if you are going to try to change culture then what you have to do is you have to bring in people who have different life experiences who have different perspectives."

## III.   MONETARY DAMAGES

See Plaintiffs' Memorandum.

## IV.   WITNESSES

1. District Attorney Lawrence Krasner
   3 S. Penn Square, Philadelphia, PA
   Liability

2. Rachel Mitchell
   3 S. Penn Square, Philadelphia, PA
   Liability

3. Arun Prabhakaran
   1207 Chestnut Street, Philadelphia, PA
   Liability

4. Shamika Taliaferro, BBA, MPA (or other Board of Pensions representative)
   2 Penn Plaza, 16th Floor, Philadelphia, PA
   Damages

5. Jack McMahon, Esquire
   139 N. Crosky Street, Philadelphia, PA
   Liability

6. Michael Giampietro, Esquire
   3 S. Penn Square, Philadelphia, PA
   Liability

7. Chief Deputy Attorney General Brian Zarallo
   1600 Arch Street, #300, Philadelphia, PA
   Liability

8. Assistant District Attorney Chesley Lightsey
   3 Penn Square, Philadelphia, PA
   Liability

9. Assistant District Attorney Anthony Voci
   3 Penn Square, Philadelphia, PA
   Liability

10. Jody Dodd
    3 Penn Square, Philadelphia, PA
    Liability

11. First Deputy District Attorney Robert Listenbee
    3 Penn Square, Philadelphia, PA
    Liability

12. Dustin Slaughter
    Philadelphia, PA
    Liability

Defendants reserve the right to call any witness identified by Plaintiffs and any rebuttal

witnesses that may become necessary at trial.

## V.   EXHIBITS

1. Complaint

2. Answer

3. Plaintiff Vega's Response to Defendants' Interrogatories

4. Plaintiff Vega's Supplemental Response to Defendants' Interrogatories

5. Plaintiff Vega's Second Supplemental Response to Defendants' Interrogatories

6. Plaintiff Vega's Production Pursuant to the Pilot Program Initial Discovery Protocols for
   Employment Cases Alleging Adverse Action

7.  Plaintiff Vega's Response to Defendants' Request for Production of Documents

8.  Plaintiff Whitehead's Response to Defendants' Interrogatories

9.  Plaintiff Whitehead's Response to Defendants' Request for Production of Documents

10. Plaintiff Whitehead's Production Pursuant to the Pilot Program Initial Discovery Protocols for Employment Cases Alleging Adverse Action

11. Plaintiff Whitehead's Amended Responses to his Production Pursuant to the Pilot Program Initial Discovery Protocols for Employment Cases Alleging Adverse Action

12. Plaintiffs' Supplemental Responses to Interrogatories and Supplemental Disclosures of Potential Lay Witness Opinion Testimony

13. Defendants Lawrence Krasner and City of Philadelphia's Responses to Plaintiff Vega's Interrogatories

14. Defendants Lawrence Krasner and City of Philadelphia's Responses to Plaintiff Vega's Interrogatories

15. Defendants Lawrence Krasner and City of Philadelphia's Responses to Plaintiff Vega's Request for Production of Documents

16. Defendants Lawrence Krasner and City of Philadelphia's Responses to Plaintiff Vega's Second Interrogatories

17. Any supplemental or amended discovery responses of Defendants Lawrence Krasner and City of Philadelphia, including their production pursuant to the Court's January 20, 2020 Order

18. Defendants Lawrence Krasner and City of Philadelphia's Production and Amended Production Pursuant to the Pilot Program Initial Discovery Protocols for Employment Cases Alleging Adverse Action

19. Personnel file of Carlos Vega (CITY0037-0152)

20. Personnel file of Joseph Whitehead (CITY0001-0036)

21. Deposition transcript of Lawrence Krasner

22. Deposition transcript of Carlos Vega

23. Deposition transcript of Joseph Whitehead

24. Deposition transcript of Robert Listenbee

25. Deposition transcript of Brian Zarallo

26. Deposition transcript of Anthony Voci

27. Deposition transcript of Rachel Mitchell

28. Deposition transcript of Arun Prabhakaran

29. Deposition transcript of Jack McMahon

30. Declaration of Rachel Mitchell with exhibits

31. Declaration of Chesley Lightsey with exhibits

32. Trial transcript of *Commonwealth v. Mohammad/Scott*

33.  List of Attorneys appointed to the DAO between July 2018 and September 2019

34. List of Attorneys appointed to the DAO between January 2018 and June 2018

35. January 4, 2018 Memorandum from Arun Prabhakaran to Rachel Mitchell (CITY 0413-0414)

36. List of Separated Employees (CITY0415-0416)

37. District Attorney's Office Policy Manual (CITY0192-0376)

38. District Attorney's Office At Will Employment Policy (CITY0205)

39. Pennsylvania Human Relations Commission Complaint and submissions of Carlos Vega (PV000014-PV000086)

40. Pennsylvania Human Relations Commission Answer of Respondents City of Philadelphia and Lawrence Krasner to Carlos Vega Complaint, Verified Statement of Lawrence Krasner, and Position Statement of Respondents. (CITY0153-0172)

