1                     IN THE UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4     MICHELLE T. SEIDNER,            :      CIVIL ACTION
                                      :
5               Plaintiff,            :
           vs.                        :
6                                     :
      CITY OF PHILADELPHIA and        :      NO. 19-4338
7     DISTRICT ATTORNEY LAWRENCE KRASNER, :
                                      :
8               Defendants.           :

9

10    CARLOS VEGA and                 :      CIVIL ACTION
      JOSEPH WHITEHEAD, JR.,          :
11                                    :
                Plaintiffs,           :
12         vs.                        :
                                      :
13    CITY OF PHILADELPHIA and        :      NO. 19-4039
      LAWRENCE S. KRASNER,            :
14                                    :
                Defendants.           :
15                                        - - - - -

16                           PHILADELPHIA, PA

17                           JANUARY 19, 2021

18    BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.

19
                     MOTION FOR SUMMARY JUDGMENT HEARING
20                   VIA VIDEO CONFERENCE IN COURTROOM 10B

21    APPEARANCES:

22                   CONSOLE MATTIACCI LAW LLC
                     BY:  KEVIN CONSOLE, ESQUIRE
23                   LANE SCHIFF, ESQUIRE
                     1525 Locust Street, 9th Floor
24                   Philadelphia, PA  19102
                     For Plaintiff Michelle Seidner
25
                     (CONT.)

```
 1   APPEARANCES:  (CONT.)

 2                 SIDKOFF, PINCUS & GREEN, P.C.
                   BY:  ROBERT A. DAVITCH, ESQUIRE
 3                 1101 Market Street, Suite 2700
                   Philadelphia, PA  19107
 4                 For Plaintiff Carlos Vega

 5
                   SIDNEY L. GOLD & ASSOCIATES, P.C.
 6                 BY:  SIDNEY L. GOLD, ESQUIRE
                   TRACI M. GREENBERG, ESQUIRE
 7                 1835 Market Street, Suite 515
                   Philadelphia, PA  19103
 8                 For Plaintiff Joseph Whitehead, Jr.

 9
                   SCHNADER HARRISON SEGAL & LEWIS LLP
10                 BY:  DAVID SMITH, ESQUIRE
                   ANNE KANE, ESQUIRE
11                 SAMANTHA BANKS, ESQUIRE
                   1600 Market Street, Suite 3600
12                 Philadelphia, PA  191013
                   For Defendant District Attorney Lawrence Krasner
13

14                 OFFICE OF THE DISTRICT ATTORNEY
                   BY:  NANCY WINKELMAN, ESQUIRE
15                 3 South Penn Square
                   Philadelphia, PA  19107
16                 For Defendant District Attorney Lawrence Krasner

17
                   CITY OF PHILADELPHIA LAW DEPARTMENT
18                 BY:  LISA A. SWIATEK, ESQUIRE
                   BENJAMIN PATCHEN, ESQUIRE
19                 1515 Arch Street, 16th Floor
                   Philadelphia, PA  19102
20                 For Defendant City of Philadelphia

21
                   KATHLEEN FELDMAN, CSR, CRR, RPR, CM
22                 Official Court Reporter
                   James A. Byrne U.S. Courthouse
23                 601 Market Street
                   Philadelphia, PA  19106
24                 (215)779-5578

25        (Transcript produced by machine shorthand via C.A.T.)
```

1            THE COURT:  Hello, everybody.  Thanks very much.

2    Everybody take your seats if you are standing.  This is the

3    time set aside for oral argument in a number of cases, all of

4    which are at least superficially related, specifically Seidner

5    versus the City of Philadelphia and Krasner, which is docketed

6    at 19-4338, and the Vega and Whitehead plaintiffs against the

7    City and Krasner, which is docketed at 19-4039.  I hope

8    everybody is now on the line.  Who is, by the way, on the

9    line?  Let's take attendance.

10           MR. DAVITCH:  Good morning, Your Honor.  Robert

11    Davitch on behalf of plaintiff Vega.

12           MS. GREENBERG:  Good morning, Your Honor.  This is

13    Traci Greenberg on behalf of plaintiff Whitehead.

14           THE COURT:  Okay, wait.  That verbal feed is

15    inadequate.  We can't hear you.

16           MR. GOLD:  Sidney Gold on behalf of Mr. Whitehead.

17           THE COURT:  Okay, Mr. Gold, you're going to have to

18    work on your verbal feed.  I don't quite know what the problem

19    is, but it's very difficult to hear you.

20           MR. CONSOLE:  This is Kevin Console on behalf of

21    Michelle Seidner.

22           THE COURT:  Okay.

23           MS. SCHIFF:  Good morning, Your Honor.  This is Lane

24    Schiff also on behalf of Michelle Seidner.

25           MR. SMITH:  Good morning, Your Honor.  This is David

1    Smith representing Lawrence Krasner.  With me are Anne Kane

2    and Samantha Banks and Nancy Winkelman with the District

3    Attorney's Office is on by telephone.

4         MS. SWIATEK:  Good morning, Your Honor.  This is

5    Lisa Swiatek from the City of Philadelphia.

6         MR. PATCHEN:  Good morning, Your Honor.  This is Ben

7    Patchen on behalf of the City of Philadelphia.

8         THE COURT:  Okay, I think that appears to be a full

9    roster of who's signed up to tell me that they're here.  You

10   should know since you're not here, in addition to me, my

11   deputy, Mr. Coyle, is here, my law clerk, Mr. Schmidt, is

12   here, and, of course, our court reporter, Ms. Feldman, is here

13   and there is one person here in the audience for whom we have.

14        I hope you can see the screen and I believe that my

15   office informed all of you that you were indeed welcome to

16   come here to court.  We expected at least one person from the

17   media to be here and, frankly, things are as quiet as a little

18   country church yard that was so daunting for people to come.

19        So we're ready to go and what I would propose,

20   frankly, is that the defense motions are roughly the same in

21   both cases, perhaps, and I know what the argument has been on

22   behalf of the defense in terms of the motions for summary

23   judgment and perhaps the most efficient use of our time would

24   be for me to first hear from the plaintiffs who are opposing

25   the motions and then the defense can come up to bat, so to

1   speak, and respond to the plaintiffs' argument.  What I would

2   ask is that all of you who are not speaking, go on whatever it

3   is you go on to be mute so that I'm not distracted by the

4   various audio systems that you've got.

5           Okay, who wants to go from the plaintiffs to

6   respond?  It doesn't matter to me whether it's counsel for

7   Seidner or counsel for Vega or counsel for Whitehead, but I

8   would ask that all of you opposing the motion try to avoid

9   repeating each other.

10          MR. CONSOLE:  Thank you, Your Honor.  I can go first

11  and this is Kevin Console on behalf of plaintiff, Michelle

12  Seidner.

13          THE COURT:  Okay, that's great.

14          MR. CONSOLE:  Your Honor, in this case, we have a

15  relatively unique scenario where our position is that there is

16  direct evidence of age bias in connection with the decisions

17  that were carried out in January 2008 by defendant Krasner.

18          THE COURT:  I'm going to interrupt you because I've

19  forgotten to say something and I'm really apologetic for

20  interrupting at this point at least.  And that is I need to

21  remind all of you that there is a federal law that prohibits

22  recording a video recording, a proceeding in federal court.

23  So to the extent some of you want to send to your mothers

24  copies of your argument today or whatever, you'll have to send

25  only audio.  You can't send a film.  So sorry to interrupt.

1    Now you can please proceed.

2              MR. CONSOLE:  Okay, thank you, Judge.

3              THE COURT:  Sure.

4              MR. CONSOLE:  And in this circuit, the analysis of

5    whether or not there's direct evidence is essentially a

6    two-part test.  The first part looks at whether or not the

7    comments reflected discriminatory bias by the decisionmaker

8    and the second part is whether or not those comments related

9    to the decisional process itself.  In other words, the adverse

10   action at issue in this case which is this January 2018

11   termination.

12             With regard to the first part of that analysis, the

13   comments that Mr. Krasner said to the media, which we

14   understand to be undisputed, represent essentially age

15   stereotypes about "old people" and "his generation" not being

16   able to change, being unwilling to embrace the new vision,

17   unable to catch up and not desiring change at all.  These are

18   stereotypes.  These are blanket statements that Mr. Krasner

19   made and he made them specifically in connection with

20   Assistant District Attorneys which is plaintiffs, all

21   plaintiffs' positions in this case, and --

22             THE COURT:  But not targeted at your client

23   specifically at least at the time, is that right?

24             MR. CONSOLE:  It's correct that he didn't reference

25   my client's name because we don't believe he knew her name at

1    that point in time.  He was as specific as he probably could

2    have been.  He was referencing the older prosecutors, the

3    older ADAs in the Philadelphia District Attorney's Office.

4    Without knowing her name, I don't believe that Mr. Krasner

5    could have really been any more specific in terms of who he

6    was talking about with those comments and I won't go through

7    all the details of the quotes and read those to you because I

8    know that those were in the briefs, but those comments clearly

9    use language that is in reference to age.  Certainly comments

10   from which a reasonable jury could conclude were referencing

11   age.  And then when we look at the second part of that

12   analysis, we look at whether or not the comments related to

13   the decisional process at issue.  And, by the way, I'm pulling

14   this language from Bullock versus Children's Hospital and also

15   Garcia v. Newtown, which was cited in defendant's brief, as

16   well as the Fakete case, and here we look at the comments

17   themselves and really the statements speak for themselves.

18   He's being asked questions in an interview either before being

19   elected as District Attorney or after he's sworn in as the

20   District Attorney.  He was asked about the changes he plans to

21   make and that's why these interviews occurred and that was the

22   purpose of the interviews and in the statements that he made,

23   he's talking about hiring.  He's literally using these words

24   hiring.  He's talking about folks who got to go.  Folks who

25   are going to be made to leave.  Employees who will be "working

1   somewhere else."  So there's really no question that the

2   statements were reflecting age and that they were made in

3   connection with the January 2018 decision.  And because we

4   have direct evidence of age discrimination --

5           THE COURT:  Well, obviously, from a technical

6   standpoint, there's the issue of whether or not there is

7   direct evidence of discriminatory hiring practice or firing

8   practice.  And whether or not instead of direct evidence, if

9   you haven't made out a sufficient presentation of direct

10  evidence, have you then, what's your position with respect to

11  the indirect evidence or the other standards that you have to

12  deal with?

13          MR. CONSOLE:  Right, Your Honor.  If the Court were

14  to conclude that the comments made by Mr. Krasner were not

15  direct evidence of discrimination, then we would turn to the

16  McDonnell Douglas circumstantial evidence framework.  And

17  under that framework, as I understand it for purposes of

18  summary judgment, defendant does not dispute that the

19  plaintiffs have established a prima facie case of

20  discrimination, at which point we'd then turn to the pretext

21  analysis, and under the pretext analysis, we look to Fuentes.

22  And under Fuentes, the plaintiff can defeat summary judgment

23  either by pointing to some evidence from which a reasonable

24  jury could disbelieve the defendant's stated reason or

25  pointing to some evidence from which a reasonable jury could

1   conclude that discrimination was at play, either of which

2   would be sufficient to defeat summary judgment.

3           THE COURT:  Well, if you don't leap over the high

4   hurdle that is in place for direct evidence cases in proving

5   discrimination, how is it that you can then deal with maybe

6   the temporal proximity issue which seems to me to be a bit of

7   a challenge for you on the circumstantial or the indirect

8   McDonnell Douglas analysis.

9           MR. CONSOLE:  Your Honor, in the Fakete case, which

10  is a Third Circuit case, the time period that the comments

11  were made was about four to five months, at least four months

12  prior to the decision at issue, and in that case, the comments

13  were determined to be direct evidence of discrimination.

14          Now, in this case, we have an even shorter time

15  period.  There were comments made in October of 2017 which is

16  just three months or so prior to the decision being made.  So

17  in line with the Fakete holding, our position is that the time

18  lapse between when the comments were made and when the action

19  occurred is not even remotely enough to defeat the direct

20  evidence argument, but also we have to consider in this case

21  that Mr. Krasner was making these comments in the months

22  leading up to the decision or the months leading up to being

23  sworn into office and he made those decisions as quickly as he

24  could.  He couldn't really have made them any sooner.  So he

25  was talking about the leading up to those decisions being made

1   and making comments not just on one occasion or two occasions,

2   but on about a half dozen occasions, he's making these

3   comments which are consistent and referencing age, and then

4   immediately upon taking office, he acts on those comments.

5          THE COURT:  Well, in terms of acting, you allege

6   that there were 30 lawyers that were terminated, whose jobs

7   were terminated, and of that group, 20 -- two-thirds of the

8   group whose jobs were discriminated were above the age of 40,

9   is that right?

10         MR. CONSOLE:  I believe that's accurate, Your Honor.

11  One of those employees, however, was not an attorney.  The

12  rest were attorneys.

13         THE COURT:  Okay, sorry about that.  And you're

14  using virtually exclusively the comments that were reported in

15  the press for the evidence that you're using against the

16  defendant of discrimination and age issues, right?

17         MR. CONSOLE:  I -- not necessarily, Your Honor.

18  There's really two things in support of the discrimination

19  end -- I'm sorry, what was that?

20         THE COURT:  No, go ahead.

21         MR. CONSOLE:  Oh, okay, I'm sorry.  The first, like

22  you said, Your Honor, are the comments regarding age and the

23  second are the statistics surrounding his hiring and firing

24  decisions.

25         Now, notice two points go to the second part of this

1  Fuentes analysis and, again, either of those would be

2  sufficient.  So those pieces of evidence --

3  THE COURT:  So they're only sufficient if they're

4  admissible evidence.  Just to humor me, how is it that the

5  comments in the press become efficacious pieces of evidence?

6  Let's see if you remember Evidence 101.

7  MR. CONSOLE:  Thank you, Your Honor.  At his

8  deposition, Mr. Krasner confirmed that he made all of those

9  statements.

10  THE COURT:  Okay.

11  MR. CONSOLE:  And so just if I may, Your Honor, just

12  to finish up that last point, the comments and the stats do go

13  towards evidence of discrimination, however, we also have

14  plenty of evidence in this case that defendant's stated

15  reasons have shifted over time, are false, and are not to be

16  believed.

17  THE COURT:  In what way --

18  MR. CONSOLE:  And that's in addition.

19  THE COURT:  Remind me what your argument is about

20  the shifting or contradictory explanations given.

21  MR. CONSOLE:  And in this regard, I'll speak only on

22  behalf of plaintiff Seidner, but in the Seidner case,

23  initially when plaintiff was terminated, she was given no

24  explanation at all.  She received her first explanation when

25  defendants provided a response to her PHRC complaint, and in

1    response, the defendants stated they essentially conducted a

2    30-year job interview where Mr. Krasner had the opportunity to

3    observe and address her performance and her courtroom demeanor

4    and things of that nature.  And then in response to the answer

5    to the complaint that was filed in this court, we saw very

6    similar stated reasons, however, about two and a half years

7    after her termination, we received defendant's interrogatory

8    responses, and then for the first time in those responses,

9    defendant claimed in a two-sentence response that plaintiff

10   was terminated specifically because of issues in her personal

11   life including specifically an alleged custody battle.  These

12   were never mentioned previously including there being no

13   mention of that stated reason in response to PHRC asking for

14   specific reasons in support of defendant's stated reason.  And

15   in that, I believe it was, December 2018 affidavit that Mr.

16   Krasner provided to the PHRC in response to that request, that

17   was a three-page affidavit, he made absolutely no mention of

18   any issues in her personal life or any issues with her

19   custody.

20         THE COURT:  Mr. Console, what is your understanding

21   as the possible justified use of personal family issues

22   vis-a-vis job performance in a termination?  You acknowledge,

23   in other words, that used correctly or used in a straightforward

24   way, that that kind of an issue can, in fact, be used to

25   terminate somebody's employment.

1          MR. CONSOLE:  Yes, Your Honor.  If the decisionmaker

2     was made aware of those issues as of the termination and if

3     those issues reasonably relate to the person's ability to

4     carry out their job, then arguably, sure, that can be a

5     legitimate stated reason, but, in this case, we have evidence

6     that Krasner wasn't even aware of this issue as of plaintiff's

7     termination.  We have evidence that this wasn't something that

8     he learned about until afterwards, and if it was something

9     that actually formed his opinion as to whether or not to

10    retain or terminate Ms. Seidner, then why did he make no

11    mention of it at all in response to that PHRC request for the

12    specific reasons?  Why was that completely omitted?  And when

13    he was asked about that at his deposition --

14         THE COURT:  Okay, could I just double check that

15    everybody's mike is off, we seem to think that Mr.

16    Davitch's mike is not yet muted, because it really helps on

17    our end in terms of hearing and understanding what's going on.

18         Go ahead, Mr. Console.

19         MR. CONSOLE:  And so, Your Honor, in this case,

20    there was really no issue in terms of plaintiff having this

21    personal confidential and highly -- it was sealed, this

22    custody battle.  It's a personal issue that she made her

23    supervisor or HR aware of and it never caused her any issues

24    at work.  It was never something that she was questioned about

25    in terms of whether this would impact her ability to carry out

1    her responsibilities.  And then to have this be thrust into

2    the spotlight years after her termination for the first time

3    where Krasner says that he learned about it through media

4    articles --

5              THE COURT:  Okay, we're going -- as you probably

6    know, one of my issues is always referring to people as Mr. or

7    Ms. or Dr. or whatever as opposed to merely last names because

8    it's part of my effort to accentuate courtesy and civility

9    with everybody.  So if you wouldn't mind indulging me when you

10   refer to the defendant, you can refer to him as Mr. Krasner.

11             MR. CONSOLE:  Of course, Your Honor.  I apologize.

12             THE COURT:  Not a problem.

13             MR. CONSOLE:  And so Mr. Krasner testified at his

14   deposition that he became aware of the custody dispute through

15   articles in the media.  That testimony is not true.  And when

16   he was asked in interrogatories to identify any media

17   publications that would have commented on that, he was unable

18   to identify or unwilling to identify a single one.  There were

19   no media publications about that.  Again, the issue was under

20   seal, it was confidential, it was personal, it was not

21   relating to her work, and it was not set forth by Krasner in

22   his response to the PHRC.  It was not set forth by Krasner in

23   his answer filed with this Court and it certainly wasn't given

24   to plaintiff as an explanation when she was terminated.  From

25   the omission of that stated reason in the PHRC response, a

1    jury could reasonably conclude that that was not something

2    that Mr. Krasner knew about or it was something that he

3    considered when deciding to terminate Seidner -- Ms. Seidner,

4    I'm sorry.

5            THE COURT:  And all of this concept of the shifting

6    reasons bears on the pending motion for summary judgment in

7    what way?

8            MR. CONSOLE:  Under the -- well, most recently, I

9    believe, in Cullen, which is Cullen versus Select Medical,

10   2019, Third Circuit, in that holding, the Court essentially

11   held that there can be no summary judgment if there's evidence

12   of a consistent explanation or shifting of stated reasons.

13           And so in this case, we have not only the shifting

14   stated reasons, but we also have the stated reasons that were

15   just false.  For instance, Mr. Krasner stated that he had a

16   30-year job interview of plaintiff where he had "extensive

17   opportunities to observe and assess her professional

18   competence, demeanor, and ethics."  That is simply not true.

19   He actually had never met plaintiff.  He couldn't recall ever

20   witnessing her in a courtroom, never had a case with --

21           THE COURT:  Well, isn't that up to the jury to

22   decide all of this?  I mean I understand your advocacy --

23           MR. CONSOLE:  Yes.

24           THE COURT:  -- but do you really need to persuade me

25   at the motion stage as to who is right or who is wrong about

1  this?  Isn't it enough for you to just point out that this is

2  a matter in dispute, it's a genuine issue of material fact,

3  and that it's a jury who should be deciding it?

4          MR. CONSOLE:  That's absolutely correct, Your Honor.

5          THE COURT:  Good.  I haven't lost my edge yet.

6          Okay, anything else, Mr. Console, on behalf of Ms.

7  Seidner?

8          MR. CONSOLE:  Yes, Your Honor.  Lastly, there is

9  what I think is a significant issue which is really the lack

10  of documentation in this case.  We have the situation where

11  there's not a single e-mail or document evidencing the reasons

12  why any of these individuals were terminated.  There's no

13  documentation of any of the factors or selection criteria that

14  were considered, and when you have this type of lack of

15  documentation and you're left simply with the dueling

16  narratives, pursuant to Johnson v. Verizon and Eno v.

17  Lumberman's, which are two cases from this Court in 2017 and

18  2012 respectively, from that lack of documentation, a jury can

19  also read that as evidence of pretext and so we have that as

20  well.

21          THE COURT:  Okay.  And after I hear from the defense

22  with respect to the motion as to Ms. Seidner, then if there's

23  something more that you need to speak about, Mr. Console, you

24  certainly may, but for now, how about if I move on to counsel

25  for the other plaintiffs unless, Mr. Smith, you or whichever

1   of your colleagues is going to be arguing want to do it

2   plaintiff by plaintiff.  It doesn't really matter.  I can keep

3   track either way.

4        MR. SMITH:  Your Honor, I think the way Your Honor

5   set it up makes the most sense.  There's a common core of

6   facts for all three and I can address them all together.

7        THE COURT:  Okay, that would be great.  So with

8   respect to the other plaintiffs, either Mr. Vega or Mr.

9   Whitehead, who wants to go next?

10       MR. DAVITCH:  I will, Your Honor.  This is Robert

11  Davitch on behalf of plaintiff Vega.  Are you able to hear me?

12       THE COURT:  I am.  Thank you very much.  Nice and

13  clear.

14       MR. DAVITCH:  Yes, nice to see you, Your Honor.  I

15  will not repeat what Mr. Console said.  I think he covered the

16  issues relating to direct evidence very adequately.

17       I also think he covered adequately the issue that

18  Mr. Krasner's statements could be circumstantial evidence of

19  age-related bias that the jury could use to infer a

20  discriminatory motive.  That argument also applies to Mr. Vega

21  as well as to Mr. Whitehead.  I should only point out, though,

22  that Mr. Krasner made one comment to the press that "those who

23  will be made to leave are those in my generation, people who

24  started in this business 30 years ago."

25       Mr. Vega had been a homicide prosecutor for exactly

1   30 years at the time his employment was terminated.  He had

2   been with the District Attorney's Office for a total of 35

3   years.  He was 61 years of age at the time and he testified

4   that he interpreted the comments to be directed to him because

5   he was in that group of people identified in the statement.

6           I would like to turn for a moment to the issue of

7   pretext as it relates to Mr. Vega's claims.

8           THE COURT:  I take it this is going to be a

9   discussion about whether or not the Scott/Muhammed trial is

10  the real reason, is that right?

11          MR. DAVITCH:  That is correct, Your Honor, and I

12  will address that issue and I will focus my comments on the

13  Scott and Muhammed trial and I will start with --

14          THE COURT:  As a preliminary matter, though, would

15  you not have to agree that a decision to terminate the

16  employment of a lawyer or an at will employee lawyer who is

17  believed to have acted unethically, whether the belief is

18  right or wrong or justified or not justified, that if somebody

19  has that belief, that would be a permissible reason to

20  discharge someone, would it not?

21          MR. DAVITCH:  Yes, Your Honor.  If it's an opinion

22  by the decisionmaker, I would agree, but in this case, Mr.

23  Vega has offered facts to dispute factual statements made by

24  Mr. Krasner with respect to what occurred in the Scott and

25  Muhammed trial.  That's one issue.  The other issue being

1    that, again, we have this concept of shifting and inconsistent

2    reasons.  I think I should address that first, Your Honor,

3    before we get into the issue of Mr. Vega's factual record that

4    disputes the factual statements that Mr. Krasner made with

5    regard to what happened in the Scott and Muhammed case.  So

6    let's talk first --

7            THE COURT:  Well, let me, though, first perhaps

8    short circuit the second position.