41. Pennsylvania Human Relations Commission Complaint and submissions of Joseph Whitehead (Whitehead054-0154)

42. Pennsylvania Human Relations Commission Answer of Respondents City of Philadelphia and Lawrence Krasner to Joseph Whitehead Complaint, Verified Statement of Lawrence Krasner, and Position Statement of Respondents. (CITY0173-0191)

43. Pension documentation for Joseph Whitehead (CITY0378-0398)

44. Correspondence between Joseph Whitehead and the Board of Pensions and Retirement

45. Pension documentation for Carlos Vega (CITY0399-0412)

46. Correspondence between Carlos Vega and the Board of Pensions and Retirement

47. Carlos Vega employment and salary history (CITY0417-0419)

48. Joseph Whitehead employment and salary history (CITY0420-0422)

49. Documents created by Rachel Mitchell (CITY423-447)

50. Plaintiff Carlos Vega's emails, letters, and resumes for job applications between January 2018 and the present (including but not limited to PV000089-PV000107)

51. Plaintiff Joseph Whitehead's emails, letters, and resumes for job applications between January 2018 and the present (Whitehead175-178, 181-195)

52. Correspondence to and from Rachel Mitchell regarding Plaintiffs' separations from the DAO (including, but not limited to PV000006-000008)

53. List created by Carlos Vega of matters assigned to him at time of termination (PV000234-PV000236)

54. Memoranda regarding juvenile lifers resentencing drafted by Plaintiff Whitehead (including but not limited to Exhibits 1-3 to the Declaration of Chesley Lightsey, Whitehead Depositions Exhibits 1-2, and Whitehead210-288)

55. January 13, 2018 Philly.com Article (Exhibit 8 to Defendants' Motion for Summary Judgment)

56. September 5, 2019 McMahon Text (McMahon Deposition Exhibit 1)

57. September 18, 2018 City Life Philadelphia Magazine Article (Vega Deposition Exhibit 19).

58. Reports of Appointment and Separation

59. Demonstrative exhibits

Defendants also reserve the right to utilize any exhibits identified by Plaintiffs and any rebuttal or impeachment evidence that may become necessary during trial.

**VI.    ESTIMATED TIME OF TRIAL**

5-7 Days.

**VII.    STIPULATIONS OF COUNSEL**

None at this time.

**VIII.    OBJECTIONS TO EXHIBITS AND EVIDENCE** (SEE BELOW)

**1.    Objections to the admissibility of any exhibit based on authenticity:**

Defendants object to the introduction of various internet articles unless presented in their entirety pursuant to Federal Rule of Evidence 106.

Defendants object to the introduction of transcripts or partial transcripts of interviews or prepared by unknown individuals including: excerpts from Jacobin Radio interview of Defendant Krasner (Whitehead 110-111); WHYY interview of Defendant Krasner (Whitehead 113-114); and WBUR articles re Defendant Krasner interview (Whitehead 11-20).

**2.    Objections to the admissibility for any reason (except relevancy) of any evidence expected to be offered:**

Defendants object to the introduction of the bar passage rates of any DAO new hires as they may be viewed as prejudicial and are not probative of any matter at issue in this case.

Defendants object to the introduction of evidence about alleged incidents that occurred after Defendant Krasner's January 2018 personnel decisions, including those involving Dana Bazelon, Anthony Voci, and Movita Johnson-Harrell as they are highly prejudicial and not probative of any matter at issue in this case.

Defendants object to repetitive and redundant testimony about Plaintiffs' skills, reputation, and competence.

3. **Deposition testimony (including videotaped depositions) to be offered during a party's case-in-chief (with citations to the page and line number), including the opposing party's counter-designations.**

The parties are not presently aware of any witnesses who will be unavailable to testify at trial, necessitating the offering of deposition testimony. If a witness is unavailable to testify, or if the parties want to offer any deposition testimony into evidence, Defendants join in Plaintiffs proposal that the parties either take a trial deposition or work together to prepare the necessary deposition transcript designations.

## IX.    OTHER MATTERS

Defendants join in Plaintiffs' request that the parties be allowed additional time beyond December 7, 2020, to submit the stipulation of uncontested facts, proposed jury voir dire questions, proposed jury instructions, motions in limine, trial memoranda, and a joint statement of the case. Paragraph 12 of the Third Amended Scheduling Order states that these submissions are due seven days after the Final Pretrial Conference "[u]nless otherwise ordered."

/s/ David Smith

_____

David Smith, Esquire
Anne Kane, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Counsel for District Attorney
Lawrence Krasner

/s/ Lisa Swiatek

_____

Lisa A. Swiatek, Esquire
Benjamin Patchen, Esquire
City of Philadelphia Law Department
Labor and Employment Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

Counsel for City of Philadelphia

November 23, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CARLOS VEGA | : | |
| and | : | |
| JOSEPH WHITEHEAD, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 2:19-cv-04039 |
| | : | |
| CITY OF PHILADELPHIA AND | : | |
| LAWRENCE KRASNER | : | |
| Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Lisa Swiatek, Esquire, attorney for The City of Philadelphia and Lawrence Krasner, do hereby certify that a true and correct copy of the foregoing Pretrial Memorandum was served by way of the electronic filing system on this 23nd day of November 2020 and is available to counsel and interested parties of record.

_____
LISA A. SWIATEK