9            MR. DAVITCH:  Sure.

10           THE COURT:  Does it really matter in an age

11   discrimination case or an employment discrimination case

12   "who's right" about the underlying facts?  I guarantee you

13   that if this case goes to trial, we are not going to retry the

14   Scott and Muhammed trial.  You understand that, right?

15           MR. DAVITCH:  Yes.

16           THE COURT:  Okay.  So your client can be completely

17   100 percent correct in terms of what happened during that

18   proceeding and Mr. Krasner could be 100 percent wrong as to

19   what happened or his opinion could be completely not valid and

20   yet if it was the opinion that he held, erroneously, perhaps,

21   and was the reason for discharging Mr. Vega, as a federal

22   employment discrimination matter, that's okay because the

23   employer can be completely hair-brained in discharging

24   somebody, right?

25           MR. DAVITCH:  Well, Your Honor, I'm not -- yes, in

 1   terms of an opinion by the decisionmaker, but I think that the
 2   Third Circuit authorities make it clear that if the
 3   decisionmaker has stated facts to support his or her decision
 4   and if the plaintiff has evidence that actually refutes those
 5   facts, which is what Mr. Vega has done in this case, under the
 6   Tomasso case, under the Fuentes case, that is sufficient to
 7   create a genuine issue of material fact for the jury to
 8   consider.  In fact, I can go over that issue first before I
 9   turn to the issue of --
10          THE COURT:  Well, certainly I understand how that
11   enters the picture in terms of evaluating this, there's no
12   question about that, I understand that, but I am disinclined
13   to see this case playing out as a complete retrial of Scott
14   and Muhammed.
15          MR. DAVITCH:  Yes, I understand, Your Honor, but let
16   me just point out, if I may, the factual dispute, statements
17   made by Mr. Krasner about that trial that have been refuted by
18   facts presented by Mr. Vega and I will discuss three issues.
19          THE COURT:  Okay.
20          MR. DAVITCH:  First of all, Mr. Krasner stated in
21   his deposition and it's been asserted in the summary judgment
22   moving papers that Mr. Vega purposely delayed in giving him
23   documents and copying documents with respect to pretrial
24   discovery in the Scott/Muhammed case.  Mr. Vega in his
25   verification has presented a series of facts which dispute

1  that factual averment and I believe that's our Exhibit 27.

2  That's number one.

3          Number two, Mr. Krasner has asserted as a fact that

4  at the end of the Scott/Muhammed trial, after the jury had

5  convicted the defendants, Mr. Vega purposely withheld

6  mitigation evidence that Mr. Krasner could have used in the

7  penalty phase of the case.  Mr. Krasner has produced facts

8  supported by the transcript of the trial in Scott/Muhammed to

9  show that he did not withhold mitigation evidence.  In fact,

10  when Mr. Krasner requested that Mr. Vega stipulate to the fact

11  that Mr. Muhammed had been sexually abused as an 11-year-old

12  before the penalty phase was started, Mr. Vega said, "Yes, I

13  will stipulate to it."  So that's a fact that disputes a key

14  statement, a factual statement made by Mr. Krasner that Mr.

15  Vega committed misconduct at the end of the trial.  That's the

16  second point.

17          The third point, Your Honor, is that Mr. Krasner

18  testified in his deposition as a fact that one reason he

19  relied on in deciding to terminate Mr. Vega was that Mr. Vega

20  had sexually harassed a paralegal in the courtroom during the

21  course of the Muhammed/Scott trial and, in fact, Mr. Krasner

22  in his deposition was very clear as to the comment.  He said

23  he heard Mr. Vega make -- he said it was disgusting and that

24  he relied on it in connection with his decisionmaking when it

25  came time to fire Mr. Vega.

1      We presented --

2      THE COURT:  Remind me, Mr. Davitch, when was the

3 Scott/Muhammed trial chronologically?

4      MR. DAVITCH:  It ended in late December 2016.

5      THE COURT:  Okay.  Is there anything in the record

6 that reflects any effort by Mr. Krasner if he was offended by

7 what he said happened in the courtroom between Mr. Vega and

8 the paralegal?  Is there any record evidence that Mr. Krasner

9 filed some kind of a complaint or concern or report about it?

10      MR. DAVITCH:  No.  In fact, he testified that he

11 never made a complaint, a disciplinary complaint or any other

12 kind of complaint, about Mr. Vega.

13      THE COURT:  So if I understand the plaintiff's

14 theory here with respect to the role of the Scott/Muhammed

15 trial, the plaintiff is basically saying that, to sort of use

16 the vernacular, Mr. Krasner lost the case and this is all just

17 sour grapes.

18      MR. DAVITCH:  Well, yes, but, I mean, that's

19 something that Mr. Vega believes, however, he also believes

20 and the evidence supports this that the decision was based on

21 age for the reasons we discussed this morning and also based

22 on what I said in my brief.

23      Again, it's -- Mr. Vega has presented facts that

24 dispute the facts asserted by Mr. Krasner with respect to what

25 happened at the trial.  And, in addition, and I can get into

1    this in a moment in my final argument, there is evidence of

2    shifting and inconsistent reasons asserted by Mr. Krasner for

3    the decision.

4            I just wanted to point out, Your Honor, with respect

5    to Scott and Muhammed, it's not just Mr. Vega who has denied

6    that he sexually harassed the paralegal.  The paralegal has

7    provided a declaration, which we have filed in support of our

8    opposition to the summary judgment motion, in which she has

9    flatly denied that Mr. Vega sexually harassed her, said

10   anything inappropriate to her or did anything wrong to her in

11   her presence to her, said or did anything improper during or

12   in connection with that trial.

13           THE COURT:  So once again I guess your argument

14   ultimately is that the role or the use of the Scott/Muhammed

15   trial as the reason for the discharge is a matter for the jury

16   to decide.

17           MR. DAVITCH:  It is, Your Honor, and just going back

18   to the Third Circuit's decision in Burton versus Teleflex, the

19   key quote is that a plaintiff can show pretext by presenting

20   evidence from which "a fact finder could reasonably either,

21   one, disbelieve the employer's articulated legitimate reasons

22   or, two, believe that an invidious discriminatory reason was

23   more likely than not a motivating or determinative cause of

24   the employer's action."  And Mr. Vega believes that he has

25   satisfied both of those prongs.

1    And I just want to conclude my argument, if I may,

2  Your Honor, by just addressing this issue of shifting and

3  inconsistent reasons.  I know that Mr. Console did a good job,

4  a thorough job in covering it, but I just want to mention it

5  briefly with respect to Mr. Vega's claim.

6            THE COURT:  Sure.

7            MR. DAVITCH:  It's undisputed that at the time of

8  his termination, Mr. Vega was not given a reason for his

9  termination.  It is undisputed that there is no

10  contemporaneous documentation prepared by Mr. Krasner

11  regarding the reasons for his termination of Mr. -- his

12  decision to terminate Mr. Vega.

13            The first time that Mr. Krasner gave testimony with

14  respect to his decisionmaking regarding Mr. Vega was when he

15  provided a verified statement to the PHRC about one year after

16  Mr. Vega was fired.  That would have been on December 12,

17  2018.  As set forth in the verified statement itself, Mr.

18  Krasner was asked to explain in his own words the specific

19  reasons for his decision.  In his verified statement, he made

20  no mention whatsoever of the Scott/Muhammed trial.  He made no

21  mention of the alleged sexual harassment of the paralegal.

22  Rather, he stated that he conducted a 30-year job interview of

23  Mr. Vega and had extensive opportunities to observe and assess

24  his professional competence, demeanor, and ethics.  Let's stop

25  there for a minute.

1          We know he didn't conduct a 30-year job interview.
2     It's undisputed that the only trial he ever had with Mr. Vega
3     was the Scott/Muhammed case.  Beyond that, Your Honor, Mr.
4     Krasner stated in his verified PHRC statement that "Before
5     making final personnel decisions, I also supplemented my own
6     observations with those of other people knowledgeable in the
7     court system who have relevant professional interactions with
8     DAO staff or had information about them."  That statement,
9     Your Honor, is important to our pretext argument for this
10    reason.  Mr. Krasner admitted in his deposition that the only
11    person with whom he consulted before he made his final
12    decision to fire Mr. Vega was his so-called trusted advisor,
13    Mr. Giampietro.  Mr. Giampietro testified in his deposition
14    that he recommended to Mr. Krasner that Mr. Krasner retain and
15    not terminate Mr. Vega.  Mr. Giampietro testified that he
16    believed, based on his experiences with Mr. Vega and even
17    though he had some knowledge of the Scott/Muhammed trial, that
18    Mr. Vega should be kept on because he was a "very, very, very
19    good" trial lawyer.
20         So we have another disputed issue of fact.  In fact,
21    Your Honor, Mr. Giampietro went on to say that he wouldn't
22    have recommended to Mr. Krasner that anyone be kept on unless
23    he thought they were very competent in the courtroom and very
24    ethical.  That was his testimony.
25         So, again, Your Honor, we have testimony for a jury

1   to consider as to whether or not a statement made by Mr.

2   Krasner regarding the basis for his decision to fire Mr. Vega

3   was a false statement that can be discredited by a jury when

4   he says that before he made his final personnel decision, he

5   supplemented it with observations of others in the system

6   while the only person he supplemented with, according to his

7   testimony, was Mr. Giampietro and we know what he had to say.

8           And the only other thing I have to say, Your Honor,

9   is the first time we see anything or hear anything about the

10  Scott/Muhammed trial and that being a factor in Mr.

11  Krasner's decisionmaking process was when he testified at his

12  deposition on September 16, 2020.

13          Thank you very much, Your Honor.

14          THE COURT:  Okay.  And once again, just as with Mr.

15  Console, if after we hear on behalf of the defendant, you have

16  anything more you want to add, then that will be fine, too.

17          Okay, that leads to counsel for Mr. Whitehead.

18          MS. GREENBERG:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MS. GREENBERG:  My prior cocounsel has covered much

21  of what I had prepared to speak to today with respect to the

22  direct evidence as well as a lot of the law with respect to

23  the pretext analysis, but I would just like to speak briefly

24  with respect to the pretext issues that specifically relate to

25  plaintiff Whitehead in this matter.

1          With respect to Mr. Whitehead in their motion for

2    summary judgment, the defendants argue that Mr. Krasner

3    selected him for termination because he considered him to be

4    extreme in his approach to prosecutions.

5          As was previously mentioned in Fuentes versus

6    Perskie, in order for us to survive the motion for summary

7    judgment, Mr. Whitehead needs only to point to some evidence

8    from which a fact finder could reasonably disbelieve the

9    employer's articulated reasons.

10          What I'd like to address briefly, Your Honor, is

11    that there are weaknesses, contradictions, implausibilities in

12    the record that from which a reasonable fact finder could

13    rationally find that articulated reason unworthy of credence.

14          First I'd like to talk about the shifting and the

15    inconsistent reasons the defendants have proffered with

16    respect to plaintiff Whitehead.  Similar to the other two

17    plaintiffs, in January of 2018, Your Honor, at the time of Mr.

18    Whitehead's termination, Mr. Krasner failed to provide him

19    with any reason for his termination.  He was issued a letter

20    and there were no details set forth therein.

21          THE COURT:  Do you -- excuse me.  Do you think there

22    is an obligation to articulate a reason?  Once again, can an

23    employer not simply as a matter of whimsy decide to fire

24    somebody, an at will employee?

25          MS. GREENBERG:  I think, Your Honor, there is no

1    legal obligation to proffer a reason at the time of

2    termination, but as Mr. Console had mentioned, when there is a

3    lack of contemporaneous documentation, there is case law that

4    states that that can be sufficient evidence of pretext and I

5    believe he referenced the Johnson versus Verizon case from

6    2017 in our district.

7             THE COURT:  Well, as I understand it, ultimately Mr.

8    Krasner said that his decision with respect to Mr. Whitehead

9    had to do with Mr. Whitehead representing a more starchy

10   prosecutorial vent than Mr. Krasner had teed up as being his

11   signature philosophy.  Why is that not a believable reason?

12   They just had a different vision.

13            MS. GREENBERG:  Sure, Your Honor.  It is our

14   position that that is not a believable reason because it

15   wasn't proffered until such time as the litigation in this

16   case.  Like I said, there was no reason given at the time of

17   termination.  At the time of the PHRC filings, Mr. Krasner in

18   his verified statement again references his "30-year

19   interview" of Mr. Whitehead where he observed and assessed

20   him.  He referenced in his answer that Mr. Whitehead was an

21   exempt at will employee subject to termination at any time for

22   any reason.  It does not articulate anything about his

23   "starchy approach" or "extreme approach."

24            THE COURT:  Starchy is my word, I think.

25            MS. GREENBERG:  Sure.  Sure, Your Honor.  I'm happy

1   to adopt it.  An extreme approach to prosecution was never

2   mentioned until such time as this litigation and, in fact,

3   during his deposition, you know, he basically conceded that he

4   couldn't point to anything specific that helped him form the

5   basis of this opinion.  He stated that it was, you know, just

6   a reputation that he had in the community and he was pressed

7   on, well, what forms the basis of that reputation?  What cases

8   can you point to that you observed Mr. Whitehead?  He couldn't

9   identify a single case by name.  He mentioned one case that he

10  happened to recall that Mr. Whitehead had years ago before he

11  was even in the homicide unit and he couldn't remember any of

12  the details with respect to that case either.  He just said,

13  you know, this is a reputation in the community.

14          THE COURT:  Is that the reference to the juvenile

15  case?

16          MS. GREENBERG:  It was one -- it was one juvenile

17  case, correct.  However, that was years ago and he couldn't

18  remember any details or, you know, why he believed that Mr.

19  Whitehead was overly harsh in his approach in that specific

20  case.  Like I said, during his deposition, he had just spoken

21  generalities with respect to Mr. Whitehead.  He could not

22  identify any specific facts that led him to believe that Mr.

23  Whitehead had this reputation.  With respect to, you know,

24  when he was pushed on that, he testified that it was his

25  belief that Mr. Whitehead was unduly harsh with respect to his

1    work in the juvenile lifers resentencing program and, you

2    know, I believe that it has come to light that Mr. Krasner had

3    no knowledge as to any of the specific work that Mr. Whitehead

4    had done in that program until such time as after he made the

5    decision to terminate Mr. Whitehead's employment.  I think

6    that that was conceded by defendants ultimately in the

7    briefing in this case.

8         The defendants also rely on the testimony of Mr.

9    Giampietro who they identify as one of Mr. Krasner's trusted

10   advisors who provided him with insight and feedback about

11   various individuals in the department leading up to

12   their decision to carry out these terminations.  And when we

13   deposed Mr. Giampietro in the case, his testimony was

14   inconsistent.  There was at one point in his deposition when

15   he was pressed, he stated, "There was no discussion about Joe

16   Whitehead."  So I believe that, you know, the defendant's

17   reliance on any argument about Mr. Giampietro's opinions about

18   Mr. Whitehead's reputation have to be called into question

19   here and should ultimately be submitted to a jury to be the

20   finder of fact on that point.

21        The defendants also spent a lot of time in their

22   brief as it pertains to Mr. Whitehead citing to the testimony

23   of Robert Listenbee and also Chesley Lightsey, and also like I

24   had mentioned earlier, that testimony is greatly misplaced.

25        Mr. Listenbee conceded in his deposition that he had

1    no conversation with Mr. Krasner about Whitehead until

2    February of 2018 after he was hired and well after Mr.

3    Whitehead was terminated and, similarly, the record is devoid

4    of any evidence that Chesley Lightsey had any conversations or

5    provided any input to Mr. Krasner which formed his decision,

6    formed the basis of his decision to select Mr. Whitehead for

7    termination.  What we --

8           THE COURT:  My law clerks know that I have an

9    inability to ignore the concept of terminating a person.  It

10   sounds, you know, select somebody for termination has a very

11   dire sound to it.  So what I always try to remember is

12   terminating employment as opposed to the person.

13          MS. GREENBERG:  Employment.

14          THE COURT:  It's just one of the little foibles that

15   I have.  There it really sort of sounded quite dire.

16          MS. GREENBERG:  Yes, Your Honor.

17          THE COURT:  Termination of a person has a really bad

18   sound.

19          MS. GREENBERG:  Termination of employment.

20          THE COURT:  There you go.

21          MS. GREENBERG:  The other one final point I would

22   like to make is that, you know, in an effort to refute the

23   defendant's argument that Mr. Whitehead acted in a harsh and

24   cruel manner with respect to his prosecution, we come to

25   contemporaneous documentation of his supervisors who worked

1  with him on a day-to-day basis, had many occasions to observe

2  him, and I won't go over all of the quotes, but in our moving

3  papers, we refer to the performance evaluations from his last

4  two years of employment, 2016 and 2017, the remarks of

5  Jennifer Selber and I believe Brian Zarallo, then the Chief of

6  Homicide, and all of those comments were glowing commendations

7  of Mr. Whitehead.  There wasn't a single reference to any

8  unduly harsh or inappropriate method of prosecution that, you

9  know, that's basically implied by Mr. Krasner and the City in

10 this case and I think that that should be given weight, those

11 individuals.  Certainly as officers of the Court, if they were

12 observing Mr. Whitehead or believed that he was acting in an

13 inappropriate manner, overly harsh, they had a duty to raise

14 that issue.  Certainly to bring it to his attention.  And Mr.

15 Krasner chose, you know, not to look at any of that

16 information in making this decision and, you know, proffering

17 that so-called opinion with respect to his reputation.  You

18 know, we believe that the contemporaneous documentation of

19 Whitehead's work during his tenure of employment stands in

20 stark contrast to the representations that are before us in

21 the motion before us today and it's our position, Your Honor,

22 that this is important evidence and it calls into question the

23 veracity of the defendant's assertion that Mr.

24 Whitehead's employment was terminated based on any extreme

25 approach to prosecution or that he was harsh and cruel in his

1    work and, you know, as a result, we believe that these are

2    issues of fact for trial and summary judgment should be denied

3    for that reason.

4           Thank you.

5           THE COURT:  Okay.  Before I call on the defense

6    counsel, can I go back to Mr. Console for a minute.

7           As I recall, the Seidner complaint includes a count

8    under 1983 claim, an equal protection clause claim under 1983,

9    and the defense part of the motion is to point out that the

10   Third Circuit takes a rather dim view of that possible remedy

11   leaving a plaintiff to the exclusive use of the ADEA.  I don't

12   see in your briefing, Mr. Console, any addressing of the

13   subject of whether or not the equal protection clause claim

14   under Section 1983 can proceed.

15          Do you want to take a minute or two to address that?

16          MR. CONSOLE:  Yes, Your Honor, I can take even less

17   time than that.

18          After reviewing the briefing and after doing some

19   extensive research on our end of things, we are in agreement

20   that the 1983 claim for age discrimination should not proceed

21   and we will not be pursuing that avenue.

22          THE COURT:  Okay, thanks very much.  I just wanted

23   to make sure we dotted that I and crossed that T.  Thank you.

24          MR. CONSOLE:  And I should have mentioned that

25   earlier, Your Honor.  Thank you, though.

1          THE COURT:  Okay.  Well, Mr. Smith, Ms. Kane, Ms.

2    Banks, victory is yours on that one.

3          MR. SMITH:  Thank you, Your Honor.

4          THE COURT:  Righto.  Who's going to be arguing?

5          MR. SMITH:  I will be, Your Honor.

6          THE COURT:  Okay.

7          MR. SMITH:  Ms. Banks is the youngest in the room,

8    but she wasn't on the case at the time we briefed it so she's

9    spared.

10          In 2017, Mr. Krasner was a candidate and actually

11    for most of the time a long-shot candidate for District

12    Attorney in Philadelphia.  He campaigned for a dramatically

13    different approach to prosecutions and he predicted in several

14    interviews, which are before Your Honor, that, if elected, he

15    would want his own team to implement that dramatically

16    different approach and he could do that because he could have

17    his own team because District Attorney office lawyers are not

18    civil service, they are employees at will.  And we can see the

19    opposite of that playing out today in the federal government

20    where the Trump Administration is trying to place at will

21    employees into civil service jobs before tomorrow.

22          THE COURT:  Is that in our record?  Is that in our

23    record?

24          MR. SMITH:  That's not in the record.

25          THE COURT:  Okay, well --

1          MR. SMITH:  That's not in the record.

2          THE COURT:  -- then you want to focus on the record.

3          MR. SMITH:  So Mr. Krasner, in choosing his team,

4     did not need cause.  He did not need to explain.  There was no

5     legal requirement of cause or an explanation, but he was not

6     permitted to act out of age discrimination.  The interviews

7     are not evidence of age bias.  We have -- for the one print

8     interview, we have the publication.  For the oral interviews,

9     we have what report to be transcriptions prepared by

10    plaintiffs.  And for purposes of summary judgment, we are not

11    going to contest the accuracy of what they've prepared.  The

12    test, Your Honor, on whether those transcripts and the print

13    interview ought to be regarded as showing an age bias should

14    be the same as when Your Honor is looking at a lengthy article

15    or discussion for defamation.  One has to look at the entirety

16    of the article or the interview and not accept out of context

17    snippets that are otherwise explained within the article.

18    There's not a lot of case law on that concept in the age

19    discrimination case law, but there is certainly in the

20    defamation case law, and there are two Pennsylvania Supreme

21    Court cases discussing directly.  The one is the Thomas Merton

22    Center versus Rockwell, which neither of these cases are cited

23    in the brief, Your Honor --

24          THE COURT:  And that is Pennsylvania Supreme Court,

25    you say?

1      MR. SMITH:  Yes.  497 Pa. 460, 442 A.2d 213.  It's a

2  1981 Pennsylvania Supreme Court case which was decided on

3  preliminary objections.  The trial court had sustained the

4  preliminary objections.  The Superior Court reversed and the

5  Pennsylvania Supreme Court reversed the Superior Court.  And

6  the issue was precisely as we have here where the plaintiff

7  had taken snippets out of context, out of a longer piece --

8      THE COURT:  Would you agree with me, Mr. Smith, that

9  using the term snippet is a pejorative?  How do I know

10 something is a snippet as opposed to a statement?

11     MR. SMITH:  Your Honor, it never occurred to me that

12 snippet might be a derogatory term, but it is a --

13     THE COURT:  It's a quantitative term, would you not

14 agree?

15     MR. SMITH:  I will call it -- I will call it a

16 segment instead of a snippet then since that's a more neutral

17 term.  And so in that case, the plaintiff in this Thomas

18 Merton Center versus Rockwell, the plaintiff pointed to a

19 couple of sentences and said that this is defamatory and the

20 trial court and the Supreme Court were in agreement.  And this

21 is what the Supreme Court said.  "If those two paragraphs of

22 the article constituted the entire story published by the Post

23 Gazette, the innuendo urged by appellee might be reasonable.

24 However, words standing alone, which may reasonably be

25 understood as defamatory, may be so explained or qualified by

1    their context as to make the interpretation unreasonable."

2    And the Supreme Court cites the Restatement of Torts and it

3    says, "Thus we must consider the full context of the article

4    to determine the effect of the article is fairly calculated to

5    produce the impression it would naturally engender."

6             And in Tucker versus The Philadelphia Daily News,

7    which is 848 A.2d, 113, a 2004 decision by the Supreme Court,

8    again, it was the trial court's sustained preliminary

9    objections, the Superior Court reversed, and the Pennsylvania

10   Supreme Court reversed the Superior Court and dismissed the

11   defamation claims.  There were more claims than just

12   defamation, but the defamation is what's important here, and

13   they use the same sort of language as in the Merton Center

14   versus Rockwell.  "Words standing alone may reasonably be

15   understood as defamatory may be explained or qualified by

16   their context as to make such an interpretation unreasonable

17   and therefore we must consider the full context of the article

18   to determine the effect, whether the effect of the article is

19   calculated to produce a defamatory meaning."

20             And I know that Your Honor is also --

21             THE COURT:  I certainly understand why you would be

22   pointing to these two Pennsylvania cases and the law of

23   defamation, but is it not correct that in defamation actions,

24   the cause of action is really the words themselves, whereas

25   here, as I understand the role of the statement being taken

1   from the press account, which, as I understand it, Mr. Krasner
2   has, in fact, confirmed he actually uttered, but here the
3   words are just being teed up as evidence, of either direct
4   evidence of a discriminatory act or as circumstantial evidence
5   to undermine other explanations given.  So there is some
6   daylight, if you will, between the standards of the use of the
7   analysis of the language for defamation actions and the use of
8   the statements here in this case, or am I drawing too fine a
9   distinction?
10         MR. SMITH:  I don't agree with the distinction and
11   let me explain why.  There is certainly a difference in
12   looking at a defamatory statement and looking at a statement
13   that allegedly evidences age discrimination and the difference
14   is that in the defamation, you're looking at the impact of the
15   statement on others, on reputation.  With age discrimination,
16   you're looking at the intent of the party making the
17   statement.  But in both cases, where you're looking at a
18   lengthy statement and someone is pointing at an excerpt from
19   that statement as evidencing either a defamatory meaning or an
20   age discriminatory intent, in both cases, you have to look at
21   it in context to see whether the interpretation is reasonable.
22   And in both cases, I think it's the Court that has to be
23   gatekeeper on whether there is a defamatory meaning or an
24   evidence of discriminatory intent.  And if you look at each of
25   these statements, and I will take them in order, the first is

1    the May 16, 2017 article in a publication called The

2    Intercept, and that is about an eight- or a ten-page article,

3    and in it Mr. Krasner does say, "If you have a truly

4    progressive DA, there's going to be a certain portion of the

5    DA's Office who can't stand the idea of change.  They're going

6    to leave.  There are other people who are going to be made to

7    leave because you cannot bring about real change and leave

8    people in place who are going to fight change every step of

9    the way."  And then he says, and this has been quoted to Your

10   Honor, "The ones who will leave will tend to be my generation,

11   people who started in this business 30 years ago, which means

12   they'll also tend to be white and male.  All true.  And that

13   will result in more openings and so on for a more diverse

14   office which is what has happened in other jurisdictions."

15   And then he said that, "But, also, at the same time, there

16   will be those in the office who are mid" -- let me -- excuse

17   me, I took something out of order.  He then says that while

18   they are recruiting, he will not only be recruiting young

19   people, he will be recruiting those who are mid-career who

20   would love to work in a truly progressive DA's Office.

21   Mid-career for a lawyer, you're talking those 40-somethings.

22   Maybe even 50-somethings.  He then says that there are already

23   in the District Attorney's Office people who dissent from the

24   traditional view and would like to be part of a more

25   progressive District Attorney Office and what Mr. Krasner says

1   about those people is "those people need to stay and in

2   supervisor positions because they represent the kind of change

3   that should come."  So what Mr. Krasner clearly is saying is

4   that he wants to choose his team based on philosophy, not

5   based on age.  He wants to recruit mid-career people from

6   outside and he wants to retain and promote people from the

7   inside who would have demonstrated that sort of progressive

8   attitude.

9        The next, and this is something prepared by the

10   plaintiffs, is an October 17th, 2017 interview with Jacobin

11   Radio and what Mr. Krasner says there is that he wants to

12   recruit people who are ex-prosecutors who have been on the

13   other side and people who have a real moral compass and have a

14   sophisticated modern understanding of the mistakes that have

15   been made in the last 50 years, referring there to mass

16   incarceration, and let them run the show.  So, again, he's

17   talking about recruiting mid-career people.  He says there are

18   those prosecutors who are open to those ideas and that vision

19   who are going to be coming in mid-career or straight out of

20   law school and who have heard the phrase mass incarceration

21   and who take seriously the idea of crime prevention as opposed

22   to the DA's being a political springboard.  And then he says,

23   "And I think I said old guard.  It certainly" --

24        THE COURT:  You wouldn't want the District

25   Attorney's Office to be a political springboard, would we?

1          MR. SMITH:  No.  He then says in that same

2    interview, "It isn't everyone above a certain age.  That's not

3    the case, but there is an old guard there who actually think

4    Lynn Abraham for 19 years was doing right thing."

5          Now, regardless of your view of whether Mr. Krasner

6    has the right idea or whether Judge Abraham had the right

7    idea, there certainly is a wide divergence in the view of how

8    the District Attorney's Office ought to function.

9          THE COURT:  What do you do with this reference to

10   the "old guard"?

11         MR. SMITH:  Well, first, Mr. Krasner explained it

12   right there.  The old guard are those that think that Lynn

13   Abraham was doing the right thing for 19 years and he

14   explained it, he was asked in his deposition, and he explained

15   that it comes from the French revolution and that the old

16   guard actually were young people.

17         THE COURT:  Well, the Vieille Garde -- if I recall

18   correctly, it's V-i-e-i-l-l-e  G-a-r-d-e.  Vieille Garde.

19   Where is there in the record, if you would indulge me, Mr.

20   Krasner's studying of 19th century European or French

21   literature?

22         MR. SMITH:  Yes, Your Honor, that is cited in our

23   brief, and if you just give me a moment, I can find the

24   transcript reference.

25         THE COURT:  Sure, because everybody loves Le Mis,

1  but really, if I recall correctly, by the way, the old guard

2  is actually a reference to the elite troops in Napoleon's

3  army, not some sort of backwards-looking older members of an

4  organization.

5          MR. SMITH:  That's exactly right and that's what Mr.

6  Krasner testified to in his deposition, that they were

7  young --

8          THE COURT:  So he wanted to get rid of the elite

9  members of the regimen instead of just people who were part of

10  a different group.  Is that what you're really saying?

11          MR. SMITH:  Yes.  Yes.  Your Honor, what he

12  testified to in his deposition, and this is quoted on page 5

13  of our motion for summary judgment.  "The reference is to the

14  French revolution, are you not aware of it?  Have you looked

15  up what old guard means?  It means the entrenched.  It means

16  the entrenched people who have been in control and who are

17  resistant to change.  The old guard, Napoleon's old guard were

18  not necessarily old, they were soldiers, in fact, they were

19  rather vigorous soldiers and had to be a fairly reasonable age

20  in order to fight.  That is what old guard refers to.  It

21  refers to people who come from an older philosophy who are in

22  control.  They might be senior, they might be young, but

23  either way, they are adherent to a philosophy and they are

24  unwilling to change" --

25          THE COURT:  Well, I think perhaps Mr.

1   Krasner's education is within a different vent in terms of

2   European history or French.  I mean he may be just

3   tremendously facile with French.  I do believe it's an

4   interesting effort to explain the reference to old guard, and

5   maybe his teepee is really chockful of those skill sets, but I

6   think that you've got to deal with from a summary judgment

7   standpoint -- again, what a jury might do with it is not

8   something that I'm going to be foretelling here, but do you

9   not have a list of references, you can call it snippets, you

10  can call them excerpts, whatever, that are available to the

11  plaintiffs under these circumstances in this case?  I mean it

12  may very well be that, from a strategic standpoint, Mr.

13  Krasner's position would be under the case law stronger.

14  That's not to say it's not strong enough, but it could be

15  stronger if he had not said anything after the fact in terms

16  of explaining his "reasons" because, in fact, the employer can

17  be impetuous, the employer can be even venial in terms of

18  discharging an at will employee, but here you've got --

19          MR. SMITH:  We appear to have some --

20                      (Noise interference)

21          THE COURT:  Here there are some shifting sands, so

22  to speak.  So why don't you focus on that because all the

23  plaintiffs make this argument about there being the pretext.

24  I understand and, frankly, think that the direct evidence

25  issue is more problematic for the plaintiffs, but the

1    circumstantial pretext, the McDonnell Douglas issue, really

2    gives me pause and perhaps you ought to focus on that, Mr.

3    Smith.

4              MR. SMITH:  Your Honor, if I may, before I go

5    there --

6              THE COURT:  Okay.

7              MR. SMITH:  -- I just want to address something that

8    you said at the beginning of this comment, and that is I think

9    if Your Honor looks at each of the supposed agist statements,

10   every one of them says something about retaining the older

11   lawyers who are philosophically in tune with what he wants to

12   accomplish and every one of them talks about recruiting

13   mid-career lawyers who have both been prosecutors and defense

14   lawyers and are philosophically in tune with what he has

15   proposed.  And that's why even if there is going to be a

16   disagreement over what old guard means, and I think the

17   definition is well established, but --

18             THE COURT:  And how does Webster's -- how does the

19   Merriam-Webster Dictionary define old guard?  Does it not say

20   that old guard means the older members of an organization just

21   to use the dictionary?

22             MR. SMITH:  I don't have it in front of me, but I

23   will look.  In each case, the context in which what that is

24   said emphasizes the retention of senior lawyers who are in

25   tune with what he is trying to accomplish and recruitment of

1    senior lawyers and then you go from there, Your Honor, to what

2    actually did he do and what actually -- what he actually did

3    was to recruit within the first 30 days a significant number

4    of senior lawyers such that at the end of the 30 days, if you

5    look at the before and after, on January 2, when Mr. Krasner

6    took office, 33 percent of the lawyers in the District

7    Attorney's Office were over 40 years old.  Thirty days later

8    after these terminations and after the initial hires,

9    31 percent were over 40 years old.  So there is not a material

10   difference in the makeup of the office before and after and

11   all of our demographic numbers are --

12              THE COURT:  Are the denominators the same?  Because

13   when you do that kind of a percentage, really you could have

14   1 out of 3 is 30 percent or you could have 10 out of 30 or 100

15   out of 300.

16              MR. SMITH:  Right.

17              THE COURT:  What's the denominator?

18              MR. SMITH:  Right.  So let me give you the exact

19   number.  When Mr. Krasner took office, 98 out of 296 lawyers

20   were over 40 years old.  That's 33 percent.  One month later

21   after the terminations, 83 out of 268 lawyers were over 40.

22   That's 31 percent.

23              THE COURT:  Okay, so it's 15 fewer people, but at

24   roughly the same percentage.

25              MR. SMITH:  That's right, Your Honor.  And in our

1    statements, in our Statements of Material Facts at 12, 13, and

2    14, we give those numbers and those numbers are admitted.

3         Also, if you look at those who were dismissed on

4    January 5, now it is correct that out of those dismissed, 11

5    were over 50, 9 were between 40 and 49, and 10 were under 40.

6    So then the earlier statement that you had, 20 over 40, that's

7    true, but the breakout I think had meaning.  So it was fairly

8    well balanced across ages based on Mr. Krasner's impressions

9    on who would fit best on his team.

10        I think it's also worth mentioning, Your Honor, we

11   have another election coming up now and so if Mr. Krasner does

12   not win reelection -- Mr. Vega's running against him.  Let's

13   hypothesize.  Mr. Vega wins.  All those lawyers over 40, what

14   happens to them, those that are tightly aligned with Mr.

15   Krasner's view of prosecution?  Is he going keep Judge Temin?

16   Is he going to keep Robert Listenbee who was Barack

17   Obama's expert on juvenile resentencing?  Is he going to keep

18   my former partner --

19        THE COURT:  Mr. Smith, the record here is on summary

20   judgment.

21        MR. SMITH:  Yes.

22        THE COURT:  Would you focus a little bit on the

23   argument about the shifting explanations?

24        MR. SMITH:  Sure.  First, I don't think that there

25   is a shifting explanation.  I think as there is no explanation

1   at all at the outset which, as Your Honor pointed out, would

2   have been the ideal.  There is then a requirement that Mr.

3   Krasner say something and he said something superficial at the

4   outset that he knew them from 30 years of experience and

5   reputation.

6           THE COURT:  Would you agree that that's a tough row

7   to hoe to sort of document 30 years worth of evaluations?

8           MR. SMITH:  I don't think it was meant quite in that

9   way, Your Honor.  I --

10          THE COURT:  It wasn't literal.  It was hyperbolic

11  then?

12          MR. SMITH:  Well, hyperbolic would say it's over the

13  top.  I don't think it's over the top.  I think it was a poor

14  choice of words to say that he looked at their reputations and

15  thought about whether they were a good fit and decided they

16  weren't a good fit and then that was a whole lot of study, but

17  I can go into what he knew about each of them and then I think

18  for each of them, it is compelling.  So let's start with Mr.

19  Vega.

20          THE COURT:  The real point is the role of

21  explanations given and when they are given and the efficacy of

22  them as it relates to what a plaintiff might or might not be

23  able to tee up to a jury in a case of employment termination.

24          As I was trying to sort of argue -- not argue, but I

25  was trying to interact with plaintiffs' counsel, it's not so

1    much whether I today believe that the sun came up on a certain

2    day or at such and such a time or not.  It's a question of

3    what does the law allow or require me to let come in to a

4    jury.  So rather than document and dot the I's and cross the

5    T's of what Mr. Krasner knew and when he knew it, assume that

6    I agree that he knew X, Y, and Z on such and such a day.  The

7    question is for summary judgment, which as you know being a

8    very experienced lawyer that in employment cases, the Court of

9    Appeals takes a sharp pencil to summary judgment positions if

10   they're granted, and quite appropriately so, so what's the

11   role of the different reasons, the fact of different reasons

12   being given at different times for summary judgment?

13        MR. SMITH:  So, Your Honor, this may be the unusual

14   case in which the initial decision to terminate employment was

15   unaccompanied by any reason whatsoever.

16        THE COURT:  And it didn't have to be, did it?

17        MR. SMITH:  It did not have to be and then I think

18   appropriately no reason was given for employees at will.  The

19   employees then in subsequent litigation say, well, tell me

20   what you were thinking and then he did because he was required

21   to.  It's not a shifting reason.  As they dug deeper, he gave

22   deeper.  But in terms of summary judgment, the issue -- Your

23   Honor said to counsel for Mr. Vega, "Well, wasn't it just sour

24   grapes?"  And then counsel for Mr. Vega said, "Well, that's

25   what my client believes."  Well, sour grapes is a sufficient

1    reason and there is no dispute that there was a bitterly

2    fought litigation.  Your Honor has the transcript of the most

3    active day of that litigation as an exhibit in the case, and

4    that's the December 13, and Mr. Vega says in the case, "Your

5    Honor, this is the third time that counsel has tried to remove

6    me from the case."  There's no question that it was bitter and

7    Your Honor can take judicial notice.  Mr. Vega has that case

8    up on his website.  It is certainly a very important case from

9    the perspective of Mr. Krasner and from the perspective of Mr.

10   Vega and the principal dispute in that case, on which we had

11   half a dozen witnesses testify and that's only slightly

12   hyperbolic, is that Mr. Vega was caught in a lie when the

13   Court asked him, "Did you have somebody else with you?  Did

14   you have a detective with you when you spoke to Mr.

15   Krasner's witnesses out in the hallway before we came in

16   here?"  And he said, "I always have a detective with me."  And

17   one of Mr. Krasner's colleagues then went out and talked to

18   the witnesses and came back very excited and the judge said,

19   "Calm down before you speak" and said "that the witness had

20   told me that there was just Vega, there wasn't anybody else,

21   he wasn't telling you the truth," and that went to the issue

22   of disqualification from continuing.  So there's no question

23   that there is a case with hard feelings.  There is nothing

24   that's been presented to Your Honor that challenges the

25   credibility of that.  They can say that Mr. Krasner was wrong

1    in feeling that Mr. Vega was misbehaving, and they do, but

2    there's no doubt as to the depth of Mr. Krasner's belief, that

3    it's just unchallenged in the contemporaneous record of the

4    trial, and we have corroborating evidence by Jack McMahon,

5    Anthony Voci, Arun Prabhakaran, and Michael Giampietro.  All

6    of them testified to the hard feelings in that case, the

7    strength of Mr. Krasner's conviction that Mr. Vega behaved

8    badly and that Mr. Krasner would not want him in his office.

9    So that's not a reason that Mr. Krasner had to give.  It's not

10   a reason that he did give when he gave a termination notice

11   with no reason whatsoever, but it is the reason in litigation

12   when they press, Well, what were you thinking, why did you do

13   it?

14           So they also complain that Mr. Krasner didn't review

15   the reviews, the internal reviews by the District Attorney's

16   Office before making his decisions.  Well, one, he wasn't

17   required to do it.  Two, he testified that he didn't believe

18   that the criteria that were used by the District Attorney's

19   Office in prior administrations were the same criteria by

20   which he wanted to measure those who would be on his team.

21   And, in fact, when you look at Mr. Vega's employment reviews,

22   performance reviews, and that's Defendant's Exhibit 5 to our

23   summary judgment motion, Mr. Vega is praised for handling the

24   same case, the Muhammed/Scott case that formed the basis for

25   Mr. Krasner's belief that Mr. Vega was not somebody he wanted

1   on his team.

2          On Mr. Whitehead, Mr. Krasner testified that he knew

3   Mr. Whitehead to be extreme in his approach to prosecution,

4   wanting the highest charge, the longest sentence and so on,

5   and Mr. Giampietro testified that he advised Mr. Krasner not

6   to retain Mr. Whitehead and that's in our Statements of

7   Material Facts 47 to 50.

8          THE COURT:  To invoke Mr. Giampietro as to Mr.

9   Whitehead, what do you do about Mr. Giampietro's view about

10  whether or not he was consulted or had a discussion about

11  either of the other two plaintiffs?

12         MR. SMITH:  Well, I believe that Giampietro's view

13  was that he would retain Mr. Vega, but he wasn't the

14  decisionmaker.  Mr. Krasner was the decisionmaker.

15         THE COURT:  Well, that's not really why I was asking

16  you the question.  It was the embracing Mr. Giampietro's

17  assessment as to one plaintiff, but having been perhaps

18  erroneous about describing Mr. Giampietro's view about the

19  other plaintiff.

20         MR. SMITH:  Oh, okay.  I didn't understand the

21  question.

22         THE COURT:  No, no, my question was perhaps

23  inartful.

24         MR. SMITH:  I think the issue is that I'm not citing

25  Mr. Giampietro as being correct.  I'm addressing Mr.

1    Giampietro's advice only on the issue of pretext --

2              THE COURT:  Okay.

3              MR. SMITH:  -- that this is advice that he got

4    before the termination and that Mr. Giampietro and Mr. Vega

5    testified that he would have retained him, but he also

6    testified that he knew that Larry Krasner, Mr. Krasner, had

7    strong feelings about Mr. Vega based on the Muhammed/Scott

8    case and then understood why his advice would not be accepted.

9    And also in the nature of corroboration, and this goes to

10   pretext, other witnesses testified about Mr. Whitehead's

11   sentencing.  Robert Listenbee, who did not join the District

12   Attorney's Office until after the employment terminations at

13   issue here, he was Barack Obama's expert on juvenile

14   sentencing and ultimately was responsible at the top of the

15   pyramid for the juvenile resentencing required by Miller

16   versus Alabama that's still going on today, and he confirmed

17   at Statements of Material Facts 53 to 59 Mr. Whitehead's

18   extremism in sentencing.  And what we have in the exhibits

19   there, Your Honor, are Mr. Whitehead's recommendations to the

20   group that considered juvenile resentencing.  We then have --

21             THE COURT:  Did Mr. -- just, though, indulge me for

22   a minute.  Did Mr. Krasner ever mention his views about Mr.

23   Whitehead's approach to prosecution or juvenile sentencing

24   before he was deposed in this litigation?

25             MR. SMITH:  He -- Mr. Prabhakaran testified that he

1    had been made aware of Mr. Krasner's -- excuse me, made aware

2    of the view that Mr. Whitehead was extreme in his sentencing

3    recommendations and he was not asked the follow-up question of

4    who made him aware of that, but his understanding as a former

5    employee at the District Attorney's Office by the time he was

6    deposed, but as someone responsible for administration during

7    this time, was that Mr. Whitehead was extreme in his

8    sentencing based on that charge --

9           THE COURT:  I must have been unclear with my

10    question.  My question is did Mr. Krasner mention his views

11    about Mr. Whitehead's approach to prosecution judgment calls

12    or to juvenile sentencing issues before Mr. Krasner was

13    deposed in this case or was that the first time Mr. Krasner

14    uttered any view about Mr. Whitehead's approach?

15           MR. SMITH:  The first comment of record for which

16    there is either a writing or recorded testimony is in this

17    case.

18           THE COURT:  In the deposition?

19           MR. SMITH:  Yes.

20           THE COURT:  Okay.  That was my only question.  And I

21    take it there's nothing in the record that anybody else

22    recalled having a discussion with Mr. Krasner earlier on in

23    the life of these events about Mr. Whitehead and his view

24    about prosecutions?

25           MR. SMITH:  Well, that's not the case.  Mr.

1   Giampietro, whose comments we cite at Statements of Material

2   Facts 47 to 50, said that he criticized Mr. Whitehead to Mr.

3   Krasner for extreme rigidity and poor prosecutorial judgment

4   which would include the sentencing recommendations.

5           THE COURT:  And that was when?

6           MR. SMITH:  That was before Mr. Krasner took office.

7   So sometime in late December or perhaps the first of January.

8           THE COURT:  Okay.  Thank you.

9           MR. SMITH:  During the period of time Mr. Krasner

10  was considering what to do.

11          And also Brian Zarallo, who was Mr.

12  Whitehead's prior supervisor, confirmed that Whitehead

13  advocated heavier sentencing, but, again, that's not in a

14  conversation with Mr. Krasner.  That was in a deposition taken

15  by plaintiffs actually before I became involved in the case.

16          THE COURT:  Can we go back to Ms. Seidner's claim --

17          MR. SMITH:  Yes.

18          THE COURT:  -- and one of the circumstances in her

19  counsel's arguments about the shifting explanations, if you

20  will, was this reference to a child custody matter and whether

21  or not Mr. Krasner actually knew about that or if it had any

22  actual authentic role to play as then subsequently stated by

23  Mr. Krasner.  What's your understanding of the chronology on

24  that issue, Mr. Smith?

25          MR. SMITH:  Sure.  My understanding of the

1   chronology on that issue, Your Honor, is that at some point in

2   the fairly distant past, the United States Attorney's Office

3   was investigating Ms. Seidner for a potential --

4           THE COURT:  Okay, my focus is the chronology of Mr.

5   Krasner's knowledge.

6           MR. SMITH:  Right, and that's where I'm going, Your

7   Honor.

8           THE COURT:  Okay.  Sorry.

9           MR. SMITH:  And so there's -- there is in the

10  District Attorney's Office records that the U.S. Attorney was

11  investigating Ms. Seidner with respect to misuse of child

12  support money which tied into the custody matter.  Mr. Krasner

13  was asked in his deposition how he knew about that and Mr.

14  Krasner's testimony was that he thought that he had read it

15  someplace, but these are events that existed back in 2012.

16  Mr. Krasner's recollection was that he probably read it.

17          THE COURT:  Read it when?  Read it when?

18          MR. SMITH:  Back in 2012 back when -- back when

19  there was this investigation.  And I think more likely than it

20  being an article, because Mr. Krasner was unable to identify

21  an article when he was asked with a follow-up interrogatory, I

22  think his recollection of having read about it was probably

23  inaccurate and I think more likely it was gossip among defense

24  lawyers that a prosecutor was in trouble and then the U.S.

25  Attorney was investigating it.  At the same time, roughly

1    about the same time, she was involved in a very bitter custody

2    battle.  Her husband was dying -- her ex-husband was dying of

3    cancer and there was a battle over whether her birth children

4    were going to be taken care of in the custody of the

5    husband's second wife rather than returning to the first -- it

6    was something that was the subject of a lot of --

7          THE COURT:  It's a rather unattractive road to go

8    down, do you not agree?

9          MR. SMITH:  And then that's why we don't mention it

10   at all in our briefing, Your Honor.  We looked at it and --

11         THE COURT:  But Mr. Krasner listed it as a reason

12   for firing her.

13         MR. SMITH:  Well, he was asked what he knew about it

14   and he said he knew that she had this problem in her past.  He

15   was aware of it at the time and then they pressed for what he

16   knew and they dug into it and he provided all of the

17   information that he knew, which is information that probably

18   didn't belong in the deposition, but they were asking the

19   questions, he had to answer them.  They also had been

20   asking --

21         THE COURT:  What I'm asking about, is it teed up by

22   Mr. Krasner anywhere as a reason for discharging Ms. Seidner

23   and, if so, when did he mention that?  Whether it was just him

24   delighting in gossip or remembering it or whatever, when does

25   it enter into the job evaluation, if at all?

1          MR. SMITH:  I don't -- first, I don't think that it

2     does.  Mr. Krasner's testimony was he knew about it.  It

3     wasn't the reason for his decision.

4          THE COURT:  Okay.

5          MR. SMITH:  The reason for his decision is that

6     she -- her history in the office was that she was the most

7     argumentative, most --

8          THE COURT:  Shocking for a lawyer to be

9     argumentative.

10          MR. SMITH:  -- difficult to deal with.  Well, what

11     is shocking, Your Honor, is that the director from HR from

12     several prior administrations kept a separate chronology of

13     all of the trouble that Ms. Seidner caused.  The detectives

14     that refused to work for her, the health insurers that said

15     that they didn't want to deal directly with her, it had to be

16     through a chart.

17          THE COURT:  It must have been before HIPAA.

18          MR. SMITH:  Maybe.  The subordinates who complained

19     to HR that she was impatient with them and called them stupid

20     and dumb and incompetent and, in fact, one of the witnesses in

21     this case actually had worked for her many, many years earlier

22     and then he testified that he was subjected to that and that

23     actually that was her reputation.  But, again, no reason was

24     required, no reason was given when she was -- when her

25     employment was terminated, and as the plaintiffs pressed for

1   "what were you thinking," Mr. Krasner told what he was

2   thinking, but the reason is he terminated them without a

3   reason and that was his right.

4           THE COURT:  Well, Mr. Smith, I know, as you know I

5   know, you have a well-deserved long reputation of representing

6   a lot of lawyers and from that I'm sure you have concluded and

7   made the same observation that many of us have that lawyers

8   are delightful witnesses.  But there it is.  It's a truth, is

9   it not?

10          MR. SMITH:  Well, yes, that is a truism, Your Honor.

11          THE COURT:  Okay.  Anything else?  Anything else you

12  want to add here because I want to give the plaintiffs'

13  counsel a very, very short opportunity to volley a little bit

14  here, but I pretty much have a good sense of the summary

15  judgment issues.

16          MR. SMITH:  So, in any event, Mr. Giampietro and Mr.

17  Zarallo, both people who knew her and we've got that in our

18  Statements of Material Facts, both of them were critical of

19  her and Mr. Zarallo said about Ms. Seidner, "Frankly, counsel,

20  she's not one of the people I would go to the wall defending.

21  You know, I'm aware of her through reputation and some things

22  like that and also of some things I've learned in an

23  unofficial capacity."  And Anthony Voci testified to her -- to

24  her mistreatment of subordinates, including him.  So -- and

25  that's it, Your Honor.

1          THE COURT:  But why -- okay, but the ultimate

2     question continues to be why is not all of this, unattractive

3     as some of it might be, not a matter for the jury to decide?

4          MR. SMITH:  Your Honor, the simplest answer to that

5     is that the statements on which they relied for evidence of

6     age discrimination are not, when read in their entirety,

7     evidence of age discrimination, and the data on which they

8     rely which they say also shows age discrimination, when looked

9     at in context, is not evidence of age discrimination.

10         THE COURT:  So ultimately the defense position has

11    to do with the district court, the trial court's gatekeeping

12    role; is that fair to summarize?

13         MR. SMITH:  That is fair, Your Honor, yes.

14         THE COURT:  Okay.  Great.

15         To be fair, now let me make good on my offer to the

16    various plaintiffs' counsel to speak briefly if, as a result

17    of the Court's questions and interaction with Mr. Smith, you

18    have anything that you feel a burning desire to say.

19         MR. CONSOLE:  Thank you, Your Honor.  If I may, I

20    will keep it brief.  This is Kevin Console on behalf of

21    Michelle Seidner.

22         THE COURT:  Right.

23         MR. CONSOLE:  One of the issues that counsel for

24    defendant just referenced was an alleged investigation,

25    federal investigation regarding plaintiff.  That

1   investigation, if you want to call it that, ended after one

2   meeting with plaintiff where she was cleared of any wrongdoing

3   and she was never charged with any type of crime.  The issue

4   was entirely dismissed.  So she was never, to use counsel's

5   phrase, in trouble.  This was an issue that Mr. Krasner set

6   forth in this case.  Any questioning that plaintiff did of Mr.

7   Krasner was because Mr. Krasner had thrust it into the

8   spotlight in this case and I just want to point out that

9   counsel made a number of statements about the details of the

10  custody issue, which I don't believe are in the record in this

11  case and I don't believe are accurate, so I won't get into

12  back and forth on that, but I just want the record today to

13  reflect that.

14          And then, lastly, I'll just close, Your Honor, with

15  a couple of points.

16          One, defendant's argument as to how a jury should

17  interpret Mr. Krasner's comments that he made to the media are

18  just that, they're arguments for the jury on a dispute of

19  material facts.  For purposes of summary judgment, with all

20  factual disputes, genuine factual disputes to be determined in

21  favor of plaintiff, it should be determined that those

22  statements do, in fact, show a discriminatory animus and even

23  if we were to put those entire statements into the record and

24  let a jury read the entire statement or statements that Mr.

25  Krasner made, we would still argue that a reasonable jury

1  could conclude from the entire context that those statements

2  evidence an age bias.

3          And then, lastly, there is evidence in Ms.

4  Seidner's case that Mr. Krasner set forth a false stated

5  reason and that is, among other things, that "he had been able

6  to conduct what essentially amounted to a 30-year job

7  interview during which he had extensive opportunities to

8  observe and assess her performance, competence, demeanor and

9  ethics."  When Mr. Krasner was asked about that statement at

10 his deposition, he said, "I would say we had insufficient

11 information to make that claim."

12         In accordance with Fuentes and Cullen, Third Circuit

13 precedent, this false and shifting stated reason alone would

14 be sufficient to defeat summary judgment.

15         And that's all I have at this time, Your Honor.

16 Thank you.

17         THE COURT:  Okay.  Before I go and ask other

18 plaintiffs' counsel, I meant to ask Ms. Swiatek or Mr. Patchen

19 if they had anything to add to supplement Mr. Smith's comments.

20         I didn't mean to --

21         MS. SWIATEK:  Thank you, Your Honor.  Thank you very

22 much, Your Honor.  We do not have anything additional to add.

23         THE COURT:  Okay, thanks.  So that's going back to

24 either Ms. Greenberg or Mr. Gold -- or Mr. Davitch.

25         MR. DAVITCH:  It's me, Your Honor, Mr. Davitch.  I

1   just have three brief points to make, Your Honor, and then

2   I'll be finished with my arguments.

3       First, I did not mean to state or suggest that the

4   only reason why Mr. Krasner terminated Mr. Vega's employment

5   was based upon his sour grapes as a result of the

6   Scott/Muhammed trial.  He may have had sour grapes.  In fact,

7   he lost a first degree murder trial to Mr. Vega, but that does

8   not overcome Mr. Vega's argument that he was discriminated

9   against because of his age by Mr. Krasner based on all the

10  facts we presented to the Court.  That's number one.

11      Number two, Mr. Smith mentions statistics and how

12  Mr. Krasner hired older employees shortly after he came on

13  board.  One fact that was omitted, which is part of a record,

14  is that from July of 2018 to September of 2019, Mr. Krasner

15  recruited and hired a total of 138 attorneys for his office

16  and 127 of them were under the age of 40.  88 of those 127

17  were under the age of 30.  So if we're going to look at

18  statistics, we have to look at the whole picture, not just a

19  snapshot in time.

20      My third argument is based on the argument --

21      THE COURT:  Well, do you know what they say, Mr.

22  Davitch, about statistics --

23      MR. DAVITCH:  Statistics --

24      THE COURT:  -- how they are manipulated or --

25      MR. DAVITCH:  Yes, I know that, but I still think I

1    had to point that out just for the record.

2            THE COURT:  Okay.

3            MR. DAVITCH:  Because it's not as obvious as Mr.

4    Smith might have us believe.

5            And the third and final argument I will make is

6    based on Mr. Smith's comment about an entry in one of Mr.

7    Vega's performance reviews.  If we're going to look at Mr.

8    Vega's performance reviews to determine whether or not the

9    asserted reasons for pretextual -- we should look at them all,

10   and if we look at all of Mr. Vega's performance reviews, we

11   will see that his supervisors over the course of years found

12   that he was not only an outstanding prosecutor, but reported

13   that he was very fair and ethical.  In fact, we've presented

14   not only his performance appraisals, but also the testimony of

15   four of his supervisors.

16           That's all I have, Your Honor.  Thank you.

17           THE COURT:  Okay, and that would lead to either Ms.

18   Greenberg or Mr. Gold on behalf of Mr. Whitehead.

19           MS. GREENBERG:  Yes, Your Honor, just one final

20   point that I would like to make just to make sure that the

21   record is clear.  When Mr. Smith was beginning, I believe that

22   you had asked him to what extent did Mr. Krasner have any

23   specific information regarding Whitehead's sentencing history

24   or resentencing prior to making the decision to terminate his

25   employment and I believe that Mr. Smith referred the Court to

1    the testimony of Mr. Giampietro.  I would just like to read

2    the actual testimony to Your Honor if I may.

3            THE COURT:  Yes.

4            MS. GREENBERG:  The question that was posed:  The

5    experiences that you had with Mr. Whitehead when you had

6    either tried cases with him or had been involved in a juvenile

7    lifer process of resentencing juveniles, did you ever have

8    occasion to discuss these issues with Mr. Krasner prior to the

9    point in time when he took office in January of 2018?

10           Answer:  The answer is Mr. Whitehead was a pain in

11   the ass and a pain in the ass to everybody.  Everything was

12   full speed ahead whether he lost or not.  He didn't know how

13   to evaluate a case in my opinion.  Mr. Krasner, I don't know

14   if he had experiences with him or not.  I'm sure that he might

15   have.  Krasner talked to a lot of people.  I'm sure other

16   people expressed it.  My conversations with Larry Krasner

17   concerning Joe Whitehead would have been limited to -- I never

18   had a sit-down where we went through Joe Whitehead, you know.

19   My opinion on what he did with juvenile lifers, I've heard

20   reference to a list.  I didn't have a list.  Maybe the day of

21   or prior to, I saw something.  Must have been on paper.  I'm

22   assuming that.  If Whitehead's name came up, all I would say,

23   I wouldn't keep him.  I don't remember Larry other than maybe

24   would you keep him and me going no.  There was no discussion

25   about Joe Whitehead.  There was no big discussion between

1    myself and Larry Krasner.

2          Your Honor, I just think that that is significant to

3    note because Mr. Giampietro is the only individual that the

4    defendants have identified as having conveyed any information

5    to Mr. Krasner related to any alleged successive sentences

6    being rendered and, as a result, I think it's an issue of fact

7    that should ultimately go to the jury.

8          Thank you.

9          THE COURT:  Okay, anything more from anybody?

10                        (No response)

11         THE COURT:  Okay.  Well, thank you all very much.

12         MR. SMITH:  No, Your Honor.

13         THE COURT:  It was a nice way to spend a couple of

14   hours to actually hear an oral argument.  You all prepared

15   very nicely, very thoroughly.  None of that, of course, can

16   hide the fact that there are very few cases that are less

17   pleasant to deal with than cases involving lawyers squabbling

18   with other lawyers on a fact pattern, but that's what we've

19   got here.  So you all have done as good a job as can be done

20   to try and ameliorate or take this above the fray to make it

21   an actual legal issue and argument and the Court appreciates

22   that.  As you know, if you wish to get a copy of the

23   transcript, you should reach out to Ms. Feldman and work with

24   her about getting a copy of the transcript.  I do not feel the

25   need to offer you all any opportunity to supplement your

1    written submissions on the pending motions.  Obviously, if

2    between now and when you hear from me in terms of a result,

3    there is any meaningful development in the case law that

4    focuses on an issue actually at issue in this case, you should

5    let me know, but, otherwise, I'm not inclined to solicit any

6    more briefing.

7           Anybody have a problem with that?

8           MR. SMITH:  None whatsoever, Your Honor.

9           THE COURT:  Okay.  Well, that's good news.  Thank

10   you very much.  Have a good rest of your day.  Stay well and I

11   will look forward to actually seeing you all in court in a

12   matter in the not-too-distant future, but hope springs

13   eternal.  Take care, everybody.  Thanks.  We're adjourned.

14          ALL COUNSEL:  Thank you, Your Honor.

15                 (Court adjourned)

16

17               C E R T I F I C A T E

18       I certify that the foregoing is a correct transcript

19   from the record of the proceedings in the above-entitled

20   matter.

21

22   _____
                     *Kathleen Feldman*

23                   Kathleen Feldman, CSR, CRR, RPR, CM
                     Official Court Reporter

24

25   Date: _____  January 21, 2021

## 1

**1** [1] - 45:14
**10** [2] - 45:14, 46:5
**100** [3] - 19:17, 19:18, 45:14
**101** [1] - 11:6
**10B** [1] - 1:20
**11** [1] - 46:4
**11-year-old** [1] - 21:11
**1101** [1] - 2:3
**113** [1] - 37:7
**12** [2] - 24:16, 46:1
**127** [2] - 62:16
**13** [2] - 46:1, 49:4
**138** [1] - 62:15
**14** [1] - 46:2
**15** [1] - 45:23
**1515** [1] - 2:19
**1525** [1] - 1:23
**16** [2] - 26:12, 39:1
**1600** [1] - 2:11
**16th** [1] - 2:19
**17th** [1] - 40:10
**1835** [1] - 2:7
**19** [3] - 1:17, 41:4, 41:13
**19-4039** [2] - 1:13, 3:7
**19-4338** [2] - 1:6, 3:6
**191013** [1] - 2:12
**19102** [2] - 1:24, 2:19
**19103** [1] - 2:7
**19106** [1] - 2:23
**19107** [2] - 2:3, 2:15
**1981** [1] - 36:2
**1983** [4] - 33:8, 33:14, 33:20
**19th** [1] - 41:20

## 2

**2** [1] - 45:5
**20** [2] - 10:7, 46:6
**2004** [1] - 37:7
**2008** [1] - 5:17
**2012** [3] - 16:18, 55:15, 55:18
**2016** [2] - 22:4, 32:4
**2017** [7] - 9:15, 16:17, 28:6, 32:4, 34:10, 39:1, 40:10
**2018** [6] - 6:10, 8:3, 12:15, 24:17, 27:17, 31:2, 62:14, 64:9
**2019** [2] - 15:10, 62:14

**2020** [1] - 26:12
**2021** [1] - 1:17
**213** [1] - 36:1
**215)779-5578** [1] - 2:24
**268** [1] - 45:21
**27** [1] - 21:1
**2700** [1] - 2:3
**296** [1] - 45:19

## 3

**3** [2] - 2:15, 45:14
**30** [11] - 10:6, 17:24, 18:1, 39:11, 45:3, 45:4, 45:14, 47:4, 47:7, 62:17
**30-year** [6] - 12:2, 15:16, 24:22, 25:1, 28:18, 61:6
**300** [1] - 45:15
**31** [2] - 45:9, 45:22
**33** [2] - 45:6, 45:20
**35** [1] - 18:2
**3600** [1] - 2:11

## 4

**40** [10] - 10:8, 45:7, 45:9, 45:20, 45:21, 46:5, 46:6, 46:13, 62:16
**40-somethings** [1] - 39:21
**442** [1] - 36:1
**460** [1] - 36:1
**47** [2] - 51:7, 54:2
**49** [1] - 46:5
**497** [1] - 36:1

## 5

**5** [3] - 42:12, 46:4, 50:22
**50** [4] - 40:15, 46:5, 51:7, 54:2
**50-somethings** [1] - 39:22
**515** [1] - 2:7
**53** [1] - 52:17
**59** [1] - 52:17

## 6

**601** [1] - 2:23
**61** [1] - 18:3

## 8

**83** [1] - 45:21
**848** [1] - 37:7
**88** [1] - 62:16

## 9

**9** [1] - 46:5
**98** [1] - 45:19
**9th** [1] - 1:23

## A

**A.2d** [2] - 36:1, 37:7
**ability** [2] - 13:3, 13:25
**able** [4] - 6:16, 17:11, 47:23, 61:5
**above-entitled** [1] - 66:19
**Abraham** [3] - 41:4, 41:6, 41:13
**absolutely** [2] - 12:17, 16:4
**abused** [1] - 21:11
**accentuate** [1] - 14:8
**accept** [1] - 35:16
**accepted** [1] - 52:8
**accomplish** [2] - 44:12, 44:25
**accordance** [1] - 61:12
**according** [1] - 26:6
**account** [1] - 38:1
**accuracy** [1] - 35:11
**accurate** [2] - 10:10, 60:11
**acknowledge** [1] - 12:22
**act** [2] - 35:6, 38:4
**acted** [2] - 18:17, 31:23
**acting** [1] - 10:5, 32:12
**ACTION** [2] - 1:4, 1:10
**action** [4] - 6:10, 9:18, 23:24, 37:24
**actions** [2] - 37:23, 38:7
**active** [1] - 49:3
**acts** [1] - 10:4
**actual** [3] - 54:22, 64:2, 65:21
**ADAs** [1] - 7:3
**add** [4] - 26:16,

58:12, 61:19, 61:22
**addition** [3] - 4:10, 11:18, 22:25
**additional** [1] - 61:22
**address** [7] - 12:3, 17:6, 18:12, 19:2, 27:10, 33:15, 44:7
**addressing** [3] - 24:2, 33:12, 51:25
**ADEA** [1] - 33:11
**adequately** [2] - 17:16, 17:17
**adherent** [1] - 42:23
**adjourned** [2] - 66:13, 66:15
**Administration** [1] - 34:20
**administration** [1] - 53:6
**administrations** [2] - 50:19, 57:12
**admissible** [1] - 11:4
**admitted** [2] - 25:10, 46:2
**adopt** [1] - 29:1
**adverse** [1] - 6:9
**advice** [3] - 52:1, 52:3, 52:8
**advised** [1] - 51:5
**advisor** [1] - 25:12
**advisors** [1] - 30:10
**advocacy** [1] - 15:22
**advocated** [1] - 54:13
**affidavit** [2] - 12:15, 12:17
**afterwards** [1] - 13:8
**age** [33] - 5:16, 6:14, 7:9, 7:11, 8:2, 8:4, 10:3, 10:8, 10:16, 10:22, 17:19, 18:3, 19:10, 22:21, 33:20, 35:6, 35:7, 35:13, 35:18, 38:13, 38:15, 38:20, 40:5, 41:2, 42:19, 59:6, 59:7, 59:8, 59:9, 61:2, 62:9, 62:16, 62:17
**age-related** [1] - 17:19
**ages** [1] - 46:8
**agist** [1] - 44:9
**ago** [4] - 17:24, 29:10, 29:17, 39:11
**agree** [8] - 18:15, 18:22, 36:8, 36:14, 38:10, 47:6, 48:6, 56:8
**agreement** [2] - 33:19, 36:20

**ahead** [3] - 10:20, 13:18, 64:12
**Alabama** [1] - 52:16
**aligned** [1] - 46:14
**ALL** [1] - 66:14
**allege** [1] - 10:5
**alleged** [4] - 12:11, 24:21, 59:24, 65:5
**allegedly** [1] - 38:13
**allow** [1] - 48:3
**alone** [3] - 36:24, 37:14, 61:13
**ameliorate** [1] - 65:20
**amounted** [1] - 61:6
**analysis** [9] - 6:4, 6:12, 7:12, 8:21, 9:8, 11:1, 26:23, 38:7
**animus** [1] - 60:22
**ANNE** [1] - 2:10
**Anne** [1] - 4:1
**answer** [7] - 12:4, 14:23, 28:20, 56:19, 59:4, 64:10
**Anthony** [2] - 50:5, 58:23
**apologetic** [1] - 5:19
**apologize** [1] - 14:11
**Appeals** [1] - 48:9
**appear** [1] - 43:19
**APPEARANCES** [1] - 1:21
**aPPEARANCES** [1] - 2:1
**appellee** [1] - 36:23
**applies** [1] - 17:20
**appraisals** [1] - 63:14
**appreciates** [1] - 65:21
**approach** [12] - 27:4, 28:23, 29:1, 29:19, 32:25, 34:13, 34:16, 51:3, 52:23, 53:11, 53:14
**appropriately** [2] - 48:10, 48:18
**Arch** [1] - 2:19
**arguably** [1] - 13:4
**argue** [4] - 27:2, 47:24, 60:25
**arguing** [2] - 17:1, 34:4
**argument** [22] - 3:3, 4:21, 5:1, 5:24, 9:20, 11:19, 17:20, 23:1, 23:13, 24:1, 25:9, 30:17, 31:23, 43:23, 46:23, 60:16, 62:8, 62:20, 63:5, 65:14,

65:21
argumentative [2] - 57:7, 57:9
arguments [3] - 54:19, 60:18, 62:2
army [1] - 42:3
article [12] - 35:14, 35:16, 35:17, 36:22, 37:3, 37:4, 37:17, 37:18, 39:1, 39:2, 55:20, 55:21
articles [2] - 14:4, 14:15
articulate [2] - 27:22, 28:22
articulated [3] - 23:21, 27:9, 27:13
Arun [1] - 50:5
aside [1] - 3:3
ass [2] - 64:11
asserted [5] - 20:21, 21:3, 22:24, 23:2, 63:9
assertion [1] - 32:23
assess [3] - 15:17, 24:23, 61:8
assessed [1] - 28:19
assessment [1] - 51:17
Assistant [1] - 6:20
ASSOCIATES [1] - 2:5
assume [1] - 48:5
assuming [1] - 64:22
attendance [1] - 3:9
attention [1] - 32:14
attitude [1] - 40:8
attorney [1] - 10:11
ATTORNEY [2] - 1:7, 2:14
Attorney [9] - 2:12, 2:16, 7:19, 7:20, 34:12, 34:17, 39:25, 55:10, 55:25
Attorney's [13] - 4:3, 7:3, 18:2, 39:23, 40:25, 41:8, 45:7, 50:15, 50:18, 52:12, 53:5, 55:2, 55:10
Attorneys [1] - 6:20
attorneys [2] - 10:12, 62:15
audience [1] - 4:13
audio [2] - 5:4, 5:25
authentic [1] - 54:22
authorities [1] - 20:2
available [1] - 43:10
avenue [1] - 33:21
averment [1] - 21:1
avoid [1] - 5:8

aware [10] - 13:2, 13:6, 13:23, 14:14, 42:14, 53:1, 53:4, 56:15, 58:21

## B

backwards [1] - 42:3
backwards-looking [1] - 42:3
bad [1] - 31:17
badly [1] - 50:8
balanced [1] - 46:8
BANKS [1] - 2:11
Banks [3] - 4:2, 34:2, 34:7
Barack [2] - 46:16, 52:13
based [13] - 22:20, 22:21, 25:16, 32:24, 40:4, 40:5, 46:8, 52:7, 53:8, 62:5, 62:9, 62:20, 63:6
basis [6] - 26:2, 29:5, 29:7, 31:6, 32:1, 50:24
bat [1] - 4:25
battle [4] - 12:11, 13:22, 56:2, 56:3
bears [1] - 15:6
became [2] - 14:14, 54:15
become [1] - 11:5
BEFORE [1] - 1:18
beginning [2] - 44:8, 63:21
behalf [14] - 3:11, 3:13, 3:16, 3:20, 3:24, 4:7, 4:22, 5:11, 11:22, 16:6, 17:11, 26:15, 59:20, 63:18
behaved [1] - 50:7
belief [5] - 18:17, 18:19, 29:25, 50:2, 50:25
believable [2] - 28:11, 28:14
believes [4] - 22:19, 23:24, 48:25
belong [1] - 56:18
Ben [1] - 4:6
BENJAMIN [1] - 2:18
best [1] - 46:9
between [6] - 9:18, 22:7, 38:6, 46:5, 64:25, 66:2
beyond [1] - 25:3
bias [6] - 5:16, 6:7, 17:19, 35:7, 35:13,

61:2
big [1] - 64:25
birth [1] - 56:3
bit [3] - 9:6, 46:22, 58:13
bitter [2] - 49:6, 56:1
bitterly [1] - 49:1
blanket [1] - 6:18
board [1] - 62:13
brained [1] - 19:23
breakout [1] - 46:7
Brian [2] - 32:5, 54:11
brief [7] - 7:15, 22:22, 30:22, 35:23, 41:23, 59:20, 62:1
briefed [1] - 34:8
briefing [5] - 30:7, 33:12, 33:18, 56:10, 66:6
briefly [4] - 24:5, 26:23, 27:10, 59:16
briefs [1] - 7:8
bring [2] - 32:14, 39:7
Bullock [1] - 7:14
burning [1] - 59:18
Burton [1] - 23:18
business [2] - 17:24, 39:11
BY [6] - 1:22, 2:2, 2:6, 2:10, 2:14, 2:18
byrne [1] - 2:22

## C

C.A.T [1] - 2:25
calculated [2] - 37:4, 37:19
Calm [1] - 49:19
campaigned [1] - 34:12
cancer [1] - 56:3
candidate [2] - 34:10, 34:11
cannot [1] - 39:7
capacity [1] - 58:23
care [2] - 56:4, 66:13
career [6] - 39:19, 39:21, 40:5, 40:17, 40:19, 44:13
CARLOS [1] - 1:10
Carlos [1] - 2:4
carried [1] - 5:17
carry [3] - 13:4, 13:25, 30:12
case [78] - 5:14, 6:10, 6:21, 7:16, 8:19, 9:9, 9:10, 9:12, 9:14,

9:20, 11:14, 11:22, 13:5, 13:19, 15:13, 15:20, 16:10, 18:22, 19:5, 19:11, 19:13, 20:5, 20:6, 20:13, 20:24, 21:7, 22:16, 25:3, 28:3, 28:5, 28:16, 29:9, 29:12, 29:15, 29:17, 29:20, 30:7, 30:13, 32:10, 34:8, 35:18, 35:19, 35:20, 36:2, 36:17, 38:8, 41:3, 43:11, 43:13, 44:23, 47:23, 48:14, 49:3, 49:4, 49:6, 49:7, 49:8, 49:10, 49:23, 50:6, 50:24, 52:8, 53:13, 53:17, 53:25, 54:15, 57:21, 60:6, 60:8, 60:11, 61:4, 64:13, 66:3, 66:4
cases [15] - 3:3, 4:21, 9:4, 16:17, 29:7, 35:21, 35:22, 37:22, 38:17, 38:20, 38:22, 48:8, 64:6, 65:16, 65:17
catch [1] - 6:17
caught [1] - 49:12
caused [1] - 13:23, 57:13
Center [1] - 35:22, 36:18, 37:13
century [1] - 41:20
certain [3] - 39:4, 41:2, 48:1
certainly [12] - 7:9, 14:23, 16:24, 20:10, 32:11, 32:14, 35:19, 37:21, 38:11, 40:23, 41:7, 49:8
certify [1] - 66:18
challenge [1] - 9:7
challenges [1] - 49:24
change [8] - 6:16, 6:17, 39:5, 39:7, 39:8, 40:2, 42:17, 42:24
changes [1] - 7:20
charge [2] - 51:4, 53:8
charged [1] - 60:3
chart [1] - 57:16
check [1] - 13:14
Chesley [2] - 30:23, 31:4
Chief [1] - 32:5
child [2] - 54:20, 55:11

children [1] - 56:3
Children's [1] - 7:14
chokful [1] - 43:5
choice [1] - 47:14
choose [1] - 40:4
choosing [1] - 35:3
chose [1] - 32:15
chronologically [1] - 22:3
chronology [4] - 54:23, 55:1, 55:4, 57:12
church [1] - 4:18
circuit [2] - 6:4, 19:8
Circuit [5] - 9:10, 15:10, 20:2, 33:10, 61:12
Circuit's [1] - 23:18
circumstances [2] - 43:11, 54:18
circumstantial [5] - 8:16, 9:7, 17:18, 38:4, 44:1
cite [1] - 54:1
cited [3] - 7:15, 35:22, 41:22
cites [1] - 37:2
citing [2] - 30:22, 51:24
City [6] - 2:20, 3:5, 3:7, 4:5, 4:7, 32:9
CITY [1] - 1:6, 1:13, 2:17
civil [4] - 1:4, 1:10, 34:18, 34:21
civility [1] - 14:8
claim [7] - 24:5, 33:8, 33:13, 33:20, 54:16, 61:11
claimed [1] - 12:9
claims [3] - 18:7, 37:11
clause [2] - 33:8, 33:13
clear [4] - 17:13, 20:2, 21:22, 63:21
cleared [1] - 60:2
clearly [2] - 7:8, 40:3
clerk [1] - 4:11
clerks [1] - 31:8
client [3] - 6:22, 19:16, 48:25
client's [1] - 6:25
close [1] - 60:14
CM [2] - 2:21, 66:23
cocounsel [1] - 26:20
colleagues [2] - 17:1, 49:17
coming [2] - 40:19,

**connection** [5] - 5:16, 6:19, 8:3, 21:24, 23:12

**consider** [5] - 9:20, 20:8, 26:1, 37:3, 37:17

**considered** [4] - 15:3, 16:14, 27:3, 52:20

**considering** [1] - 54:10

**consistent** [2] - 10:3, 15:12

**console** [10] - 12:20, 13:18, 16:6, 16:23, 17:15, 24:3, 26:15, 28:2, 33:6, 33:12

**CONSOLE** [29] - 1:22, 1:22, 3:20, 5:10, 5:14, 6:2, 6:4, 6:24, 8:13, 9:9, 10:10, 10:17, 10:21, 11:7, 11:11, 11:18, 11:21, 13:1, 13:19, 14:11, 14:13, 15:8, 15:23, 16:4, 16:8, 33:16, 33:24, 59:19, 59:23

**Console** [3] - 3:20, 5:11, 59:20

**constituted** [1] - 36:22

**consulted** [2] - 25:11, 51:10

**CONT** [2] - 1:25, 2:1

**contemporaneous** [5] - 24:10, 28:3, 31:25, 32:18, 50:3

**contest** [1] - 35:11

**context** [10] - 35:16, 36:7, 37:1, 37:3, 37:16, 37:17, 38:21, 44:23, 59:9, 61:1

**continues** [1] - 59:2

**continuing** [1] - 49:22

**contradictions** [1] - 27:11

**contradictory** [1] - 11:20

**contrast** [1] - 32:20

**control** [2] - 42:16, 42:22

**conversation** [2] - 31:1, 54:14

**conversations** [2] - 31:4, 64:16

**conveyed** [1] - 65:4

**convicted** [1] - 21:5

**conviction** [1] - 50:7

**copies** [1] - 5:24

**copy** [2] - 65:22, 65:24

**copying** [1] - 20:23

**core** [1] - 17:5

**correct** [9] - 6:24, 16:4, 18:11, 19:17, 29:17, 37:23, 46:4, 51:25, 66:18

**correctly** [3] - 12:23, 41:18, 42:1

**corroborating** [1] - 50:4

**corroboration** [1] - 52:9

**COUNSEL** [1] - 66:14

**counsel** [16] - 5:6, 5:7, 16:24, 26:17, 33:6, 47:25, 48:23, 48:24, 49:5, 58:13, 58:19, 59:16, 59:23, 60:9, 61:18

**counsel's** [2] - 54:19, 60:4

**count** [1] - 33:7

**country** [1] - 4:18

**couple** [3] - 36:19, 60:15, 65:13

**course** [5] - 4:12, 14:11, 21:21, 63:11, 65:15

**Court** [26] - 2:22, 8:13, 14:23, 15:10, 16:17, 32:11, 35:21, 35:24, 36:2, 36:4, 36:5, 36:20, 36:21, 37:2, 37:7, 37:9, 37:10, 38:22, 48:8, 49:13, 62:10, 63:25, 65:21, 66:23

**court** [10] - 4:12, 4:16, 5:22, 12:5, 25:7, 36:3, 36:20, 59:11, 66:11, 66:15

**COURT** [120] - 1:1, 3:1, 3:14, 3:17, 3:22, 4:8, 5:13, 5:18, 6:3, 6:22, 8:5, 9:3, 10:5, 10:13, 10:20, 11:3, 11:10, 11:17, 11:19, 12:20, 13:14, 14:5, 14:12, 15:5, 15:21, 15:24, 16:5, 16:21, 17:7, 17:12, 18:8, 18:14, 19:7, 19:10, 19:16, 20:10, 20:19, 22:2, 22:5, 22:13, 23:13, 24:6, 26:14, 26:19, 27:21, 28:7, 28:24, 29:14, 31:8,

31:14, 31:17, 31:20, 33:5, 33:22, 34:1, 34:4, 34:6, 34:22, 34:25, 35:2, 35:24, 36:8, 36:13, 37:21, 40:24, 41:9, 41:17, 41:25, 42:8, 42:25, 43:21, 44:6, 44:18, 45:12, 45:17, 45:23, 46:19, 46:22, 47:6, 47:10, 47:20, 48:16, 51:8, 51:15, 51:22, 52:2, 52:21, 53:9, 53:18, 53:20, 54:5, 54:8, 54:16, 54:18, 55:4, 55:8, 55:17, 56:7, 56:11, 56:21, 57:4, 57:8, 57:17, 58:4, 58:11, 59:1, 59:10, 59:14, 59:22, 61:17, 61:23, 62:21, 62:24, 63:2, 63:17, 64:3, 65:9, 65:11, 65:13, 66:9

**court's** [2] - 37:8, 59:11

**Court's** [1] - 59:17

**courtesy** [1] - 14:8

**Courthouse** [1] - 2:22

**courtroom** [5] - 12:3, 15:20, 21:20, 22:7, 25:23

**COURTROOM** [1] - 1:20

**covered** [3] - 17:15, 17:17, 26:20

**covering** [1] - 24:4

**Coyle** [1] - 4:11

**create** [1] - 20:7

**credence** [1] - 27:13

**credibility** [1] - 49:25

**crime** [2] - 40:21, 60:3

**criteria** [3] - 16:13, 50:18, 50:19

**critical** [1] - 58:18

**criticized** [1] - 54:2

**cross** [1] - 48:4

**crossed** [1] - 33:23

**CRR** [2] - 2:21, 66:23

**cruel** [2] - 31:24, 32:25

**CSR** [2] - 2:21, 66:23

**Cullen** [1] - 15:9, 61:12

**custody** [9] - 12:11, 12:19, 13:22, 14:14, 54:20, 55:12, 56:1, 56:4, 60:10

## D

**DA** [1] - 39:4

**DA's** [3] - 39:5, 39:20, 40:22

**Daily** [1] - 37:6

**DAO** [1] - 25:8

**data** [1] - 59:7

**Date** [1] - 66:25

**daunting** [1] - 4:18

**DAVID** [1] - 2:10

**David** [1] - 3:25

**Davitch** [6] - 3:11, 17:11, 22:2, 61:24, 61:25, 62:22

**DAVITCH** [20] - 2:2, 3:10, 17:10, 17:14, 18:11, 18:21, 19:9, 19:15, 19:25, 20:15, 20:20, 22:4, 22:10, 22:18, 23:17, 24:7, 61:25, 62:23, 62:25, 63:3

**Davitch's** [1] - 13:16

**day-to-day** [1] - 32:1

**daylight** [1] - 38:6

**days** [2] - 45:3, 45:4, 45:7

**deal** [6] - 8:12, 9:5, 43:6, 57:10, 57:15, 65:17

**December** [5] - 12:15, 22:4, 24:16, 49:4, 54:7

**decide** [4] - 15:22, 23:16, 27:23, 59:3

**decided** [2] - 36:2, 47:15

**deciding** [3] - 15:3, 16:3, 21:19

**decision** [25] - 8:3, 9:12, 9:16, 9:22, 18:15, 20:3, 22:20, 23:3, 23:18, 24:12, 24:19, 25:12, 26:2, 26:4, 28:8, 30:5, 30:12, 31:5, 31:6, 32:16, 37:7, 48:14, 57:3, 57:5, 63:24

**decisional** [2] - 6:9, 7:13

**decisionmaker** [7] - 6:7, 13:1, 18:22, 20:1, 20:3, 51:14

**decisionmaking** [3] - 21:24, 24:14, 26:11

**decisions** [6] - 5:16, 9:23, 9:25, 10:24, 25:5, 50:16

**commendations** [1] - 32:6

**comment** [5] - 17:22, 21:22, 44:8, 53:15, 63:6

**commented** [1] - 14:17

**comments** [27] - 6:7, 6:8, 6:13, 7:6, 7:8, 7:9, 7:12, 7:16, 8:14, 9:10, 9:12, 9:15, 9:18, 9:21, 10:1, 10:3, 10:4, 10:14, 10:22, 11:5, 11:12, 18:4, 18:12, 32:6, 54:1, 60:17, 61:19

**committed** [1] - 21:15

**common** [1] - 17:5

**community** [2] - 29:6, 29:13

**compass** [1] - 40:13

**compelling** [1] - 47:18

**competence** [3] - 15:18, 24:24, 61:8

**competent** [1] - 25:23

**complain** [1] - 50:14

**complained** [1] - 57:18

**complaint** [7] - 11:25, 12:5, 22:9, 22:11, 22:12, 33:7

**complete** [1] - 20:13

**completely** [4] - 13:12, 19:16, 19:19, 19:23

**conceded** [3] - 29:3, 30:6, 30:25

**concept** [4] - 15:5, 19:1, 31:9, 35:18

**concern** [1] - 22:9

**concerning** [1] - 64:17

**conclude** [6] - 7:10, 8:14, 9:1, 15:1, 24:1, 61:1

**concluded** [1] - 58:6

**conduct** [2] - 25:1, 61:6

**conducted** [2] - 12:1, 24:22

**CONFERENCE** [1] - 1:20

**confidential** [2] - 13:21, 14:20

**confirmed** [4] - 11:8, 38:2, 52:16, 54:12

declaration [1] - 23:7
deeper [2] - 48:21, 48:22
defamation [9] - 35:15, 35:20, 37:11, 37:12, 37:23, 38:7, 38:14
defamatory [7] - 36:19, 36:25, 37:15, 37:19, 38:12, 38:19, 38:23
defeat [4] - 8:22, 9:2, 9:19, 61:14
Defendant [3] - 2:12, 2:16, 2:20
defendant [7] - 5:17, 8:18, 10:16, 12:9, 14:10, 26:15, 59:24
defendant's [9] - 7:15, 8:24, 11:14, 12:7, 12:14, 30:16, 31:23, 32:23, 60:16
Defendant's [1] - 50:22
Defendants [2] - 1:8, 1:14
defendants [9] - 11:25, 12:1, 21:5, 27:2, 27:15, 30:6, 30:8, 30:21, 65:4
defending [1] - 58:20
defense [9] - 4:20, 4:22, 4:25, 16:21, 33:5, 33:9, 44:13, 55:23, 59:10
define [1] - 44:19
definition [1] - 44:17
degree [1] - 62:7
delayed [1] - 20:2
delightful [1] - 58:8
delighting [1] - 56:24
demeanor [4] - 12:3, 15:18, 24:24, 61:8
demographic [1] - 45:11
demonstrated [1] - 40:7
denied [3] - 23:5, 23:9, 33:2
denominator [1] - 45:17
denominators [1] - 45:12
department [1] - 30:11
DEPARTMENT [1] - 2:17
deposed [4] - 30:13, 52:24, 53:6, 53:13
deposition [21] -

11:8, 13:13, 14:14, 20:21, 21:18, 21:22, 25:10, 25:13, 26:12, 29:3, 29:20, 30:14, 30:25, 41:14, 42:6, 42:12, 53:18, 54:14, 55:13, 56:18, 61:10
depth [1] - 50:2
deputy [1] - 4:11
derogatory [1] - 36:12
describing [1] - 51:18
deserved [1] - 58:5
desire [1] - 59:18
desiring [1] - 6:17
details [5] - 7:7, 27:20, 29:12, 29:18, 60:9
detective [2] - 49:14, 49:16
detectives [1] - 57:13
determinative [1] - 23:23
determine [3] - 37:4, 37:18, 63:8
determined [3] - 9:13, 60:20, 60:21
development [1] - 66:3
devoid [1] - 31:3
Dictionary [1] - 44:19
dictionary [1] - 44:21
difference [3] - 38:11, 38:13, 45:10
different [8] - 28:12, 34:13, 34:16, 42:10, 43:1, 48:11, 48:12
difficult [2] - 3:19, 57:10
dim [1] - 33:10
dire [2] - 31:11, 31:15
direct [14] - 5:16, 6:5, 8:4, 8:7, 8:8, 8:9, 8:15, 9:4, 9:13, 9:19, 17:16, 26:22, 38:3, 43:24
directed [1] - 18:4
directly [2] - 35:21, 57:15
director [1] - 57:11
disagreement [1] - 44:16
disbelieve [3] - 8:24, 23:21, 27:8
discharge [2] - 18:20, 23:15

discharging [4] - 19:21, 19:23, 43:18, 56:22
disciplinary [1] - 22:11
discovery [1] - 20:24
discredited [1] - 26:3
discriminated [2] - 10:8, 62:8
discrimination [21] - 8:4, 8:15, 8:20, 9:1, 9:5, 9:13, 10:16, 10:18, 11:13, 19:11, 19:22, 33:20, 35:6, 35:19, 38:13, 38:15, 59:6, 59:7, 59:8, 59:9
discriminatory [8] - 6:7, 8:7, 17:20, 23:22, 38:4, 38:20, 38:24, 60:22
discuss [2] - 20:18, 64:8
discussed [1] - 22:21
discussing [1] - 35:21
discussion [7] - 18:9, 30:15, 35:15, 51:10, 53:22, 64:24, 64:25
disgusting [1] - 21:23
disinclined [1] - 20:12
dismissed [4] - 37:10, 46:3, 46:4, 60:4
dispute [10] - 8:18, 14:14, 16:2, 18:23, 20:16, 20:25, 22:24, 49:1, 49:10, 60:18
disputed [1] - 25:20
disputes [4] - 19:4, 21:13, 60:20
disqualification [1] - 49:22
dissent [1] - 39:23
distant [2] - 55:2, 66:12
distinction [2] - 38:9, 38:10
distracted [1] - 5:3
DISTRICT [4] - 1:1, 1:2, 1:7, 2:14
district [2] - 28:6, 59:11
District [20] - 2:12, 2:16, 4:2, 6:20, 7:3, 7:19, 7:20, 18:2, 34:11, 34:17, 39:23,

39:25, 40:24, 41:8, 45:6, 50:15, 50:18, 52:11, 53:5, 55:10
divergence [1] - 41:7
diverse [1] - 39:13
docketed [2] - 3:5, 3:7
document [3] - 16:11, 47:7, 48:4
documentation [8] - 16:10, 16:13, 16:15, 16:18, 24:10, 28:3, 31:25, 32:18
documents [2] - 20:23
done [4] - 20:5, 30:4, 65:19
dot [1] - 48:4
dotted [1] - 33:23
double [1] - 13:14
doubt [1] - 50:2
Douglas [3] - 8:16, 9:8, 44:1
down [3] - 49:19, 56:8, 64:18
dozen [2] - 10:2, 49:11
Dr [1] - 14:7
dramatically [2] - 34:12, 34:15
drawing [1] - 38:8
dueling [1] - 16:15
dug [2] - 48:21, 56:16
dumb [1] - 57:20
during [9] - 19:17, 21:20, 23:11, 29:3, 29:20, 32:19, 53:6, 54:9, 61:7
duty [1] - 32:13
dying [2] - 56:2

E

e-mail [1] - 16:11
E.K [1] - 1:18
EASTERN [1] - 1:2
edge [1] - 16:5
education [1] - 43:1
effect [3] - 37:4, 37:18
efficacious [1] - 11:5
efficacy [1] - 47:21
efficient [1] - 4:23
effort [4] - 14:8, 22:6, 31:22, 43:4
eight [1] - 39:2
either [16] - 7:18, 8:23, 9:1, 11:1, 17:3,

17:8, 23:20, 29:12, 38:3, 38:19, 42:23, 51:11, 53:16, 61:24, 63:17, 64:6
elected [2] - 7:19, 34:14
election [1] - 46:11
elite [2] - 42:2, 42:8
embrace [1] - 6:16
embracing [1] - 51:16
emphasizes [1] - 44:24
employee [5] - 18:16, 27:24, 28:21, 43:18, 53:5
employees [7] - 7:25, 10:11, 34:18, 34:21, 48:18, 48:19, 62:12
employer [4] - 19:23, 27:23, 43:16, 43:17
employer's [3] - 23:21, 23:24, 27:9
employment [20] - 12:25, 18:1, 18:16, 19:11, 19:22, 30:5, 31:12, 31:13, 31:19, 32:4, 32:19, 32:24, 47:23, 48:8, 48:14, 50:21, 52:12, 57:25, 62:4, 63:25
end [6] - 10:19, 13:17, 21:4, 21:15, 33:19, 45:4
ended [2] - 22:4, 60:1
engender [1] - 37:5
Eno [1] - 16:16
enter [1] - 56:25
enters [1] - 20:11
entire [4] - 36:22, 60:23, 60:24, 61:1
entirely [1] - 60:4
entirety [2] - 35:15, 59:6
entitled [1] - 66:19
entrenched [2] - 42:15, 42:16
entry [1] - 63:6
equal [2] - 33:8, 33:13
erroneous [1] - 51:18
erroneously [1] - 19:20
ESQUIRE [11] - 1:22, 1:23, 2:2, 2:6, 2:6, 2:10, 2:10, 2:11, 2:14, 2:18, 2:18

**essentially** [5] - 6:5, 6:14, 12:1, 15:10, 61:6
**established** [2] - 8:19, 44:17
**eternal** [1] - 66:13
**ethical** [2] - 25:24, 63:13
**ethics** [3] - 15:18, 24:24, 61:9
**European** [2] - 41:20, 43:2
**evaluate** [1] - 64:13
**evaluating** [1] - 20:11
**evaluation** [1] - 56:25
**evaluations** [2] - 32:3, 47:7
**event** [1] - 58:16
**events** [2] - 53:23, 55:15
**Evidence** [1] - 11:6
**evidence** [50] - 5:16, 6:5, 8:4, 8:7, 8:8, 8:10, 8:11, 8:15, 8:16, 8:23, 8:25, 9:4, 9:13, 9:20, 10:15, 11:2, 11:4, 11:5, 11:13, 11:14, 13:5, 13:7, 15:11, 16:19, 17:16, 17:18, 20:4, 21:6, 21:9, 22:8, 22:20, 23:1, 23:20, 26:22, 27:7, 28:4, 31:4, 32:22, 35:7, 38:3, 38:4, 38:24, 43:24, 50:4, 59:5, 59:7, 59:9, 61:2, 61:3
**evidences** [1] - 38:13
**evidencing** [2] - 16:11, 38:19
**ex** [2] - 40:12, 56:2
**ex-husband** [1] - 56:2
**ex-prosecutors** [1] - 40:12
**exact** [1] - 45:18
**exactly** [2] - 17:25, 42:5
**excerpt** [1] - 38:18
**excerpts** [1] - 43:10
**excited** [1] - 49:18
**exclusive** [1] - 33:11
**exclusively** [1] - 10:14
**excuse** [3] - 27:21, 39:16, 53:1
**exempt** [1] - 28:21

**Exhibit** [2] - 21:1, 50:22
**exhibit** [1] - 49:3
**exhibits** [1] - 52:18
**existed** [1] - 55:15
**expected** [1] - 4:16
**experience** [1] - 47:4
**experienced** [1] - 48:8
**experiences** [3] - 25:16, 64:5, 64:14
**expert** [2] - 46:17, 52:13
**explain** [4] - 24:18, 35:4, 38:11, 43:4
**explained** [6] - 35:17, 36:25, 37:15, 41:11, 41:14
**explaining** [1] - 43:16
**explanation** [7] - 11:24, 14:24, 15:12, 35:5, 46:25
**explanations** [5] - 11:20, 38:5, 46:23, 47:21, 54:19
**expressed** [1] - 64:16
**extensive** [4] - 15:16, 24:23, 33:19, 61:7
**extent** [2] - 5:23, 63:22
**extreme** [8] - 27:4, 28:23, 29:1, 32:24, 51:3, 53:2, 53:7, 54:3
**extremism** [1] - 52:18

## F

**facie** [1] - 8:19
**facile** [1] - 43:3
**fact** [33] - 12:24, 16:2, 20:7, 20:8, 21:3, 21:9, 21:10, 21:13, 21:18, 21:21, 22:10, 23:20, 25:20, 27:8, 27:12, 29:2, 30:20, 33:2, 38:2, 42:18, 43:15, 43:16, 48:11, 50:21, 57:20, 60:22, 62:6, 62:13, 63:13, 65:6, 65:16, 65:18
**factor** [1] - 26:10
**factors** [1] - 16:13
**facts** [13] - 17:6, 18:23, 19:12, 20:3, 20:5, 20:18, 20:25,

21:7, 22:23, 22:24, 29:22, 60:19, 62:10
**Facts** [5] - 46:1, 51:7, 52:17, 54:2, 58:18
**factual** [8] - 18:23, 19:3, 19:4, 20:16, 21:1, 21:14, 60:20
**failed** [1] - 27:18
**fair** [1] - 59:12, 59:13, 59:15, 63:13
**fairly** [4] - 37:4, 42:19, 46:7, 55:2
**Fakete** [3] - 7:16, 9:9, 9:17
**false** [5] - 11:15, 15:15, 26:3, 61:4, 61:13
**family** [1] - 12:21
**favor** [1] - 60:21
**February** [1] - 31:2
**federal** [5] - 5:21, 5:22, 19:21, 34:19, 59:25
**feed** [2] - 3:14, 3:18
**feedback** [1] - 30:10
**feelings** [3] - 49:23, 50:6, 52:7
**Feldman** [3] - 4:12, 65:23, 66:23
**FELDMAN** [1] - 2:21
**few** [1] - 65:16
**fewer** [1] - 45:23
**fight** [2] - 39:8, 42:20
**filed** [4] - 12:5, 14:23, 22:9, 23:7
**filings** [1] - 28:17
**film** [1] - 5:25
**final** [7] - 23:1, 25:5, 25:11, 26:4, 31:21, 63:5, 63:19
**finder** [4] - 23:20, 27:8, 27:12, 30:20
**fine** [2] - 26:16, 38:8
**finish** [1] - 11:12
**finished** [1] - 62:2
**fire** [4] - 21:25, 25:12, 26:2, 27:23
**fired** [1] - 24:16
**firing** [3] - 8:7, 10:23, 56:12
**first** [27] - 4:24, 5:10, 6:6, 6:12, 10:21, 11:24, 12:8, 14:2, 19:2, 19:6, 19:7, 20:8, 20:20, 24:13, 26:9, 27:14, 38:25, 41:11, 45:3, 46:24, 53:13, 53:15, 54:7, 56:5, 57:1, 62:3, 62:7

**fit** [3] - 46:9, 47:15, 47:16
**five** [1] - 9:11
**flatly** [1] - 23:9
**Floor** [2] - 1:23, 2:19
**focus** [6] - 18:12, 35:2, 43:22, 44:2, 46:22, 55:4
**focuses** [1] - 66:4
**foibles** [1] - 31:14
**folks** [2] - 7:24
**follow** [2] - 53:3, 55:21
**follow-up** [2] - 53:3, 55:21
**FOR** [2] - 1:2, 1:19
**foregoing** [1] - 66:18
**foretelling** [1] - 43:8
**forgotten** [1] - 5:19
**form** [1] - 29:4
**formed** [4] - 13:9, 31:5, 31:6, 50:24
**former** [2] - 46:18, 53:4
**forms** [1] - 29:7
**forth** [7] - 14:21, 14:22, 24:17, 27:20, 60:6, 60:12, 61:4
**forward** [1] - 66:11
**fought** [1] - 49:2
**four** [3] - 9:11, 63:15
**framework** [2] - 8:16, 8:17
**frankly** [3] - 4:17, 4:20, 43:24
**Frankly** [1] - 58:19
**fray** [1] - 65:20
**French** [5] - 41:15, 41:20, 42:14, 43:2, 43:3
**front** [1] - 44:22
**Fuentes** [6] - 8:21, 8:22, 11:1, 20:6, 27:5, 61:12
**full** [4] - 4:8, 37:3, 37:17, 64:12
**function** [1] - 41:8
**future** [1] - 66:12

## G

**G-a-r-d-e** [1] - 41:18
**Garcia** [1] - 7:15
**Garde** [2] - 41:17, 41:18
**gatekeeper** [1] - 38:23
**gatekeeping** [1] - 59:11

**Gazette** [1] - 36:23
**GENE** [1] - 1:18
**generalities** [1] - 29:21
**generation** [3] - 6:15, 17:23, 39:10
**genuine** [3] - 16:2, 20:7, 60:20
**Giampietro** [16] - 25:13, 25:15, 25:21, 26:7, 30:9, 30:13, 50:5, 51:5, 51:8, 51:25, 52:4, 54:1, 58:16, 64:1, 65:3
**Giampietro's** [6] - 30:17, 51:9, 51:12, 51:16, 51:18, 52:1
**given** [12] - 11:20, 11:23, 14:23, 24:8, 28:16, 32:10, 38:5, 47:21, 48:12, 48:18, 57:24
**glowing** [1] - 32:6
**GOLD** [3] - 2:5, 2:6, 3:16
**Gold** [1] - 3:16
**gold** [3] - 3:17, 61:24, 63:18
**gossip** [2] - 55:23, 56:24
**government** [1] - 34:19
**granted** [1] - 48:10
**grapes** [5] - 22:17, 48:24, 48:25, 62:5, 62:6
**great** [5] - 5:13, 17:7, 59:14
**greatly** [1] - 30:24
**GREEN** [1] - 2:2
**Greenberg** [3] - 3:13, 61:24, 63:18
**GREENBERG** [14] - 2:6, 3:12, 26:18, 26:20, 27:25, 28:13, 28:25, 29:16, 31:13, 31:16, 31:19, 31:21, 63:19, 64:4
**group** [5] - 10:7, 10:8, 18:5, 42:10, 52:20
**guarantee** [1] - 19:12
**guard** [14] - 40:23, 41:3, 41:10, 41:12, 41:16, 42:1, 42:15, 42:17, 42:20, 43:4, 44:16, 44:19, 44:20
**guess** [1] - 23:13

## H

hair [1] - 19:23
hair-brained [1] - 19:23
half [3] - 10:2, 12:6, 49:11
hallway [1] - 49:15
handling [1] - 50:23
happy [1] - 28:25
harassed [3] - 21:20, 23:6, 23:9
harassment [1] - 24:21
hard [2] - 49:23, 50:6
HARRISON [1] - 2:9
harsh [6] - 29:19, 29:25, 31:23, 32:8, 32:13, 32:25
health [1] - 57:14
hear [9] - 3:15, 3:19, 4:24, 16:21, 17:11, 26:9, 26:15, 65:14, 66:2
heard [3] - 21:23, 40:20, 64:19
HEARING [1] - 1:19
hearing [1] - 13:17
heavier [1] - 54:13
held [2] - 15:11, 19:20
hello [1] - 3:1
helped [1] - 29:4
helps [1] - 13:16
hide [1] - 65:16
high [1] - 9:3
highest [1] - 51:4
highly [1] - 13:21
HIPAA [1] - 57:17
hired [3] - 31:2, 62:12, 62:15
hires [1] - 45:8
hiring [4] - 7:23, 7:24, 8:7, 10:23
history [3] - 43:2, 57:6, 63:23
hoe [1] - 47:7
holding [2] - 9:17, 15:10
Homicide [1] - 32:6
homicide [2] - 17:25, 29:11
Honor [96] - 3:10, 3:12, 3:23, 3:25, 4:4, 4:6, 5:10, 5:14, 8:13, 9:9, 10:10, 10:17, 10:22, 11:7, 11:11, 13:1, 13:19, 14:11, 16:4, 16:8, 17:4, 17:10, 17:14, 18:11, 18:21, 19:2, 19:25, 20:15, 21:17, 23:4, 23:17, 24:2, 25:3, 25:9, 25:21, 25:25, 26:8, 26:13, 26:18, 27:10, 27:17, 27:25, 28:13, 28:25, 31:16, 32:21, 33:16, 33:25, 34:3, 34:5, 34:14, 35:12, 35:14, 35:23, 36:11, 37:20, 39:10, 41:22, 42:11, 44:4, 44:9, 45:1, 45:25, 46:10, 47:1, 47:9, 48:13, 48:23, 49:2, 49:5, 49:7, 49:24, 52:19, 55:1, 55:7, 56:10, 57:11, 58:10, 58:25, 59:4, 59:13, 59:19, 60:14, 61:15, 61:21, 61:22, 61:25, 62:1, 63:16, 63:19, 64:2, 65:2, 65:12, 66:8, 66:14
HONORABLE [1] - 1:18
hope [3] - 3:7, 4:14, 66:12
Hospital [1] - 7:14
hours [1] - 65:14
HR [3] - 13:23, 57:11, 57:19
humor [1] - 11:4
hurdle [1] - 9:4
husband [1] - 56:2
husband's [1] - 56:5
hyperbolic [3] - 47:10, 47:12, 49:12
hypothesize [1] - 46:13

## I

I's [1] - 48:4
idea [4] - 39:5, 40:21, 41:6, 41:7
ideal [1] - 47:2
ideas [1] - 40:18
identified [2] - 18:5, 65:4
identify [7] - 14:16, 14:18, 29:9, 29:22, 30:9, 55:20
ignore [1] - 31:9
immediately [1] - 10:4
impact [2] - 13:25, 38:14
impatient [1] - 57:19
impetuous [1] - 43:17
implausibilities [1] - 27:11
implement [1] - 34:15
implied [1] - 32:9
important [4] - 25:9, 32:22, 37:12, 49:8
impression [1] - 37:5
impressions [1] - 46:8
improper [1] - 23:11
IN [2] - 1:1, 1:20
inability [1] - 31:9
inaccurate [1] - 55:23
inadequate [1] - 3:15
inappropriate [3] - 23:10, 32:8, 32:13
inartful [1] - 51:23
incarceration [2] - 40:16, 40:20
inclined [1] - 66:5
include [1] - 54:4
includes [1] - 33:7
including [3] - 12:11, 12:12, 58:24
incompetent [1] - 57:20
inconsistent [5] - 19:1, 23:2, 24:3, 27:15, 30:14
indeed [1] - 4:15
indirect [2] - 8:11, 9:7
individual [1] - 65:3
individuals [3] - 16:12, 30:11, 32:11
indulge [2] - 41:19, 52:21
indulging [1] - 14:9
infer [1] - 17:19
information [7] - 25:8, 32:16, 56:17, 61:11, 63:23, 65:4
informed [1] - 4:15
initial [2] - 45:8, 48:14
innuendo [1] - 36:23
input [1] - 31:5
inside [1] - 40:7
insight [1] - 30:10
instance [1] - 15:15
instead [3] - 8:8, 36:16, 42:9
insufficient [1] - 61:10
insurers [1] - 57:14
intent [3] - 38:16, 38:20, 38:24
interact [1] - 47:25
interaction [1] - 59:17
interactions [1] - 25:7
Intercept [1] - 39:2
interesting [1] - 43:4
interference [1] - 43:20
internal [1] - 50:15
interpret [1] - 60:17
interpretation [3] - 37:1, 37:16, 38:21
interpreted [1] - 18:4
interrogatories [1] - 14:16
interrogatory [2] - 12:7, 55:21
interrupt [2] - 5:18, 5:25
interrupting [1] - 5:20
interview [12] - 7:18, 12:2, 15:16, 24:22, 25:1, 28:19, 35:8, 35:13, 35:16, 40:10, 41:2, 61:7
interviews [5] - 7:21, 7:22, 34:14, 35:6, 35:8
investigating [3] - 55:3, 55:11, 55:25
investigation [4] - 55:19, 59:24, 59:25, 60:1
invidious [1] - 23:22
invoke [1] - 51:8
involved [3] - 54:15, 56:1, 64:6
involving [1] - 65:17
issue [6] - 6:10, 7:13, 8:6, 9:6, 9:12, 12:24, 13:6, 13:20, 13:22, 14:19, 16:2, 16:9, 17:17, 18:6, 18:12, 18:25, 19:3, 20:7, 20:8, 20:9, 24:2, 25:20, 32:14, 36:6, 43:25, 44:1, 48:22, 49:21, 51:24, 52:1, 52:13, 54:24, 55:1, 60:3, 60:5, 60:10, 65:6, 65:21, 66:4
issued [1] - 27:19
issues [17] - 10:16, 12:10, 12:18, 12:21, 13:2, 13:3, 13:23, 14:6, 17:16, 20:18, 26:24, 33:2, 53:12, 58:15, 59:23, 64:8
itself [2] - 6:9, 24:17

## J

Jack [1] - 50:4
Jacobin [1] - 40:10
james [1] - 2:22
JANUARY [1] - 1:17
January [8] - 5:17, 6:10, 8:3, 27:17, 45:5, 46:4, 54:7, 64:9
Jennifer [1] - 32:5
job [11] - 12:2, 12:22, 13:4, 15:16, 24:3, 24:4, 24:22, 25:1, 56:25, 61:6, 65:19
jobs [3] - 10:6, 10:8, 34:21
Joe [4] - 30:15, 64:17, 64:18, 64:25
Johnson [2] - 16:16, 28:5
join [1] - 52:11
JOSEPH [1] - 1:10
Joseph [1] - 2:8
JR [1] - 1:10
Jr [1] - 2:8
judge [1] - 49:18
Judge [3] - 6:2, 41:6, 46:15
judgment [25] - 4:23, 8:18, 8:22, 9:2, 15:6, 15:11, 20:21, 23:8, 27:2, 27:7, 33:2, 35:10, 42:13, 43:6, 46:20, 48:7, 48:9, 48:12, 48:22, 50:23, 53:11, 54:3, 58:15, 60:19, 61:14
JUDGMENT [1] - 1:19
judicial [1] - 49:7
July [1] - 62:14
jurisdictions [1] - 39:14
jury [23] - 7:10, 8:24, 8:25, 15:1, 15:21, 16:3, 16:18, 17:19, 20:7, 21:4, 23:15, 25:25, 26:3, 30:19, 43:7, 47:23, 48:4, 59:3, 60:16, 60:18, 60:24, 60:25, 65:7
justified [3] - 12:21, 18:18
juvenile [11] - 29:14, 29:16, 30:1, 46:17,

**juveniles** [1] - 64:7

---

**K**

**KANE** [1] - 2:10
**Kane** [2] - 4:1, 34:1
**kATHLEEN** [1] - 2:21
**Kathleen** [1] - 66:23
**keep** [7] - 17:2,
46:15, 46:16, 46:17,
59:20, 64:23, 64:24
**kept** [2] - 25:18,
25:22, 57:12
**KEVIN** [1] - 1:22
**Kevin** [3] - 3:20,
5:11, 59:20
**key** [2] - 21:13, 23:19
**kind** [5] - 12:24,
22:9, 22:12, 40:2,
45:13
**knowing** [1] - 7:4
**knowledge** [3] -
25:17, 30:3, 55:5
**knowledgeable** [1] -
25:6
**KRASNER** [2] - 1:7,
1:13
**Krasner** [117] - 2:12,
2:16, 3:5, 3:7, 4:1,
5:17, 6:13, 6:18, 7:4,
8:14, 9:21, 11:8, 12:2,
12:16, 13:6, 14:3,
14:10, 14:13, 14:21,
14:22, 15:2, 15:15,
17:22, 18:24, 19:4,
19:18, 20:17, 20:20,
21:3, 21:6, 21:7,
21:10, 21:14, 21:17,
21:21, 22:6, 22:8,
22:16, 22:24, 23:2,
24:10, 24:13, 24:18,
25:4, 25:10, 25:14,
25:22, 26:2, 27:2,
27:18, 28:8, 28:10,
28:17, 30:2, 31:1,
31:5, 32:9, 32:15,
34:10, 35:3, 38:1,
39:3, 39:25, 40:3,
40:11, 41:5, 41:11,
42:6, 45:5, 45:19,
46:11, 47:3, 48:5,
49:9, 49:25, 50:8,
50:9, 50:14, 51:2,
51:5, 51:14, 52:6,
52:22, 53:10, 53:12,
53:13, 53:22, 54:3,
54:6, 54:9, 54:14,

54:21, 54:23, 55:12,
55:20, 56:11, 56:22,
58:1, 60:5, 60:7,
60:25, 61:4, 61:9,
62:4, 62:9, 62:12,
62:14, 63:22, 64:8,
64:13, 64:15, 64:16,
65:1, 65:5
**Krasner's** [19] -
17:18, 26:11, 30:9,
41:20, 43:1, 43:13,
46:8, 46:15, 49:15,
49:17, 50:2, 50:7,
50:25, 53:1, 55:5,
55:14, 55:16, 57:2,
60:17

---

**L**

**lack** [4] - 16:9, 16:14,
16:18, 28:3
**Lane** [1] - 3:23
**LANE** [1] - 1:23
**language** [4] - 7:9,
7:14, 37:13, 38:7
**lapse** [1] - 9:18
**Larry** [4] - 52:6,
64:16, 64:23, 65:1
**last** [4] - 11:12, 14:7,
32:3, 40:15
**lastly** [3] - 16:8,
60:14, 61:3
**late** [2] - 22:4, 54:7
**LAW** [2] - 1:22, 2:17
**law** [13] - 4:11, 5:21,
26:22, 28:3, 31:8,
35:18, 35:19, 35:20,
37:22, 40:20, 43:13,
48:3, 66:3
**Lawrence** [3] - 2:12,
2:16, 4:1
**LAWRENCE** [2] -
1:7, 1:13
**lawyer** [6] - 18:16,
25:19, 39:21, 48:8,
57:8
**lawyers** [17] - 10:6,
34:17, 44:11, 44:13,
44:14, 44:24, 45:1,
45:4, 45:6, 45:19,
45:21, 46:13, 55:24,
58:6, 58:7, 65:17,
65:18
**Le** [1] - 41:25
**lead** [1] - 63:17
**leading** [4] - 9:22,
9:25, 30:11
**leads** [1] - 26:17
**leap** [1] - 9:3

**learned** [3] - 13:8,
14:3, 58:22
**least** [5] - 3:4, 4:16,
5:20, 6:23, 9:11
**leave** [6] - 7:25,
17:23, 39:6, 39:7,
39:10
**leaving** [1] - 33:11
**led** [1] - 29:22
**left** [1] - 16:15
**legal** [2] - 28:1, 35:5,
65:21
**legitimate** [2] - 13:5,
23:21
**lengthy** [2] - 35:14,
38:18
**less** [2] - 33:16,
65:16
**letter** [1] - 27:19
**LEWIS** [1] - 2:9
**lie** [1] - 49:12
**life** [3] - 12:11, 12:18,
53:23
**lifer** [1] - 64:7
**lifers** [2] - 30:1,
64:19
**light** [1] - 30:2
**Lightsey** [2] - 30:23,
31:4
**likely** [3] - 23:23,
55:19, 55:23
**limited** [1] - 64:17
**line** [3] - 3:8, 3:9,
9:17
**LISA** [1] - 2:18
**Lisa** [1] - 4:5
**list** [3] - 43:9, 64:20
**listed** [1] - 56:11
**Listenbee** [4] -
30:23, 30:25, 46:16,
52:11
**literal** [1] - 47:10
**literally** [1] - 7:23
**literature** [1] - 41:21
**litigation** [7] - 28:15,
29:2, 48:19, 49:2,
49:3, 50:11, 52:24
**LLC** [1] - 1:22
**LLP** [1] - 2:9
**Locust** [1] - 1:23
**long-shot** [1] - 34:11
**longest** [1] - 51:4
**look** [18] - 7:11, 7:12,
7:16, 8:21, 32:15,
35:15, 38:20, 38:24,
44:23, 45:5, 46:3,
50:21, 62:17, 62:18,
63:7, 63:9, 63:10,
66:11
**looked** [4] - 42:14,

47:14, 56:10, 59:8
**looking** [7] - 35:14,
38:12, 38:14, 38:16,
38:17, 42:3
**looks** [2] - 6:6, 44:9
**lost** [4] - 16:5, 22:16,
62:7, 64:12
**love** [1] - 39:20
**loves** [1] - 41:25
**Lumberman's** [1] -
16:17
**Lynn** [2] - 41:4,
41:12

---

**M**

**machine** [1] - 2:25
**mail** [1] - 16:11
**makeup** [1] - 45:10
**male** [1] - 39:12
**manipulated** [1] -
62:24
**manner** [2] - 31:24,
32:13
**Market** [4] - 2:3, 2:7,
2:11, 2:23
**mass** [2] - 40:15,
40:20
**material** [4] - 16:2,
20:7, 45:9, 60:19
**Material** [5] - 46:1,
51:7, 52:17, 54:1,
58:18
**matter** [14] - 5:6,
16:2, 17:2, 18:14,
19:10, 19:22, 23:15,
26:25, 27:23, 54:20,
55:12, 59:3, 66:12,
66:20
**MATTIACCI** [1] -
1:22
**McDonnell** [3] - 8:16,
9:8, 44:1
**McMahon** [1] - 50:4
**mean** [6] - 15:22,
22:18, 43:2, 43:11,
61:20, 62:3
**meaning** [4] - 37:19,
38:19, 38:23, 46:7
**meaningful** [1] - 66:3
**means** [6] - 39:11,
42:15, 44:16, 44:20
**meant** [2] - 47:8,
61:18
**measure** [1] - 50:20
**media** [7] - 4:17,
6:13, 14:3, 14:15,
14:16, 14:19, 60:17
**Medical** [1] - 15:9

**meeting** [1] - 60:2
**members** [3] - 42:3,
42:9, 44:20
**mention** [10] - 12:13,
12:17, 13:11, 24:4,
24:20, 24:21, 52:22,
53:10, 56:9, 56:23
**mentioned** [7] -
12:12, 27:5, 28:2,
29:2, 29:9, 30:24,
33:24
**mentioning** [1] -
46:10
**mentions** [1] - 62:11
**merely** [1] - 14:7
**Merriam** [1] - 44:19
**Merriam-Webster** [1]
- 44:19
**Merton** [3] - 35:21,
36:18, 37:13
**met** [1] - 15:19
**method** [1] - 32:8
**Michael** [1] - 50:5
**Michelle** [5] - 1:24,
3:21, 3:24, 5:11,
59:21
**MICHELLE** [1] - 1:4
**mid** [7] - 39:16,
39:19, 39:21, 40:5,
40:17, 40:19, 44:13
**mid-career** [6] -
39:19, 39:21, 40:5,
40:17, 40:19, 44:13
**might** [10] - 36:12,
36:23, 42:22, 43:7,
47:22, 59:3, 63:4,
64:14
**mike** [2] - 13:15,
13:16
**Miller** [1] - 52:15
**mind** [1] - 14:9
**minute** [4] - 24:25,
33:6, 33:15, 52:22
**Mis** [1] - 41:25
**misbehaving** [1] -
50:1
**misconduct** [1] -
21:15
**misplaced** [1] -
30:24
**mistakes** [1] - 40:14
**mistreatment** [1] -
58:24
**misuse** [1] - 55:11
**mitigation** [2] - 21:6,
21:9
**modern** [1] - 40:14
**moment** [3] - 18:6,
23:1, 41:23
**money** [1] - 55:12

**month** [1] - 45:20
**months** [5] - 9:11, 9:16, 9:21, 9:22
**moral** [1] - 40:13
**morning** [9] - 3:10, 3:12, 3:23, 3:25, 4:4, 4:6, 22:21, 26:18, 26:19
**most** [7] - 4:23, 15:8, 17:5, 34:11, 49:2, 57:6, 57:7
**mothers** [1] - 5:23
**MOTION** [1] - 1:19
**motion** [11] - 5:8, 15:6, 15:25, 16:22, 23:8, 27:1, 27:6, 32:21, 33:9, 42:13, 50:23
**motions** [4] - 4:20, 4:22, 4:25, 66:1
**motivating** [1] - 23:23
**motive** [1] - 17:20
**move** [1] - 16:24
**moving** [2] - 20:22, 32:2
**MR** [105] - 3:10, 3:16, 3:20, 3:25, 4:6, 5:10, 5:14, 6:2, 6:4, 6:24, 8:13, 9:9, 10:10, 10:17, 10:21, 11:7, 11:11, 11:18, 11:21, 13:1, 13:19, 14:11, 14:13, 15:8, 15:23, 16:4, 16:8, 17:4, 17:10, 17:14, 18:11, 18:21, 19:9, 19:15, 19:25, 20:15, 20:20, 22:4, 22:10, 22:18, 23:17, 24:7, 33:16, 33:24, 34:3, 34:5, 34:7, 34:24, 35:1, 35:3, 36:1, 36:11, 36:15, 38:10, 41:1, 41:11, 41:22, 42:5, 42:11, 43:19, 44:4, 44:7, 44:22, 45:16, 45:18, 45:25, 46:21, 46:24, 47:8, 47:12, 48:13, 48:17, 51:12, 51:20, 51:24, 52:3, 52:25, 53:15, 53:19, 53:25, 54:6, 54:9, 54:17, 54:25, 55:6, 55:9, 55:18, 56:9, 56:13, 57:1, 57:5, 57:10, 57:18, 58:10, 58:16, 59:4, 59:13, 59:19, 59:23, 61:25, 62:23, 62:25, 63:3,

65:12, 66:8
**MS** [15] - 3:12, 3:23, 4:4, 26:18, 26:20, 27:25, 28:13, 28:25, 31:13, 31:16, 31:19, 31:21, 61:21, 63:19, 64:4
**Muhammed** [7] - 18:13, 18:25, 19:5, 19:14, 20:14, 21:11, 23:5
**Muhammed/Scott** [3] - 21:21, 50:24, 52:7
**murder** [1] - 62:7
**must** [5] - 37:3, 37:17, 53:9, 57:17, 64:21
**mute** [1] - 5:3
**muted** [1] - 13:16

## N

**name** [5] - 6:25, 7:4, 29:9, 64:22
**names** [1] - 14:7
**NANCY** [1] - 2:14
**Nancy** [1] - 4:2
**Napoleon's** [2] - 42:2, 42:17
**narratives** [1] - 16:16
**naturally** [1] - 37:5
**nature** [2] - 12:4, 52:9
**necessarily** [2] - 10:17, 42:18
**need** [7] - 5:20, 15:24, 16:23, 35:4, 40:1, 65:25
**needs** [1] - 27:7
**neutral** [1] - 36:16
**never** [11] - 12:12, 13:23, 13:24, 15:19, 15:20, 22:11, 29:1, 36:11, 60:3, 60:4, 64:17
**new** [1] - 6:16
**news** [1] - 66:9
**News** [1] - 37:6
**Newtown** [1] - 7:15
**next** [2] - 17:9, 40:9
**nice** [3] - 17:12, 17:14, 65:13
**nicely** [1] - 65:15
**Noise** [1] - 43:20
**none** [2] - 65:15, 66:8
**not-too-distant** [1] - 66:12
**note** [1] - 65:3

**nothing** [2] - 49:23, 53:21
**notice** [2] - 10:25, 49:7, 50:10
**number** [8] - 3:3, 21:2, 21:3, 45:3, 45:19, 60:9, 62:10, 62:11
**numbers** [3] - 45:11, 46:2

## O

**Obama's** [2] - 46:17, 52:13
**objections** [3] - 36:3, 36:4, 37:9
**obligation** [2] - 27:22, 28:1
**observation** [1] - 58:7
**observations** [2] - 25:6, 26:5
**observe** [5] - 12:3, 15:17, 24:23, 32:1, 61:8
**observed** [2] - 28:19, 29:8
**observing** [1] - 32:12
**obvious** [1] - 63:3
**obviously** [2] - 8:5, 66:1
**occasion** [2] - 10:1, 64:8
**occasions** [3] - 10:1, 10:2, 32:1
**occurred** [4] - 7:21, 9:19, 18:24, 36:11
**October** [2] - 9:15, 40:10
**OF** [5] - 1:2, 1:6, 1:13, 2:14, 2:17
**offended** [1] - 22:6
**offer** [2] - 59:15, 65:25
**offered** [1] - 18:23
**Office** [16] - 4:3, 7:3, 18:2, 39:5, 39:20, 39:23, 39:25, 40:25, 41:8, 45:7, 50:16, 50:19, 52:12, 53:5, 55:2, 55:10
**OFFICE** [1] - 2:14
**office** [14] - 4:15, 9:23, 10:4, 34:17, 39:14, 39:16, 45:6, 45:10, 45:19, 50:8, 54:6, 57:6, 62:15, 64:9

**officers** [1] - 32:11
**Official** [2] - 2:22, 66:23
**old** [19] - 6:15, 40:23, 41:3, 41:10, 41:12, 41:15, 42:1, 42:15, 42:17, 42:18, 42:20, 43:4, 44:16, 44:19, 44:20, 45:7, 45:9, 45:20
**older** [7] - 7:2, 7:3, 42:3, 42:21, 44:10, 44:20, 62:12
**omission** [1] - 14:25
**omitted** [2] - 13:12, 62:13
**once** [3] - 23:13, 26:14, 27:22
**one** [39] - 4:13, 4:16, 10:1, 10:11, 14:6, 14:18, 17:22, 18:25, 21:2, 21:18, 23:21, 24:15, 29:9, 29:16, 30:9, 30:14, 31:14, 31:21, 34:2, 35:7, 35:15, 35:21, 44:10, 44:12, 45:20, 49:17, 50:16, 51:17, 54:18, 57:20, 58:20, 59:23, 60:1, 60:16, 62:10, 62:13, 63:6, 63:19
**ones** [1] - 39:10
**open** [1] - 40:18
**openings** [1] - 39:13
**opinion** [9] - 13:9, 18:21, 19:19, 19:20, 20:1, 29:5, 32:17, 64:13, 64:19
**opinions** [1] - 30:17
**opportunities** [3] - 15:17, 24:23, 61:7
**opportunity** [3] - 12:2, 58:13, 65:25
**opposed** [4] - 14:7, 31:12, 36:10, 40:21
**opposing** [2] - 4:24, 5:8
**opposite** [1] - 34:19
**opposition** [1] - 23:8
**oral** [3] - 3:3, 35:8, 65:14
**order** [4] - 27:6, 38:25, 39:17, 42:20
**organization** [2] - 42:4, 44:20
**otherwise** [2] - 35:17, 66:5
**ought** [3] - 35:13, 41:8, 44:2
**outset** [2] - 47:1,

47:4
**outside** [1] - 40:6
**outstanding** [1] - 63:12
**overcome** [1] - 62:8
**overly** [2] - 29:19, 32:13
**own** [4] - 24:18, 25:5, 34:15, 34:17

## P

**P.C** [2] - 2:2, 2:5
**PA** [8] - 1:16, 1:24, 2:3, 2:7, 2:12, 2:15, 2:19, 2:23
**page** [3] - 12:17, 39:2, 42:12
**pain** [2] - 64:10, 64:11
**paper** [1] - 64:21
**papers** [2] - 20:22, 32:3
**paragraphs** [1] - 36:21
**paralegal** [5] - 21:20, 22:8, 23:6, 24:21
**part** [11] - 6:6, 6:8, 6:12, 7:11, 10:25, 14:8, 33:9, 39:24, 42:9, 62:13
**partner** [1] - 46:18
**party** [1] - 38:16
**past** [2] - 55:2, 56:14
**PATCHEN** [2] - 2:18, 4:6
**Patchen** [2] - 4:7, 61:18
**pattern** [1] - 65:18
**pause** [1] - 44:2
**pejorative** [1] - 36:9
**penalty** [2] - 21:7, 21:12
**pencil** [1] - 48:9
**pending** [2] - 15:6, 66:1
**Penn** [1] - 2:15
**PENNSYLVANIA** [1] - 1:2
**Pennsylvania** [6] - 35:20, 35:24, 36:2, 36:5, 37:9, 37:22
**people** [27] - 4:18, 6:15, 14:6, 17:23, 18:5, 25:6, 39:6, 39:8, 39:11, 39:19, 39:23, 40:1, 40:5, 40:6, 40:12, 40:13, 40:17, 41:16, 42:9, 42:16,

42:21, 45:23, 58:17, 58:20, 64:15, 64:16
**percent** [7] - 19:17, 19:18, 45:6, 45:9, 45:14, 45:20, 45:22
**percentage** [2] - 45:13, 45:24
**performance** [9] - 12:3, 12:22, 32:3, 50:22, 61:8, 63:7, 63:8, 63:10, 63:14
**perhaps** [9] - 4:21, 4:23, 19:7, 19:20, 42:25, 44:2, 51:17, 51:22, 54:7
**period** [3] - 9:10, 9:15, 54:9
**permissible** [1] - 18:19
**permitted** [1] - 35:6
**Perskie** [1] - 27:6
**person** [7] - 4:13, 4:16, 25:11, 26:6, 31:9, 31:12, 31:17
**person's** [1] - 13:3
**personal** [6] - 12:10, 12:18, 12:21, 13:21, 13:22, 14:20
**personnel** [2] - 25:5, 26:4
**perspective** [2] - 49:9
**persuade** [1] - 15:24
**pertains** [1] - 30:22
**phase** [2] - 21:7, 21:12
**philadelphia** [2] - 2:3, 2:15
**PHILADELPHIA** [4] - 1:6, 1:13, 1:16, 2:17
**Philadelphia** [12] - 1:24, 2:7, 2:12, 2:19, 2:20, 2:23, 3:5, 4:5, 4:7, 7:3, 34:12, 37:6
**philosophically** [2] - 44:11, 44:14
**philosophy** [4] - 28:11, 40:4, 42:21, 42:23
**phrase** [2] - 40:20, 60:5
**PHRC** [9] - 11:25, 12:13, 12:16, 13:11, 14:22, 14:25, 24:15, 25:4, 28:17
**picture** [2] - 20:11, 62:18
**piece** [1] - 36:7
**pieces** [2] - 11:2, 11:5

**PINCUS** [1] - 2:2
**place** [3] - 9:4, 34:20, 39:8
**plaintiff** [30] - 3:11, 3:13, 5:11, 8:22, 11:22, 11:23, 12:9, 13:20, 14:24, 15:16, 15:19, 17:2, 17:11, 20:4, 22:15, 23:19, 26:25, 27:16, 33:11, 36:6, 36:17, 36:18, 47:22, 51:17, 51:19, 59:25, 60:2, 60:6, 60:21
**Plaintiff** [4] - 1:5, 1:24, 2:4, 2:8
**plaintiff's** [2] - 13:6, 22:13
**Plaintiffs** [1] - 1:11
**plaintiffs** [16] - 3:6, 4:24, 5:5, 6:20, 8:19, 16:25, 17:8, 27:17, 35:10, 40:10, 43:11, 43:23, 43:25, 51:11, 54:15, 57:25
**plaintiffs'** [6] - 5:1, 6:21, 47:25, 58:12, 59:16, 61:18
**plans** [1] - 7:20
**play** [2] - 9:1, 54:22
**playing** [2] - 20:13, 34:19
**pleasant** [1] - 65:17
**plenty** [1] - 11:14
**point** [23] - 5:20, 7:1, 8:20, 11:12, 16:1, 17:21, 20:16, 21:16, 21:17, 23:4, 27:7, 29:4, 29:8, 30:14, 30:20, 31:21, 33:9, 47:20, 55:1, 60:8, 63:1, 63:20, 64:9
**pointed** [2] - 36:18, 47:1
**pointing** [4] - 8:23, 8:25, 37:22, 38:18
**points** [3] - 10:25, 60:15, 62:1
**political** [2] - 40:22, 40:25
**poor** [2] - 47:13, 54:3
**portion** [1] - 39:4
**posed** [1] - 64:4
**position** [8] - 5:15, 8:10, 9:17, 19:8, 28:14, 32:21, 43:13, 59:10
**positions** [3] - 6:21, 40:2, 48:9
**possible** [2] - 12:21,

33:10
**Post** [1] - 36:22
**potential** [1] - 55:3
**Prabhakaran** [2] - 50:5, 52:25
**practice** [2] - 8:7, 8:8
**praised** [1] - 50:23
**PRATTER** [1] - 1:18
**precedent** [1] - 61:13
**precisely** [1] - 36:6
**predicted** [1] - 34:13
**preliminary** [4] - 18:14, 36:3, 36:4, 37:8
**prepared** [6] - 24:10, 26:21, 35:9, 35:11, 40:9, 65:14
**presence** [1] - 23:11
**presentation** [1] - 8:9
**presented** [7] - 20:18, 20:25, 22:1, 22:23, 49:24, 62:10, 63:13
**presenting** [1] - 23:19
**press** [5] - 10:15, 11:5, 17:22, 38:1, 50:12
**pressed** [4] - 29:6, 30:15, 56:15, 57:25
**pretext** [13] - 8:20, 8:21, 16:19, 18:7, 23:19, 25:9, 26:23, 26:24, 28:4, 43:23, 44:1, 52:1, 52:10
**pretextual** [1] - 63:9
**pretrial** [1] - 20:23
**pretty** [1] - 58:14
**prevention** [1] - 40:21
**previously** [2] - 12:12, 27:5
**prima** [1] - 8:19
**principal** [1] - 49:10
**print** [2] - 35:7, 35:12
**problem** [4] - 3:18, 14:12, 56:14, 66:7
**problematic** [1] - 43:25
**proceed** [3] - 6:1, 33:14, 33:20
**proceeding** [2] - 5:22, 19:18
**proceedings** [1] - 66:19
**process** [4] - 6:9, 7:13, 26:11, 64:7
**produce** [2] - 37:5, 37:19

**produced** [2] - 2:25, 21:7
**professional** [3] - 15:17, 24:24, 25:7
**proffer** [1] - 28:1
**proffered** [2] - 27:15, 28:15
**proffering** [1] - 32:16
**program** [2] - 30:1, 30:4
**progressive** [4] - 39:4, 39:20, 39:25, 40:7
**prohibits** [1] - 5:21
**promote** [1] - 40:6
**prongs** [1] - 23:25
**propose** [1] - 4:19
**proposed** [1] - 44:15
**prosecution** [8] - 29:1, 31:24, 32:8, 32:25, 46:15, 51:3, 52:23, 53:11
**prosecutions** [3] - 27:4, 34:13, 53:24
**prosecutor** [3] - 17:25, 55:24, 63:12
**prosecutorial** [2] - 28:10, 54:3
**prosecutors** [4] - 7:2, 40:12, 40:18, 44:13
**protection** [2] - 33:8, 33:13
**provide** [1] - 27:18
**provided** [7] - 11:25, 12:16, 23:7, 24:15, 30:10, 31:5, 56:16
**proving** [1] - 9:4
**proximity** [1] - 9:6
**publication** [2] - 35:8, 39:1
**publications** [2] - 14:17, 14:19
**published** [1] - 36:22
**pulling** [1] - 7:13
**purpose** [1] - 7:22
**purposely** [2] - 20:22, 21:5
**purposes** [3] - 8:17, 35:10, 60:19
**pursuant** [1] - 16:16
**pursuing** [1] - 33:21
**pushed** [1] - 29:24
**put** [1] - 60:23
**pyramid** [1] - 52:15

**Q**

**qualified** [2] - 36:25,

37:15
**quantitative** [1] - 36:13
**questioned** [1] - 13:24
**questioning** [1] - 60:6
**questions** [3] - 7:18, 56:19, 59:17
**quickly** [1] - 9:23
**quiet** [1] - 4:17
**quite** [4] - 3:18, 31:15, 47:8, 48:10
**quote** [1] - 23:19
**quoted** [2] - 39:9, 42:12
**quotes** [2] - 7:7, 32:2

**R**

**Radio** [1] - 40:11
**raise** [1] - 32:13
**rather** [6] - 24:22, 33:10, 42:19, 48:4, 56:5, 56:7
**rationally** [1] - 27:13
**reach** [1] - 65:23
**read** [10] - 7:7, 16:19, 55:14, 55:16, 55:17, 55:22, 59:6, 60:24, 64:1
**ready** [1] - 4:19
**real** [4] - 18:10, 39:7, 40:13, 47:20
**really** [21] - 5:19, 7:5, 7:17, 8:1, 9:24, 10:18, 13:16, 13:20, 15:24, 16:9, 17:2, 19:10, 31:15, 31:17, 37:24, 42:1, 42:10, 43:5, 44:1, 45:13, 51:15
**reason** [41] - 8:24, 12:13, 12:14, 13:5, 14:25, 18:10, 18:19, 19:21, 21:18, 23:15, 23:22, 24:8, 25:10, 27:13, 27:19, 27:22, 28:1, 28:11, 28:14, 28:16, 28:22, 33:3, 48:15, 48:18, 48:21, 49:1, 50:9, 50:10, 50:11, 56:11, 56:22, 57:3, 57:5, 57:23, 57:24, 58:2, 58:3, 61:5, 61:13, 62:4
**reasonable** [8] - 7:10, 8:23, 8:25, 27:12, 36:23, 38:21, 42:19, 60:25

**reasonably** [6] - 13:3, 15:1, 23:20, 27:8, 36:24, 37:14
**reasons** [22] - 11:15, 12:6, 12:14, 13:12, 15:6, 15:12, 15:14, 16:11, 19:2, 22:21, 23:2, 23:21, 24:3, 24:11, 24:19, 27:9, 27:15, 43:16, 48:11, 63:9
**recalled** [1] - 53:22
**received** [2] - 11:24, 12:7
**recently** [1] - 15:8
**recollection** [2] - 55:16, 55:22
**recommendations** [3] - 52:19, 53:3, 54:4
**recommended** [2] - 25:14, 25:22
**record** [22] - 19:3, 22:5, 22:8, 27:12, 31:3, 34:22, 34:23, 34:24, 35:1, 35:2, 41:19, 46:19, 50:3, 53:15, 53:21, 60:10, 60:12, 60:23, 62:13, 63:1, 63:21, 66:19
**recorded** [1] - 53:16
**recording** [2] - 5:22
**records** [1] - 55:10
**recruit** [3] - 40:5, 40:12, 45:3
**recruited** [1] - 62:15
**recruiting** [5] - 39:18, 39:19, 40:17, 44:12
**recruitment** [1] - 44:25
**reelection** [1] - 46:12
**refer** [3] - 14:10, 32:3
**reference** [11] - 6:24, 7:9, 29:14, 32:7, 41:9, 41:24, 42:2, 42:13, 43:4, 54:20, 64:20
**referenced** [3] - 28:5, 28:20, 59:24
**references** [2] - 28:18, 43:9
**referencing** [3] - 7:2, 7:10, 10:3
**referred** [1] - 63:25
**referring** [2] - 14:6, 40:15
**refers** [2] - 42:20, 42:21
**reflect** [1] - 60:13
**reflected** [1] - 6:7
**reflecting** [1] - 8:2
**reflects** [1] - 22:6
**refused** [1] - 57:14
**refute** [1] - 31:22
**refuted** [1] - 20:17
**refutes** [1] - 20:4
**regard** [3] - 6:12, 11:21, 19:5
**regarded** [1] - 35:13
**regarding** [6] - 10:22, 24:11, 24:14, 26:2, 59:25, 63:23
**regardless** [1] - 41:5
**regimen** [1] - 42:9
**relate** [2] - 13:3, 26:24
**related** [5] - 3:4, 6:8, 7:12, 17:19, 65:5
**relates** [2] - 18:7, 47:22
**relating** [2] - 14:21, 17:16
**relatively** [1] - 5:15
**relevant** [1] - 25:7
**reliance** [1] - 30:17
**relied** [3] - 21:19, 21:24, 59:5
**rely** [2] - 30:8, 59:8
**remarks** [1] - 32:4
**remedy** [1] - 33:10
**remember** [5] - 11:6, 29:11, 29:18, 31:11, 64:23
**remembering** [1] - 56:24
**remind** [3] - 5:21, 11:19, 22:2
**remotely** [1] - 9:19
**remove** [1] - 49:5
**rendered** [1] - 65:6
**repeat** [1] - 17:15
**repeating** [1] - 5:9
**report** [2] - 22:9, 35:9
**reported** [2] - 10:14, 63:12
**reporter** [1] - 4:12
**Reporter** [2] - 2:22, 66:23
**represent** [2] - 6:14, 40:2
**representations** [1] - 32:20
**representing** [3] - 4:1, 28:9, 58:5
**reputation** [11] - 29:6, 29:7, 29:13, 29:23, 30:18, 32:17, 38:15, 47:5, 57:23, 58:5, 58:21
**reputations** [1] -
47:14
**request** [2] - 12:16, 13:11
**requested** [1] - 21:10
**require** [1] - 48:3
**required** [4] - 48:20, 50:17, 52:15, 57:24
**requirement** [2] - 35:5, 47:2
**research** [1] - 33:19
**resentencing** [6] - 30:1, 46:17, 52:15, 52:20, 63:24, 64:7
**resistant** [1] - 42:17
**respect** [23] - 8:10, 16:22, 17:8, 18:24, 20:23, 22:14, 22:24, 23:4, 24:5, 24:14, 26:21, 26:22, 26:24, 27:1, 27:16, 28:8, 29:12, 29:21, 29:23, 29:25, 31:24, 32:17, 55:11
**respectively** [1] - 16:18
**respond** [2] - 5:1, 5:6
**response** [10] - 11:25, 12:1, 12:4, 12:9, 12:13, 12:16, 13:11, 14:22, 14:25, 65:10
**responses** [2] - 12:8
**responsibilities** [1] - 14:1
**responsible** [2] - 52:14, 53:6
**rest** [2] - 10:12, 66:10
**Restatement** [1] - 37:2
**result** [6] - 33:1, 39:13, 59:16, 62:5, 65:6, 66:2
**retain** [5] - 13:10, 25:14, 40:6, 51:6, 51:13
**retained** [1] - 52:5
**retaining** [1] - 44:10
**retention** [1] - 44:24
**retrial** [1] - 20:13
**retry** [1] - 19:13
**returning** [1] - 56:5
**reversed** [4] - 36:4, 36:5, 37:9, 37:10
**review** [1] - 50:14
**reviewing** [1] - 33:18
**reviews** [7] - 50:15, 50:21, 50:22, 63:7, 63:8, 63:10
**revolution** [2] -
41:15, 42:14
**rid** [1] - 42:8
**righto** [1] - 34:4
**rigidity** [1] - 54:3
**road** [1] - 56:7
**Robert** [5] - 3:10, 17:10, 30:23, 46:16, 52:11
**ROBERT** [1] - 2:2
**Rockwell** [3] - 35:22, 36:18, 37:14
**role** [7] - 22:14, 23:14, 37:25, 47:20, 48:11, 54:22, 59:12
**room** [1] - 34:7
**roster** [1] - 4:9
**roughly** [3] - 4:20, 45:24, 55:25
**row** [1] - 47:6
**RPR** [2] - 2:21, 66:23
**run** [1] - 40:16
**running** [1] - 46:12

## S

s**AMANTHA** [1] - 2:11
**Samantha** [1] - 4:2
**sands** [1] - 43:21
**satisfied** [1] - 23:25
**saw** [2] - 12:5, 64:21
**scenario** [1] - 5:15
**Schiff** [1] - 3:24
**SCHIFF** [2] - 1:23, 3:23
**Schmidt** [1] - 4:11
**SCHNADER** [1] - 2:9
**school** [1] - 40:20
**Scott** [6] - 18:13, 18:24, 19:5, 19:14, 20:13, 23:5
**Scott/Muhammed** [2] - 18:9, 20:24, 21:4, 21:8, 22:3, 22:14, 23:14, 24:20, 25:3, 25:17, 26:10, 62:6
**screen** [1] - 4:14
**seal** [1] - 14:20
**sealed** [1] - 13:21
**seats** [1] - 3:2
**second** [7] - 6:8, 7:11, 10:23, 10:25, 19:8, 21:16, 56:5
**Section** [1] - 33:14
**see** [9] - 4:14, 11:6, 17:14, 20:13, 26:9, 33:12, 34:18, 38:21, 63:11
**seeing** [1] - 66:11
**seem** [1] - 13:15
**SEGAL** [1] - 2:9
**segment** [1] - 36:16
**SEIDNER** [1] - 1:4
**Seidner** [20] - 1:24, 3:4, 3:21, 3:24, 5:7, 5:12, 11:22, 13:10, 15:3, 16:7, 16:22, 33:7, 55:3, 55:11, 56:22, 57:13, 58:19, 59:21
**Seidner's** [2] - 54:16, 61:4
**Selber** [1] - 32:5
**Select** [1] - 15:9
**select** [2] - 31:6, 31:10
**selected** [1] - 27:3
**selection** [1] - 16:13
**send** [3] - 5:23, 5:24, 5:25
**senior** [4] - 42:22, 44:24, 45:1, 45:4
**sense** [2] - 17:5, 58:14
**sentence** [2] - 12:9, 51:4
**sentences** [2] - 36:19, 65:5
**sentencing** [10] - 52:11, 52:14, 52:18, 52:23, 53:2, 53:8, 53:12, 54:4, 54:13, 63:23
**separate** [1] - 57:12
**September** [2] - 26:12, 62:14
**series** [1] - 20:25
**seriously** [1] - 40:21
**service** [2] - 34:18, 34:21
**set** [8] - 3:3, 14:21, 14:22, 17:5, 24:17, 27:20, 60:5, 61:4
**sets** [1] - 43:5
**several** [2] - 34:13, 57:12
**sexual** [1] - 24:21
**sexually** [4] - 21:11, 21:20, 23:6, 23:9
**sharp** [1] - 48:9
**shifted** [1] - 11:15
**shifting** [14] - 11:20, 15:5, 15:12, 15:13, 19:1, 23:2, 24:2, 27:14, 43:21, 46:23, 46:25, 48:21, 54:19, 61:13
**shocking** [2] - 57:8,

57:11

**short** [2] - 19:8, 58:13

**shorter** [1] - 9:14

**shorthand** [1] - 2:25

**shortly** [1] - 62:12

**shot** [1] - 34:11

**show** [4] - 21:9, 23:19, 40:16, 60:22

**showing** [1] - 35:13

**shows** [1] - 59:8

**side** [1] - 40:13

**SIDKOFF** [1] - 2:2

**Sidney** [1] - 3:16

**SIDNEY** [2] - 2:5, 2:6

**signature** [1] - 28:11

**signed** [1] - 4:9

**significant** [3] - 16:9, 45:3, 65:2

**similar** [2] - 12:6, 27:16

**similarly** [1] - 31:3

**simplest** [1] - 59:4

**simply** [3] - 15:18, 16:15, 27:23

**single** [4] - 14:18, 16:11, 29:9, 32:7

**sit** [1] - 64:18

**sit-down** [1] - 64:18

**situation** [1] - 16:10

**skill** [1] - 43:5

**slightly** [1] - 49:11

**Smith** [13] - 4:1, 16:25, 34:1, 36:8, 44:3, 46:19, 54:24, 58:4, 59:17, 62:11, 63:4, 63:21, 63:25

**SMITH** [58] - 2:10, 3:25, 17:4, 34:3, 34:5, 34:7, 34:24, 35:1, 35:3, 36:1, 36:11, 36:15, 38:10, 41:1, 41:11, 41:22, 42:5, 42:11, 43:19, 44:4, 44:7, 44:22, 45:16, 45:18, 45:25, 46:21, 46:24, 47:8, 47:12, 48:13, 48:17, 51:12, 51:20, 51:24, 52:3, 52:25, 53:15, 53:19, 53:25, 54:6, 54:9, 54:17, 54:25, 55:6, 55:9, 55:18, 56:9, 56:13, 57:1, 57:5, 57:10, 57:18, 58:10, 58:16, 59:4, 59:13, 65:12, 66:8

**Smith's** [2] - 61:19, 63:6

**snapshot** [1] - 62:19

**snippet** [4] - 36:9, 36:10, 36:12, 36:16

**snippets** [3] - 35:17, 36:7, 43:9

**so-called** [2] - 25:12, 32:17

**soldiers** [2] - 42:18, 42:19

**solicit** [1] - 66:5

**someone** [3] - 18:20, 38:18, 53:6

**someplace** [1] - 55:15

**sometime** [1] - 54:7

**somewhere** [1] - 8:1

**sooner** [1] - 9:24

**sophisticated** [1] - 40:14

**sorry** [6] - 5:25, 10:13, 10:19, 10:21, 15:4, 55:8

**sort** [7] - 22:15, 31:15, 37:13, 40:7, 42:3, 47:7, 47:24

**sound** [2] - 31:11, 31:18

**sounded** [1] - 31:15

**sounds** [1] - 31:10

**sour** [5] - 22:17, 48:23, 48:25, 62:5, 62:6

**South** [1] - 2:15

**spared** [1] - 34:9

**speaking** [1] - 5:2

**specific** [10] - 7:1, 7:5, 12:14, 13:12, 24:18, 29:4, 29:19, 29:22, 30:3, 63:23

**specifically** [6] - 3:4, 6:19, 6:23, 12:10, 12:11, 26:24

**speed** [1] - 64:12

**spend** [1] - 65:13

**spent** [1] - 30:21

**spoken** [1] - 29:20

**spotlight** [2] - 14:2, 60:8

**springboard** [2] - 40:22, 40:25

**springs** [1] - 66:12

**squabbling** [1] - 65:17

**Square** [1] - 2:15

**staff** [1] - 25:8

**stage** [1] - 15:25

**stand** [1] - 39:5

**standards** [2] - 8:11, 38:6

**standing** [3] - 3:2, 36:24, 37:14

**standpoint** [3] - 8:6, 43:7, 43:12

**stands** [1] - 32:19

**starchy** [3] - 28:9, 28:23, 28:24

**stark** [1] - 32:20

**start** [2] - 18:13, 47:18

**started** [3] - 17:24, 21:12, 39:11

**state** [1] - 62:3

**statement** [22] - 18:5, 21:14, 24:15, 24:17, 24:19, 25:4, 25:8, 26:1, 26:3, 28:18, 36:10, 37:25, 38:12, 38:15, 38:17, 38:18, 38:19, 46:6, 60:24, 61:9

**Statements** [5] - 46:1, 51:6, 52:17, 54:1, 58:18

**statements** [19] - 6:18, 7:17, 7:22, 8:2, 11:9, 17:18, 18:23, 19:4, 20:16, 38:8, 38:25, 44:9, 46:1, 59:5, 60:9, 60:22, 60:23, 60:24, 61:1

**states** [1] - 28:4

**STATES** [1] - 1:1

**States** [1] - 55:2

**statistics** [5] - 10:23, 62:11, 62:18, 62:22, 62:23

**stats** [1] - 11:12

**stay** [2] - 40:1, 66:10

**step** [1] - 39:8

**stereotypes** [2] - 6:15, 6:18

**still** [3] - 52:16, 60:25, 62:25

**stipulate** [2] - 21:10, 21:13

**stop** [1] - 24:24

**story** [1] - 36:22

**straight** [1] - 40:19

**straightforward** [1] - 12:24

**strategic** [1] - 43:12

**Street** [5] - 1:23, 2:3, 2:7, 2:11, 2:19, 2:23

**strength** [1] - 50:7

**strong** [2] - 43:14, 52:7

**stronger** [2] - 43:13, 43:15

**study** [1] - 47:16

**studying** [1] - 41:20

**stupid** [1] - 57:19

**subject** [3] - 28:21, 33:13, 56:6

**subjected** [1] - 57:22

**submissions** [1] - 66:1

**submitted** [1] - 30:19

**subordinates** [2] - 57:18, 58:24

**subsequent** [1] - 48:19

**subsequently** [1] - 54:22

**successive** [1] - 65:5

**sufficient** [8] - 8:9, 9:2, 11:2, 11:3, 20:6, 28:4, 48:25, 61:14

**suggest** [1] - 62:3

**Suite** [3] - 2:3, 2:7, 2:11

**summarize** [1] - 59:12

**summary** [23] - 4:22, 8:18, 8:22, 9:2, 15:6, 15:11, 20:21, 23:8, 27:2, 27:6, 33:2, 35:10, 42:13, 43:6, 46:19, 48:7, 48:9, 48:12, 48:22, 50:23, 58:14, 60:19, 61:14

**SUMMARY** [1] - 1:19

**sun** [1] - 48:1

**superficial** [1] - 47:3

**superficially** [1] - 3:4

**Superior** [4] - 36:4, 36:5, 37:9, 37:10

**supervisor** [3] - 13:23, 40:2, 54:12

**supervisors** [3] - 31:25, 63:11, 63:15

**supplement** [2] - 61:19, 65:25

**supplemented** [3] - 25:5, 26:5, 26:6

**support** [5] - 10:18, 12:14, 20:3, 23:7, 55:12

**supported** [1] - 21:8

**supports** [1] - 22:20

**supposed** [1] - 44:9

**Supreme** [9] - 35:20, 35:24, 36:2, 36:5, 36:20, 36:21, 37:2, 37:7, 37:10

**surrounding** [1] - 10:23

**survive** [1] - 27:6

**sustained** [2] - 36:3, 37:8

**Swiatek** [2] - 4:5, 61:18

**SWIATEK** [3] - 2:18, 4:4, 61:21

**sworn** [2] - 7:19, 9:23

**system** [2] - 25:7, 26:5

**systems** [1] - 5:4

## T

**T's** [1] - 48:5

**talks** [1] - 44:12

**targeted** [1] - 6:22

**team** [7] - 34:15, 34:17, 35:3, 40:4, 46:9, 50:20, 51:1

**technical** [1] - 8:5

**tee** [1] - 47:23

**teed** [3] - 28:10, 38:3, 56:21

**teepee** [1] - 43:5

**Teleflex** [1] - 23:18

**telephone** [1] - 4:3

**Temin** [1] - 46:15

**temporal** [1] - 9:6

**ten** [1] - 39:2

**ten-page** [1] - 39:2

**tend** [2] - 39:10, 39:12

**tenure** [1] - 32:19

**term** [4] - 36:9, 36:13, 36:13, 36:17

**terminate** [10] - 12:25, 13:10, 15:3, 18:15, 21:19, 24:12, 25:15, 30:5, 48:14, 63:24

**terminated** [12] - 10:6, 10:7, 11:23, 12:10, 14:24, 16:12, 18:1, 31:3, 32:24, 57:25, 58:2, 62:4

**terminating** [2] - 31:9, 31:12

**termination** [22] - 6:11, 12:7, 12:22, 13:2, 13:7, 14:2, 24:8, 24:9, 24:11, 27:3, 27:18, 27:19, 28:2, 28:17, 28:21, 31:7, 31:10, 31:17, 31:19, 47:23, 50:10, 52:4

**terminations** [4] - 30:12, 45:8, 45:21, 52:12

**terms** [14] - 4:22, 7:5, 10:5, 13:17, 13:20, 13:25, 19:17, 20:1, 20:11, 43:1, 43:15,

43:17, 48:22, 66:2
**test** [2] - 6:6, 35:12
**testified** [20] - 14:13, 18:3, 21:18, 22:10, 25:13, 25:15, 26:11, 29:24, 42:6, 42:12, 50:6, 50:17, 51:2, 51:5, 52:5, 52:6, 52:10, 52:25, 57:22, 58:23
**testify** [1] - 49:11
**testimony** [15] - 14:15, 24:13, 25:24, 25:25, 26:7, 30:8, 30:13, 30:22, 30:24, 53:16, 55:14, 57:2, 63:14, 64:1, 64:2
**THE** [122] - 1:1, 1:2, 1:18, 2:14, 3:1, 3:14, 3:17, 3:22, 4:8, 5:13, 5:18, 6:3, 6:22, 8:5, 9:3, 10:5, 10:13, 10:20, 11:3, 11:10, 11:17, 11:19, 12:20, 13:14, 14:5, 14:12, 15:5, 15:21, 15:24, 16:5, 16:21, 17:7, 17:12, 18:8, 18:14, 19:7, 19:10, 19:16, 20:10, 20:19, 22:2, 22:5, 22:13, 23:13, 24:6, 26:14, 26:19, 27:21, 28:7, 28:24, 29:14, 31:8, 31:14, 31:17, 31:20, 33:5, 33:22, 34:1, 34:4, 34:6, 34:22, 34:25, 35:2, 35:24, 36:8, 36:13, 37:21, 40:24, 41:9, 41:17, 41:25, 42:8, 42:25, 43:21, 44:6, 44:18, 45:12, 45:23, 46:19, 46:22, 47:6, 47:10, 47:20, 48:16, 51:8, 51:15, 51:22, 52:2, 52:21, 53:9, 53:18, 53:20, 54:5, 54:8, 54:16, 54:18, 55:4, 55:8, 55:17, 56:7, 56:11, 56:21, 57:4, 57:8, 57:17, 58:4, 58:11, 59:1, 59:10, 59:14, 59:22, 61:17, 61:23, 62:21, 62:24, 63:2, 63:17, 64:3, 65:9, 65:11, 65:13, 66:9
**themselves** [3] - 7:17, 37:24
**theory** [1] - 22:14

**therefore** [1] - 37:17
**therein** [1] - 27:20
**they've** [1] - 35:11
**thinking** [4] - 48:20, 50:12, 58:1, 58:2
**third** [4] - 21:17, 49:5, 62:20, 63:5
**Third** [6] - 9:10, 15:10, 20:2, 23:18, 33:10, 61:12
**thirds** [1] - 10:7
**Thirty** [1] - 45:7
**Thomas** [2] - 35:21, 36:17
**thorough** [1] - 24:4
**thoroughly** [1] - 65:15
**three** [5] - 9:16, 12:17, 17:6, 20:18, 62:1
**three-page** [1] - 12:17
**thrust** [2] - 14:1, 60:7
**tied** [1] - 55:12
**tightly** [1] - 46:14
**today** [7] - 5:24, 26:21, 32:21, 34:19, 48:1, 52:16, 60:12
**together** [1] - 17:6
**Tomasso** [1] - 20:6
**tomorrow** [1] - 34:21
**took** [5] - 39:17, 45:6, 45:19, 54:6, 64:9
**top** [3] - 47:13, 52:14
**Torts** [1] - 37:2
**total** [2] - 18:2, 62:15
**tough** [1] - 47:6
**towards** [1] - 11:13
**TRACI** [1] - 2:6
**Traci** [1] - 3:13
**track** [1] - 17:3
**traditional** [1] - 39:24
**transcript** [6] - 21:8, 41:24, 49:2, 65:23, 65:24, 66:18
**Transcript** [1] - 2:25
**transcriptions** [1] - 35:9
**transcripts** [1] - 35:12
**tremendously** [1] - 43:3
**trial** [28] - 18:9, 18:13, 18:25, 19:13, 19:14, 20:17, 21:4, 21:8, 21:15, 21:21, 22:3, 22:15, 22:25, 23:12, 23:15, 24:20,

25:2, 25:17, 25:19, 26:10, 33:2, 36:3, 36:20, 37:8, 50:4, 59:11, 62:6, 62:7
**tried** [2] - 49:5, 64:6
**troops** [1] - 42:2
**trouble** [3] - 55:24, 57:13, 60:5
**true** [4] - 14:15, 15:18, 39:12, 46:7
**truism** [1] - 58:10
**truly** [2] - 39:3, 39:20
**Trump** [1] - 34:20
**trusted** [2] - 25:12, 30:9
**truth** [2] - 49:21, 58:8
**try** [3] - 5:8, 31:11, 65:20
**trying** [4] - 34:20, 44:25, 47:24, 47:25
**Tucker** [1] - 37:6
**tune** [3] - 44:11, 44:14, 44:25
**turn** [4] - 8:15, 8:20, 18:6, 20:9
**two** [19] - 6:6, 10:1, 10:7, 10:18, 10:25, 12:6, 12:9, 16:17, 21:3, 23:22, 27:16, 32:4, 33:15, 35:20, 36:21, 37:22, 50:17, 51:11, 62:11
**two-part** [1] - 6:6
**two-sentence** [1] - 12:9
**two-thirds** [1] - 10:7
**type** [2] - 16:14, 60:3

## U

**U.S** [3] - 2:22, 55:10, 55:24
**ultimate** [1] - 59:1
**ultimately** [7] - 23:14, 28:7, 30:6, 30:19, 52:14, 59:10, 65:7
**unable** [3] - 6:17, 14:17, 55:20
**unaccompanied** [1] - 48:15
**unattractive** [2] - 56:7, 59:2
**unchallenged** [1] - 50:3
**unclear** [1] - 53:9
**under** [15] - 8:17, 8:21, 8:22, 14:19, 15:8, 20:5, 20:6, 33:8,

33:14, 43:11, 43:13, 46:5, 62:16, 62:17
**underlying** [1] - 19:12
**undermine** [1] - 38:5
**understood** [3] - 36:25, 37:15, 52:8
**undisputed** [4] - 6:14, 24:7, 24:9, 25:2
**unduly** [1] - 29:25, 32:8
**unethically** [1] - 18:17
**unique** [1] - 5:15
**unit** [1] - 29:11
**United** [1] - 55:2
**UNITED** [1] - 1:1
**unless** [2] - 16:25, 25:22
**unofficial** [1] - 58:23
**unreasonable** [2] - 37:1, 37:16
**unusual** [1] - 48:13
**unwilling** [2] - 6:16, 14:18, 42:24
**unworthy** [1] - 27:13
**up** [21] - 4:9, 4:25, 6:17, 9:22, 9:25, 11:12, 15:21, 17:5, 28:10, 30:11, 38:3, 42:15, 46:11, 47:23, 48:1, 49:8, 53:3, 55:21, 56:21, 64:22
**urged** [1] - 36:23
**uttered** [2] - 38:2, 53:14

## V

**valid** [1] - 19:19
**various** [3] - 5:4, 30:11, 59:16
**VEGA** [1] - 1:10
**Vega** [57] - 2:4, 3:6, 3:11, 5:7, 17:8, 17:11, 17:20, 17:25, 18:23, 19:21, 20:5, 20:18, 20:22, 20:24, 21:5, 21:10, 21:12, 21:15, 21:19, 21:23, 21:25, 22:7, 22:12, 22:19, 22:23, 23:5, 23:9, 23:24, 24:8, 24:12, 24:14, 24:16, 24:23, 25:2, 25:12, 25:15, 25:16, 25:18, 26:2, 46:13, 47:19, 48:23, 48:24, 49:4, 49:7, 49:10, 49:12, 49:20,

50:1, 50:7, 50:23, 50:25, 51:13, 52:4, 52:7, 62:7
**Vega's** [10] - 18:7, 19:3, 24:5, 46:12, 50:21, 62:4, 62:8, 63:7, 63:8, 63:10
**venial** [1] - 43:17
**vent** [2] - 28:10, 43:1
**veracity** [1] - 32:23
**verbal** [2] - 3:14, 3:18
**verification** [1] - 20:25
**verified** [5] - 24:15, 24:17, 24:19, 25:4, 28:18
**Verizon** [2] - 16:16, 28:5
**vernacular** [1] - 22:16
**versus** [11] - 3:5, 7:14, 15:9, 23:18, 27:5, 28:5, 35:22, 36:18, 37:6, 37:14, 52:16
**VIA** [1] - 1:20
**via** [1] - 2:25
**victory** [1] - 34:2
**video** [1] - 5:22
**VIDEO** [1] - 1:20
**Vieille** [2] - 41:17, 41:18
**VIEILLE** [1] - 41:18
**view** [11] - 33:10, 39:24, 41:5, 41:7, 46:15, 51:9, 51:12, 51:18, 53:2, 53:14, 53:23
**views** [2] - 52:22, 53:10
**vigorous** [1] - 42:19
**virtually** [1] - 10:14
**vis** [2] - 12:22
**vis-a-vis** [1] - 12:22
**vision** [3] - 6:16, 28:12, 40:18
**Voci** [2] - 50:5, 58:23
**volley** [1] - 58:13
**vs** [2] - 1:5, 1:12

## W

**wait** [1] - 3:14
**wall** [1] - 58:20
**wants** [7] - 5:5, 17:9, 40:4, 40:5, 40:6, 40:11, 44:11
**weaknesses** [1] -

27:11

**website** [1] - 49:8

**Webster** [1] - 44:19

**Webster's** [1] - 44:18

**weight** [1] - 32:10

**welcome** [1] - 4:15

**well-deserved** [1] - 58:5

**whatsoever** [4] - 24:20, 48:15, 50:11, 66:8

**whereas** [1] - 37:24

**whichever** [1] - 16:25

**whimsy** [1] - 27:23

**white** [1] - 39:12

**WHITEHEAD** [1] - 1:10

**Whitehead** [46] - 2:8, 3:6, 3:13, 3:16, 5:7, 17:9, 17:21, 26:17, 26:25, 27:1, 27:7, 27:16, 28:8, 28:9, 28:19, 28:20, 29:8, 29:10, 29:19, 29:21, 29:23, 29:25, 30:3, 30:16, 30:22, 31:1, 31:3, 31:6, 31:23, 32:7, 32:12, 51:2, 51:3, 51:6, 51:9, 53:2, 53:7, 53:23, 54:2, 54:12, 63:18, 64:5, 64:10, 64:17, 64:18, 64:25

**whitehead's** [1] - 52:23

**Whitehead's** [13] - 27:18, 30:5, 30:18, 32:19, 32:24, 52:10, 52:17, 52:19, 53:11, 53:14, 54:12, 63:23, 64:22

**whole** [2] - 47:16, 62:18

**wide** [1] - 41:7

**wife** [1] - 56:5

**win** [1] - 46:12

**WINKELMAN** [1] - 2:14

**Winkelman** [1] - 4:2

**wins** [1] - 46:13

**wish** [1] - 65:22

**withheld** [1] - 21:5

**withhold** [1] - 21:9

**witness** [1] - 49:19

**witnesses** [6] - 49:11, 49:15, 49:18, 52:10, 57:20, 58:8

**witnessing** [1] - 15:20

**word** [1] - 28:24

**words** [9] - 6:9, 7:23, 12:23, 24:18, 36:24, 37:14, 37:24, 38:3, 47:14

**worth** [2] - 46:10, 47:7

**writing** [1] - 53:16

**written** [1] - 66:1

**wrongdoing** [1] - 60:2

## Y

**yard** [1] - 4:18

**year** [1] - 24:15

**years** [20] - 12:6, 14:2, 17:24, 18:1, 18:3, 29:10, 29:17, 32:4, 39:11, 40:15, 41:4, 41:13, 45:7, 45:9, 45:20, 47:4, 47:7, 57:21, 63:11

**young** [4] - 39:18, 41:16, 42:7, 42:22

**youngest** [1] - 34:7

## Z

**Zarallo** [4] - 32:5, 54:11, 58:17, 58:19