**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARLOS VEGA** | : | **CIVIL ACTION** |
| **and** | : | |
| **JOSEPH WHITEHEAD, JR.** | : | **NO. 19-4039** |
| | : | |
| **Plaintiffs,** | : | **JURY TRIAL DEMANDED** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| **and** | : | |
| **LAWRENCE S. KRASNER** | : | |
| | : | |
| **Defendants.** | : | |

## [PROPOSED] ORDER

AND NOW, this _____ day of _____, 2022, upon

consideration of *Plaintiffs' Motion in Limine to Preclude Testimony and Evidence from

Jack McMahon Regarding the Termination of Plaintiff Vega's Employment with

Defendant City, and of Communications Between Jack McMahon and Defendant

Krasner Pertaining to Plaintiff Vega That Occurred After January 5, 2018*, and the

responses and replies thereto, is hereby **ORDERED** that the Motion is **GRANTED**, and

that:

1.      Defendants are precluded from presenting testimony or evidence from

Jack McMahon regarding the termination of Plaintiff Vega's employment with Defendant

City of Philadelphia.

2.    Defendants are precluded from presenting testimony or evidence of or related to communications between Jack McMahon and Defendant Krasner pertaining to Plaintiff Vega that occurred after January 5, 2018.

BY THE COURT:

_____
GENE E.K. PRATTER
United States District Judge

### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLOS VEGA** | : | **CIVIL ACTION** |
| **and** | : | |
| **JOSEPH WHITEHEAD, JR.** | : | **NO. 19-4039** |
| **Plaintiffs,** | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| **CITY OF PHILADELPHIA** | : | |
| **and** | : | |
| **LAWRENCE S. KRASNER** | : | |
| **Defendants.** | : | |

### PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE TESTIMONY AND EVIDENCE FROM JACK MCMAHON REGARDING THE TERMINATION OF PLAINTIFF VEGA'S EMPLOYMENT WITH DEFENDANT CITY, AND OF COMMUNICATIONS BETWEEN JACK MCMAHON AND DEFENDANT KRASNER PERTAINING TO PLAINTIFF VEGA THAT OCCURRED AFTER JANUARY 5, 2018

For the reasons set forth in the accompanying Memorandum of Law, Plaintiffs

respectfully request that this Court enter the proposed form of Order submitted

herewith, precluding the Defendants from presenting testimony or evidence from Jack

McMahon regarding the termination of Plaintiff Vega's employment with Defendant City,

and of communications between Jack McMahon and Defendant Krasner pertaining to

Plaintiff Vega that occurred after January 5, 2018.

/s/ Robert A. Davitch
Samantha F. Green, Esq.
**Sidkoff, Pincus & Green, P.C.**
1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600 – Office
(215) 574-0310 – Fax
rad@sidkoffpincusgreen.com

Attorneys for Plaintiffs

/s/ Sidney L. Gold
Sidney L. Gold, Esq.
Traci M. Greenberg, Esq.
**Sidney L. Gold & Associates, P.C.**
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999 – Office
SGold@DiscrimLaw.net

Attorneys for Plaintiffs

Date: July 1, 2022

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLOS VEGA** | : | **CIVIL ACTION** |
| **and** | : | |
| **JOSEPH WHITEHEAD, JR.** | : | **NO. 19-4039** |
| | : | |
| **Plaintiffs,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| **and** | : | |
| **LAWRENCE S. KRASNER** | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
*IN LIMINE* TO PRECLUDE TESTIMONY AND EVIDENCE FROM JACK
MCMAHON REGARDING THE TERMINATION OF PLAINTIFF VEGA'S
EMPLOYMENT WITH DEFENDANT CITY, AND OF COMMUNICATIONS
BETWEEN JACK MCMAHON AND DEFENDANT KRASNER PERTAINING
TO PLAINTIFF VEGA THAT OCCURRED AFTER JANUARY 5, 2018**

I.    **INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiffs, Carlos Vega and Joseph Whitehead, Jr., join in bringing this age

discrimination in employment action against their former employer, the City of

Philadelphia ("City"), and the City's District Attorney ("DA"), Lawrence Krasner.

Plaintiffs were career prosecutors who were hired by the City in the 1980s to work in the

District Attorney's Office ("DAO").  Doc. No. Nos. 56-58: Memorandum and Order of

Judge Pratter re: Def. Motion for Summary Judgment, 9/17/2021 ("SJ Mem.") at p. 1.

In 2017, when Mr. Krasner announced his candidacy for DA, Mr. Vega and Mr.

Whitehead were 61 and 64 years old, respectively, and were still employed at the DAO,

as homicide prosecutors.  SJ Mem. at 1, 3.  When he was running for District Attorney,

Mr. Krasner made a series of public comments in media interviews which Plaintiffs

contend reflected his bias against and stereotypical views of older career prosecutors.

By way of example, Mr. Krasner proclaimed in a May 2017 interview that "people who are going to made to leave [the DAO] . . . will tend to be my generation, people who started in this business 30 years ago[.]" SJ Mem. at 3; Doc. No. 34-5 at 121.  In another pre-election interview, Mr. Krasner declared that "the old guard [in the DAO] . . . needs to go."  Id.; Doc. No. 34-5 at 128.

In November 2017, Mr. Krasner won the election for DA, and he was sworn into office on January 2, 2018.  SJ Mem. at 1.  Three days later, on January 5, 2018, Mr. Krasner terminated the employment of 30 attorneys at the DAO, including Plaintiffs, 20 of whom were over the age of 40.  Id. at 1 and 12 n.5.  It is undisputed that Mr. Krasner was the sole decisionmaker.

After being forced out of their jobs with the City, Plaintiffs filed separate complaints of age discrimination with the Pennsylvania Human Relations Commission ("PHRC").  In response to each complaint, Mr. Krasner submitted a verified statement to the PHRC explaining the basis for his decision, in which he asserted that he "had been able to conduct what essentially amounted to a thirty-year job interview" of each Plaintiff, which included "extensive opportunities to observe and assess their professional competence, demeanor, and ethics."  SJ Mem. at 2; Doc. No. 40-13 Ex. 22 ¶2.  These verified statements did not identify any particular case prosecuted Mr. Vega that caused Mr. Krasner to make the termination decision.  SJ Mem. at 2.

In his deposition taken on September 16, 2020, Mr. Krasner was more specific, testifying that his decision to discharge Mr. Vega resulted from Mr. Vega's alleged misconduct in a triple capital homicide case ("Scott/Muhammed"), which was tried to verdict in 2016, and was the only case that Mr. Krasner, as a defense attorney, ever

2

tried against Mr. Vega where Mr. Vega was the prosecutor.  SJ Mem. at 2; Krasner Tr.
9/16/2020 NT 302:24-303:4, Ex. A attached hereto.  In the Scott/Muhammed trial, Mr.
Krasner represented one defendant (Muhammad) and Jack McMahon, Esquire,
represented the other defendant (Scott).  See Statement of Material Facts re: Def. Mot.
Sum. Judg. ("SOMF"), 11/2/2020 at ¶¶21, 27; Pl. Resp. to SOMF, 11/23/20 at ¶¶21a
and 27a.

In his deposition, taken on October 22, 2020, Mr. McMahon acknowledged that
he played no role, had no involvement, and was not consulted in the decision to
terminate Mr. Vega's employment.  McMahon Tr. 10/22/20 NT 12:3-5, 21:24-22:5, Ex. B
attached hereto (testifying that "it's clear that it wasn't my decision to be firing [Mr.
Vega], it was Mr. Krasner's in starting a new DA's office" and "I didn't give Larry
[Krasner] any guidance on who he hired and who he fired, that's certainly up to him,
that's his office and he has to shape it the way he wishes it to be shaped[.]").

In their Pretrial Memorandum, Defendants identified as a trial exhibit an article
published in Philly.com on January 13, 2018, which attributed quotes and comments to
Mr. McMahon regarding the appropriateness of Mr. Krasner's decision to discharge Mr.
Vega.  Doc. No. 61: Def. Exhibit List at p. 8 at D89; Philly.com article, 1/13/2018, Ex. C
attached hereto.[1]  Plaintiffs anticipate that Defendants will call Mr. McMahon as a
witness to give testimony consistent with statements that were ascribed to him in the
Philly.com article, including that:

- The Scott/Muhammed trial was "very, very personally contentious."

- The Scott/Muhammed trial "had an effect on", and he "[could] only

---

[1] Defendants relied on the Philly.com article in support of their summary judgment
motion.  SOMF at ¶32.

<u>assume</u> it had an effect on Larry [Krasner]."

- If the <u>Scott/Muhammed</u> case informed Mr. Krasner's view of who he should hire and fire, "that's not only justified, it's smart."

- If Mr. Krasner made his decision to terminate Mr. Vega based on what occurred during the <u>Scott/Muhammed</u> trial, "that's absolutely normal - - it's to be expected" and "anybody put in that situation should do the exact same thing."

<u>See</u> Ex. C (emphasis added). If, as Defendants argued in their summary judgment motion, Mr. McMahon was quoted accurately in the <u>Philly.com</u> article, his comments about Mr. Vega were gratuitous, speculative, and based on assumptions rather than personal knowledge. There is no dispute about this since Mr. McMahon testified that he was not consulted and did not participate in the decision to discharge Mr. Vega.

In their Pretrial Memorandum, Defendants listed as another trial exhibit two text messages sent by Mr. McMahon to Mr. Krasner in <u>September 2019</u>. Doc. No. 61: Def. Exhibit List at p. 4 at D40. In those texts, <u>written 20 months after Mr. Vega had been discharged</u>, Mr. McMahon stated, gratuitously, sarcastically, and cruelly:

> Somebody told me Carlos is suing you because you fired him because he was too old – old meaning he just had longer to be a lying, cheating scumbag.
>
> *****
>
> Read paper about poor Carlos – I'll testify why you fired him – what he did with us in <u>Scott/Muhammed</u> was a disgrace, plus he lied directly to [the] court. Knowing directly the methods of Carlos it would have been a dereliction of duty to keep him.

<u>See</u> Text messages from Mr. McMahon to Mr. Krasner, 9/5/2019 and 9/6/2019, Ex. D attached hereto. Mr. McMahon has authenticated these texts. McMahon NT 10:8-11:20, Ex. B attached hereto. In accord with what he said to Mr. Krasner in the text

messages, Mr. McMahon speculated and offered gratuitous opinions in his deposition about the reasons for Mr. Vega's termination and his age discrimination claim, testifying that "the thought that Carlos was fired because of his age was just so ludicrous and absurd to me," and "that he would claim that he was being fired because he was old when, in reality, that has nothing at all to do with why Larry [Krasner] fired him, in my opinion."  McMahon Tr. NT 12:6-15, Ex. B attached hereto; see also id. at 22:5-8 (testifying that "when I heard that Carlos was saying, oh, it's because I was too old, again, that's just humorous and ludicrous"); id. at 22:12-15 (testifying that "if I read that Carlos Vega wasn't fired after what happened in our case, I would have been totally shocked.").

Plaintiffs seek to preclude Defendants from presenting testimony or evidence from Mr. McMahon regarding the termination of Plaintiff Vega's employment (including testimony from him as to the appropriateness of Defendant Krasner's decision), and of communications (written and oral) between Mr. McMahon and Defendant Krasner regarding Mr. Vega that occurred after Mr. Vega's employment was terminated.  The evidence sought to be excluded includes (but is not limited to) statements made by Mr. McMahon to Philly.com and in Mr. McMahon's September 2019 text messages.  Such post hoc evidence is totally irrelevant, and even if it had any probative value, it should be precluded pursuant to Fed.R.Evid. 403.

II.   **ARGUMENT**

A.   **Standards Governing *In Limine* Motions**

Courts have the inherent power to exclude evidence in order to "manage the course of trials."  Luce v. United States, 469 U.S. 38, 41 n.4 (1994); see also id. at 40

5

n.2 (noting that purpose of a motion *in limine* is "to exclude anticipated prejudicial

evidence before the evidence is actually offered"); Bradley v. Pittsburgh Bd. of Educ.,

913 F.2d 1064, 1068 (3d Cir. 1990) ("[A] motion *in limine* is designed to narrow the

evidentiary issues for trial and to eliminate unnecessary trial interruptions."). It is well-

settled that the admission or exclusion of evidence at a trial falls within the sound

discretion of the district court. Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,

2010 U.S. App. LEXIS 13827, at *8 (3d Cir. 2010) (quoting United States v. Abel, 469

U.S. 45, 54 (1984)).

**B.    Testimony and Evidence from Mr. McMahon Pertaining to the
        Termination of Mr. Vega's Employment, and of After the Fact
        Communications Between Mr. McMahon and Defendant Krasner
        Regarding Mr. Vega Should Be Excluded As Irrelevant**

"In determining whether to admit evidence, a court must make the threshold

determination that the proffered evidence is relevant." N. Am. Roofing & Sheet Metal

Co., Inc. v. Bldg. Constr. Trades Council of Phila. and Vicinity, 2005 U.S. Dist. LEXIS

241, at *6 (E.D.Pa. Jan. 10, 2005). Fed.R.Evid. 401 provides that "[e]vidence is

relevant if: it has any tendency to make a fact more or less probable than it would be

without the evidence; and the fact is of consequence in determining the action"

(emphasis added). Fed.R.Evid. 402 states that "[i]rrelevant evidence is not admissible."

Thus, if evidence offered by a party has no bearing on a material element of the case, it

should be excluded. Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187-189 (3d

Cir. 1990); see also Inline Connection Corp. v. AOL Time Warner Inc., 470 F.Supp 2d

424, 433 (D. Del. 2007) ("[F]or a fact to be relevant it must be of consequence to the

issue under determination"); Forrest v. Beloit Corp., 424 F.3d 344, 355 (3d Cir. 2005).

The evidence sought to be excluded is clearly not "of consequence in

6

determining the action." Fed.R.Evid. 401.  It lacks any relevance or probative value since it is undisputed that Mr. Krasner made the decision to terminate Mr. Vega's employment, and that Mr. McMahon played no role and had no involvement.  Mr. McMahon even acknowledged that he could "only assume" that the Scott/Muhammed trial influenced Mr. Krasner.  Thus, Mr. McMahon can only guess and hypothesize as to why Mr. Krasner made the decision.  He was even quoted in the Philly.com article as having said that "if" Mr. Krasner discharged Mr. Vega because of what occurred during the Scott/Muhammed trial, it would have been "justified," "smart," "absolutely normal" and "to be expected."  These theoretical, after-the-fact opinions have no bearing on the issue of whether Mr. Krasner was motivated by a discriminatory animus when he discharged Mr. Vega.  The same can be said of Mr. McMahon's irrelevant and extraneous opinion, expressed to Mr. Krasner in September 2019, that "it would have been a dereliction of duty" for Mr. Krasner to have retained Mr. Vega.  This surmise is not at all probative of Mr. Krasner's knowledge, intent, or state of mind on January 5, 2018, when he made the decision to terminate Mr. Vega.  Samuels v. Albert Einstein Med. Ctr., Civil Action No. 97-3448, U.S. Dist. LEXIS 17320, at 12-13 (E.D.Pa. Nov. 4, 1998).

The ad hominem attack included in Mr. McMahon's September 2019 text to Mr. Krasner (that Mr. Vega was "a lying, cheating scumbag") likewise lacks any probative value.  Moreover, this type of harsh, vituperative, and inflammatory language, coming from an attorney who was not involved in the termination decision, is way beyond the pale and has no place in a trial.  Fineman v. Armstrong World Indus., 980 F.2d 171, 209 (3d Cir. 1992); Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 303, 306 (E.D.Pa.

7

2007).[2]

      **C.**    **Alternatively, Testimony and Evidence from Mr. McMahon Pertaining to the Termination of Mr. Vega's Employment, and of After the Fact Communications Between Mr. McMahon and Defendant Krasner Regarding Mr. Vega, Should Be Excluded Because Its Probative Value, If Any, Is Substantially Outweighed by Dangers of Unfair Prejudice, Confusion, Waste of Time, and Undue Delay**

Fed.R.Evid. 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit the evidence." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 (3d Cir. 2002). In determining whether to admit or exclude evidence under Rule 403, "the proper equation places on one side the maximum reasonable probative force for the offered evidence, while the

---

[2] The exclusion of evidence of McMahon's post hoc comments and opinions regarding the termination of Mr. Vega's employment can be sharply contrasted with evidence Plaintiffs will present from their supervisors at the DAO, including performance appraisals prepared by the supervisors, to rebut Mr. Krasner's testimony regarding the negative views he harbored of Mr. Vega at the time he made the decision. Although Mr. Krasner testified that he did not speak to the supervisors and did not look at performance appraisals, testimony from the supervisors is essential to discredit Mr. Krasner's testimony regarding his supposed "thirty-year interview" of Mr. Vega; that Mr. Vega was unethical and untrustworthy in the Scott/Muhammed case; and that Mr. Vega's behavior in that case was consistent with his reputation. The supervisors will describe to the jury their favorable assessments and evaluations of Mr. Vega's performance, ethics and integrity before the termination, which can give rise to an inference of a discriminatory motive on the part of Mr. Krasner. Wright v. Northampton Cmty. Coll., No. 18-2976, 2020 U.S. Dist. LEXIS 99726, at *26 (E.D.Pa. June 8, 2020); Kelly v. United States Steel Corp., No. 2:11-cv-00193, 2012 U.S. Dist. LEXIS 16797, at *5-6 (W.Pa. Nov. 9, 2012). Conversely, the evidence from Mr. McMahon sought to be excluded has nothing to do with rebutting Mr. Krasner's articulated reasons for discharging Mr. Vega and everything to do with an effort by Defendants to offer after-the-fact proof to attempt to legitimize Mr. Krasner's decision. This is improper.

other side of the equation should include the likely prejudicial impact of the evidence." Id. at 1344 (quotation omitted).  Furthermore, "evidence may be excluded [under Rule 403] if its probative value is not worth the problems that its admission may cause."  Id. at 1343.

Even if the evidence sought to be excluded had minimal relevance, it should be precluded under Rule 403.  Allowing its admission would present a real danger that the jury would be confused or misled to find that Mr. McMahon's post hoc statements, opinions and speculation regarding the validity of Mr. Vega's discharge somehow justifies Mr. Krasner's decision - even though Mr. McMahon had no input and was not consulted.  This would result in unfair prejudice to Mr. Vega.  Ansell v. Green Acres Constr. Co., 347 F.3d 515, 525 (3d Cir. 2003) (quoting Wagenmann v. Adams, 829 F.3d 196, 217 (3d Cir. 2017)).  In addition, if the jury were to see or hear testimony about Mr. Mahon's hostile and vituperative text messages, it could be swayed or influenced to dislike or turn against Mr. Vega for no valid reason.  Finally, permitting the presentation of the evidence Plaintiffs seek to exclude would delay the proceedings and waste time. Accordingly, assuming there is any probative value to the evidence sought to be precluded, it should be barred pursuant to Rule 403.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter the proposed form of Order submitted herewith, precluding the Defendants from presenting testimony or evidence from Jack McMahon pertaining to the termination of Mr. Vega's employment with the City, and of communications between Mr. McMahon and Mr.

Krasner pertaining to Mr. Vega that occurred after Mr. Vega's employment with the City was terminated.

                    /s/ Robert A. Davitch
                    Robert A. Davitch, Esq.
                    Samantha F. Green, Esq.
                    **Sidkoff, Pincus & Green, P.C.**
                    1101 Market Street, Suite 2700
                    Philadelphia, PA 19107
                    (215) 574-0600 – Office
                    (215) 574-0310 – Fax
                    rad@sidkoffpincusgreen.com

                    /s/ Sidney L. Gold
                    Sidney L. Gold, Esq.
                    Traci M. Greenberg, Esq.
                    **Sidney L. Gold & Associates, P.C.**
                    1835 Market Street, Suite 515
                    Philadelphia, PA 19103
                    (215) 569-1999 – Office
                    SGold@DiscrimLaw.net

                    Attorneys for Plaintiffs

Date: July 1, 2022

# EXHIBIT A



**A&A**
Court Reporting
Videoconferencing
215-829-9300
833-562-9300
www.a-acourtreporting.com

Transcript of the Testimony of

# LAWRENCE KRASNER

September 16, 2020

## MICHELLE T. SEIDNER

*vs*

## CITY OF PHILADELPHIA and LAWRENCE KRASNER

MICHELLE T. SEIDNER vs
CITY OF PHILADELPHIA and LAWRENCE KRASNER                    KRASNER, LAWRENCE

Page 302

1   Q    That is correct, that was Thursday.
2   And when had you tentatively decided to
3   request Mr. Vega's resignation?
4   A    I had a very disappointing experience with
5   Mr. Vega in late 2016 in a very, very gut-wrenching
6   trial.
7   Q    You told us about that.
8   A    Right. And thinking about who would stay and
9   who might go was really not even an issue until
10  after winning the primary.
11  Q    Mr. Krasner, did you have it in your
12  mind in or around May or June of 2017 that Mr. Vega
13  was going to go?
14  A    I was very seriously considering it. I mean,
15  and frankly it wasn't anything I had to struggle
16  over.
17  Some of the things he had done in that trial
18  were way beyond the pale, and it wasn't just
19  activity in the courtroom. It was sexual harassment
20  of someone in that courtroom. It was layered on by
21  some other things that I might have just forgotten
22  and forgiven, which was how abusive he was towards
23  members of my staff during the preceding five years.
24  But there was just a huge critical mass of
25  things that Mr. Vega did and things that he

Page 303

1   supervised during that trial that I just couldn't
2   get over honestly. There was just no way that I was
3   gonna have someone who would do those things in my
4   office.
5   Q    Did you witness any act that you
6   thought was sexual harassment during the course of
7   that trial?
8   A    Yes.
9   Q    Okay. And what did you witness?
10  A    So during this lengthy trial there was
11  another attorney representing a different defendant
12  that was Jack McMann representing our client's
13  codefendant.
14  This was, if I recall correctly, a case in
15  which the death penalty was being sought against
16  both of these defendants. It was an absolutely
17  heartbreaking case involving the murders of three
18  people in a corner grocery, in a bodega.
19  And the trial was extremely emotional. It
20  went far longer than expected. During a break
21  Mr. Vega was walking around near his counsel table
22  and we were at the adjoining counsel table.
23  Mr. McMann, I believe, had walked away, and he had
24  this very young woman working with him, probably
25  early 20s, maybe 22, something like that, red hair.

Page 304

1   Mr. McMann had confided in me that she had
2   certain challenges in terms of being on the
3   spectrum. And that in many ways he thought that
4   made her an excellent paralegal. Because she was
5   very focused on detail and very hard working. And
6   she was sitting at that table while I was there.
7   Vega turns to her and starts making all of
8   these comments to the -- that were, A, flirtatious
9   and, B, they were more flirtatious. The part I
10  remember most vividly is he said, I can't wait to
11  get you in the orgasmic glow.
12  There were people sitting in the gallery. I
13  was watching this. This woman was being victimized
14  frankly. And no doubt even a little more difficult
15  to handle because of her situation, and I thought it
16  was disgusting.
17  Q    Did you report Mr. Vega to any of the
18  his supervisors at the District Attorney's office as
19  a result of that incident?
20  A    You mean like Seth Williams who was infamous
21  for sexually harassing everyone? No.
22  Q    I didn't ask a specific name. How
23  about his immediate supervisor, Jennifer Selber or
24  Brian Zarallo?
25  A    No.

Page 305

1   Q    How about Ed Cameron?
2   A    I did not go to people who, Number 1, I knew
3   would not act; Number 2, were not really interested
4   in that. They were interested in getting a death
5   penalty.
6   My obligation was to do my duty as an
7   attorney, to zealously represent, which is a
8   different obligation that I have now, but it was to
9   zealously represent a defendant, and I was not going
10  to do anything to inflame the DA's office at a point
11  when they were trying to execute my client.
12  So, no, I did not do that. Was I disgusted
13  by it? Yes. Did I say something to McMann? Yes, I
14  said something to McMann.
15  Q    Did you report Mr. Vega's conduct to
16  the trial judge?
17  A    No. He was not on the bench and I did not do
18  that.
19  Q    Have you ever filed a Complaint
20  against Mr. Vega with the Pennsylvania Disciplinary
21  Board?
22  A    Number 1, no; Number 2, I like basically
23  every other attorney in the criminal system, with a
24  few exceptions, have never filed a Disciplinary
25  Complaint against another attorney, nor have I gone

# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                        -  -  -

3

4

       CARLOS VEGA and       :   NO. 2:19-cv-04039
5      JOSEPH WHITEHEAD,      :
                              :
6              Plaintiffs,    :
                              :
7      vs.                    :
                              :
8      CITY OF PHILADELPHIA   :
       and LAWRENCE KRASNER,  :
9                             :
               Defendants.    :
10

                        -  -  -
11          DEPOSITION OF JACK MCMAHON

12          THURSDAY, OCTOBER 22, 2020

13                 9:06 A.M.
                        -  -  -
14

15     REPORTED BY:

16     Jean M. Walker, Court Reporter - Notary Public

17     APPEARING REMOTELY FROM CAMDEN COUNTY, NEW JERSEY

18

19

20

21

22

23

24

25

Page 10

1    write to Mr. Krasner -- text Mr. Krasner having

2    heard that Carlos Vega was suing him for employment

3    discrimination?

4        A.      I did.  I sent him -- when I look back at

5    my texts, I sent him two consecutive texts; one on

6    one day and then one on the next day, after I read

7    it in the paper.

8        Q.      Let's -- let's put on the screen a copy of

9    that text that -- those texts that were forwarded to

10   me.  I'm going to ask you a few questions about it.

11   The document will show up on your screen.

12       A.      Sure.

13       Q.      What we're looking at is actually a

14   forward to me and someone else of those two texts.

15   And the two texts you're referring to are those that

16   appear in the middle of the screen; is that right?

17   Let's enlarge that to make it easier to see.

18       A.      Yeah, I see them.

19       Q.      What was your first text, on September 5?

20       A.      It was, apparently, at 6:18 in the

21   evening.  And I guess I had been informed, you know,

22   just through the court system, that somebody told me

23   that Carlos was suing you because you fired him

24   because he was too old.  Old meaning, he --

25               (At this time, the court

Page 11

1               reporter asked for clarification.)

2               THE WITNESS:  I'm sorry.  Old

3           meaning, he just had longer to be a lying,

4           cheating scumbag.  That was my first one

5           on that evening.

6    BY MR. SMITH:

7        Q.      And on the following day, also in the

8    early evening, you wrote again.  Can you tell us

9    what you said in that second text?

10       A.      In the second text it appears that I had

11   -- there must have been something in the newspaper

12   about Carlos filing a lawsuit for being too old,

13   which I thought was ludicrous, but.  So I indicated

14   to him that I'd testify why you fired him and what

15   he did with us in the Scott/Muhammed was a disgrace.

16   Plus, he lied directly to the court.  Knowing

17   directly the methods of Carlos, it would have been a

18   dereliction of duty to keep him.

19               And that's what I sent to him the

20   following day.

21       Q.      Okay.  From those texts it sounds like you

22   feel pretty strongly that Mr. Vega should have been

23   forced to leave the district attorney's office?

24       A.      My position was this -- yeah, I mean,

25   obviously, it looks that I was speaking strongly to

Page 12

1    Mr. Krasner on a personal level.  It was not for

2    public consumption.  That was between me and

3    Mr. Krasner to -- and it's clear that it wasn't my

4    decision to be firing him, it was Mr. Krasner's in

5    starting a new DA's office.

6               But the thought that Carlos was fired

7    because of his age was just so ludicrous and absurd

8    to me.  When I saw that, I must say, I laughed, my

9    first reaction when I heard it.  Then, I even

10   laughed the second day when I saw it in the

11   newspaper.  And I thought this was just pretty

12   humorous and -- that he would claim that he was

13   being fired because he was old when, in reality,

14   that has nothing at all to do with why Larry fired

15   him, in my opinion.

16       Q.      In your second text you refer to Scott

17   slash Muhammed.  What -- what is that?

18       A.      That's a homicide case that Mr. Krasner

19   and I tried in December, oh, God, I guess it was,

20   '16.  I can't remember the exact year.  It was

21   December though, I know, because it went right up to

22   Christmas, and it was a death penalty homicide case.

23               I represented Mr. Nalik Scott and

24   Mr. Krasner and Mr. Voci represented Ibrahim

25   Muhammed.  It was a death penalty jury trial in

Page 13

1    front of Judge Bronson that took place -- I think it

2    started at the end of November and went all the way

3    up to almost Christmas.

4        Q.      And you say that what Mr. Vega did in that

5    case was a disgrace, plus he lied directly to the

6    court.  Let's start with what he did that, in your

7    view, was a disgrace.

8        A.      Well, you know, again, I'm going back on

9    recollection of a number of years ago, but -- and I

10   looked at a few things to refresh my recollection,

11   the transcripts and whatnot.

12               Number one, after the conclusion of that

13   trial, it was, without a doubt, having done this for

14   as many years as I have, that his performance in the

15   way he handled counsel, the way he handled things he

16   said to the jury, the court, was just abominable.

17   I've done that job, I knew that job, and it was not

18   necessary to do it in that fashion.

19               It started right from the beginning.  He

20   was -- witnesses were changing their stories in

21   meetings with Mr. Vega, which we had no notice of,

22   that they were changing the height.  This was an

23   identification case, clearly and simply, nothing

24   else.  And so changing the height and descriptions

25   of our main eyewitness was critical and important in

Page 18

1   This continued all the way through, form
2   -- then he lied about our representations
3   about the identification.
4         He had indicated that this
5   witness, the male witness, I can't spell
6   his name, Mr. Alu -- I can't pronounce his
7   one. Amber Creamer was one of them and
8   the other fellow.
9         And they -- their testimony
10  about this issue of whether they could
11  identify our clients or not, Mr. Vega had
12  said a long time ago that they would not,
13  and therefore, there was no lineup ordered
14  for them and -- because at one time, this
15  was a separate case with them. It was a
16  separate robbery that eventually they
17  withdrew on.
18        So it was important whether they
19  were going to I.D. or not. And we made --
20  Mr. Vega representations that they would
21  not and would not use them as I.D.
22  witnesses at any time, and therefore, we
23  didn't ask for a lineup. We didn't pursue
24  a lineup, as any defense attorney would do
25  in that situation, if we were told there

Page 19

1   was even a possibility.
2         Then he came to the court, when
3   we brought them in, to testify that he
4   talked to them -- and one of them, and
5   that they were now going to make an
6   identification. And he pushed for an
7   identification on -- to be able to
8   cross-examine on and lied directly to us
9   and to the court that there was never any
10  such misrepresentation about that at all.
11        I can tell you, clear, without a
12  doubt, that's 100 percent a lie and just
13  makes sense. No self-respecting defense
14  attorney in an identification case would
15  not pursue a lineup unless he had some
16  assurance from a prosecutor that, in fact,
17  no identification was made. And the fact
18  we didn't pursue that is the best evidence
19  that he made that agreement.
20        And then he attempted, as Carlos
21  wanted to do, tried to change up that
22  whole scenario and that whole history, so
23  that he could somehow -- because he had
24  talked to this witness and this witness
25  was now going to identify, which was also

Page 20

1   interesting because he talked to him that
2   day, we talked to him before that, and the
3   guy said there was no way he could make an
4   identification, in any way, shape or form,
5   and then boom, he goes in and talks with
6   Carlos, again, without any request to us
7   to go talk to him, and now he tells us
8   that the guy can make an identification.
9         Well -- and then -- and then he
10  said that a detective was in there with
11  him when he was talking to these
12  witnesses. Another lie. No detective was
13  ever -- he said, well, it's my procedure
14  to do that, yet he never presented any
15  detective. He said Detective Gaul or
16  Detective Verrechio were in there. We
17  said, show us, bring him out, show him,
18  and he never did because it was a lie. It
19  was a typical Carlos, made-up, story to
20  get through the moment and he made up that
21  whole story.
22        So these are just some of the
23  highlights of what I recollect of this
24  entire event, but the end result was, in
25  my opinion, that the -- that the way

Page 21

1   Mr. Vega handled counsel, the witnesses,
2   the court, the trial, was not, in my mind,
3   the way to do it, and it just seemed to me
4   improper. So that's -- that's -- that's
5   what I can recall at this time.
6         And I can tell you that those --
7   that those texts shows the anger that I
8   had -- that myself and Mr. Krasner had
9   about it. I mean, we were very disturbed
10  about this whole process. And this was
11  before Larry was even running for DA. I
12  had no idea he was running for DA when we
13  tried this case.
14        And we were both, in our
15  personal conversations, during and after
16  the case, were just very disappointed or
17  upset by the performance Mr. Krasner --
18  not Mr. Krasner, Mr. Vega and his
19  co-counsel Mr. Handrich, who, if you read
20  the opening, proceeded to just give an
21  outrageous opening statement in this case
22  and set the tone for the entire process,
23  in my mind.
24        And so, it was clear that, by
25  these texts that I wrote to Larry, that,

Page 22

1    in my opinion, and I didn't give Larry any
2    guidance on who he hired and who he fired,
3    that's certainly up to him, that's his
4    office and he has to shape it the way he
5    wishes it to be shaped, but when I heard
6    that Carlos was saying, oh, it's because I
7    was too old, again, that's just humorous
8    and ludicrous.
9                And -- and if Larry had not
10   fired Carlos Vega, if I would observe
11   these people getting fired, as I read in
12   the newspaper who gets fired, if I read
13   that Carlos Vega wasn't fired after what
14   happened in our case, I would have been
15   totally shocked.
16               So after the conversations I had
17   with Larry during the trial and even
18   before he was elected DA, we were both
19   taken aback by Mr. Vega's performance in
20   that case.
21   BY MR. SMITH:
22   Q.        Do you remember any of what Mr. Krasner
23   said to you during and soon after the trial
24   regarding Mr. Vega's honesty and ethics during the
25   trial?

Page 23

1    A.        Well --
2                MR. DAVITCH:  I want to note an
3    objection for the record, but, of course,
4    the witness may answer.
5                THE WITNESS:  Well, the answer
6    to that question is I can't remember
7    specifically a question and answer during
8    the course of the trial.  I mean, we spent
9    the better part of a month together during
10   this trial, lunch, after court, meetings,
11   and it was consistently discussed about
12   the tactics and the methodology of
13   Mr. Vega.
14               And -- and it's even reflected
15   in the transcript.  There was a point in
16   time where I read it the other day, where
17   Mr. Krasner, even to the court, expressed
18   his frustration with Mr. Vega on the
19   record, where he's saying, you know,
20   something to the effect of, I'm just tired
21   of this trial by ambush or trial by
22   whatever.  And that was on the record, but
23   that was consistent with what we talked
24   about constantly -- I wouldn't say
25   constantly, but we talked about oftentimes

Page 24

1                during the process of doing this and
2                afterwards also.
3    BY MR. SMITH:
4    Q.        Now, in that Scott/Muhammed case the
5    defendants that you and Mr. Krasner represented
6    were, in fact, convicted; is that right?
7    A.        Yes, they were.
8    Q.        And you pursued posttrial motions and --
9    and an appeal; is that right?
10   A.        That is correct.
11   Q.        And the posttrial motions were denied and
12   the appeal also was denied; is that right?
13   A.        That is correct.  And, in fact, to be
14   complete, we sought out aliquoter in the Supreme
15   Court of Pennsylvania and we took the direct appeal
16   Superior Court conviction was affirmed.  We sought
17   aliquoter in the Supreme Court.  That was denied.
18               MR. SMITH:  So let's mark these
19               text messages as McMahon Exhibit-1 and put
20               on the screen as McMahon Exhibit-2 the
21               trial transcript of the Scott/Muhammed
22               case for November 28, 2016.
23               (McMahon-1 and McMahon-2,
24               remotely introduced and provided
25               electronically to the reporter.)

Page 25

1    BY MR. SMITH:
2    Q.        Do you recognize, at least from the cover
3    page, that what we put on the screen is the trial
4    transcript from the November 28, 2016?
5    A.        Yes.
6    Q.        And, in fact, you provided this copy of
7    the transcript to me, at my request; is that right?
8    A.        That is correct.
9    Q.        Let's turn to the page of the transcript
10   that includes pages 13 through 16 of the notes of
11   testimony.  And if you see in the upper right-hand
12   side, you are saying to the court, I have a motion
13   being brought over to be filed with the court, just
14   so it's of record, but I can bring it to the court's
15   attention now.  And then down lower in that column
16   you're talking about Jessica Nunez.
17   A.        Correct.
18   Q.        And is this -- is this the first issue
19   that you discussed, the issue --
20   A.        That is correct.
21   Q.        -- about the height?
22   A.        That is correct.
23   Q.        Okay.  And let's turn to the next page of
24   the transcript, and I'm going to ask you a question
25   about -- about what is on page 19.  Okay.  And on

# EXHIBIT C

## DA Krasner promised change. His first full week showed he meant it.

Philly.com

January 13, 2018 Saturday

Copyright 2018

Distributed by Tribune Content Agency

**Section:** STATE AND REGIONAL NEWS

**Length:** 1129 words

**Byline:** Chris Palmer, Philly.com

## Body

Jan. 13--Choose the sword, Carlos Vega told the jury.

Fresh off securing convictions in a contentious 2016 triple-murder trial, Vega -- a veteran Philadelphia homicide prosecutor -- asked jurors to vote for the death penalty, telling the courtroom that Lady Justice "is blindfolded and holding the scales of justice."

"But think about what's in her other hand," he said. "A sword. And that is a sword for the protection of the innocent and for the punishment of the guilty."

Opposing Vega during that trial was Larry Krasner, a career defense attorney who earlier this month was sworn in as Philadelphia's district attorney.

Upon assuming office, Krasner -- who campaigned on a pledge of sweeping reforms -- has wasted little time unsheathing his own metaphorical sword.

In barely 10 days on the job, he axed dozens of prosecutors, including Vega, and promoted or hired dozens more, including an 83-year-old former judge as first deputy and other well-regarded defense attorneys for his leadership team.

He also, more than once, signaled he would follow through on some of his bolder campaign pledges, such as not shying away from charging police officers who shoot suspects.

Krasner said the flurry of activity was part of a plan to reorganize the office to reflect his reform-minded vision -- one that ditches the tough-on-crime tactics of the past for what he describes as a balanced sense of justice. The actions delighted his liberal supporters, enraged his critics, and delayed at least two trials -- one of a man accused of vehicular homicide for allegedly killing a 3-year-old girl during a street race.

Krasner said he anticipated choppy waters at the beginning of his tenure, but believes such drastic changes were necessary to kick-start his efforts not just to revamp the office but the city's criminal justice system.

"I think people who understand that there was a need for change recognize that we're taking real steps," he said last week, "even though they may be difficult, even though there may be imperfections at times."

Stalled cases, stalled explanation

Krasner spoke just days after his first dramatic decision -- forcing 31 employees to resign, including prosecutors who had been scheduled to begin trials Monday.

D 89

DA Krasner promised change. His first full week showed he meant it.

One, Thomas Lipscomb, was handling the street-racing case. Another, Andrew Notaristefano, was set to prosecute a 2015 murder that had been awaiting a trial for nearly three years.

The judge in Notaristefano's case, Barbara A. McDermott, was so incensed that prosecutors were again seeking to delay the trial she ordered Krasner's office to explain why she should not force it to pay the $11,000 needed to cover the accused killer's extended incarceration, his transportation to court Monday, and the cost of summoning jurors.

"This case," McDermott said, "has been this court's top priority."

Krasner waited until Tuesday to publicly explain the firings, telling reporters those dismissed simply did not reflect the office's new mission -- and that as the coach, he gets to "pick the team."

Krasner also did not deny what many lawyers and prosecutors privately had speculated since the purge -- that his personal impressions played at least some role in deciding who would stay and who would go.

And during his news conference, he made remarks that raised eyebrows of some observers. In introducing his new interim homicide chief, for example, Krasner said: "He has always been after the truth. It would be good to have an office where our attorneys understand their obligation always to tell the truth, and always to be transparent and fair with victims and witnesses and defendants, in a way that hasn't always been the case in this office."

Krasner said that the remark was not referencing anyone specific, although he said he would not get into reasons for individual dismissals. He also insisted that the final list was based on more information than his own opinion -- and that it was not, as cynics suspected, a personal "hit list."

"In every single instance," Krasner said, "we had multiple sources and multiple incidents coming from different sides: defense [attorneys] and prosecutors or the judiciary, plus my own experience."

Still, Benjamin Lerner, the city's deputy managing director for criminal justice and a former Common Pleas Judge who oversaw homicide cases for more than a decade, said it was "outrageous" to suggest any of the ousted prosecutors -- more than a half-dozen were believed to be from the homicide unit -- were dishonest or not capable.

"The lawyers on that list," Lerner said in an interview, "are some of the absolutely most competent and most honorable prosecutors who any district attorney's office would be lucky to have."

Moving forward

Jack McMahon, a longtime Philadelphia defense lawyer, said the new district attorney has every right to surround himself with people he trusts. McMahon was part of the defense team in the triple-murder case prosecuted by Vega, and he said that the trial was "very, very personally contentious," and that "I know it had an effect on me, so I can only assume it had an effect on Larry."

In McMahon's view, if that case or any others informed Krasner's view of whom to employ and whom to fire, that's not only justified, it's smart.

"That's absolutely normal -- it's to be expected," McMahon said. "And I think anybody put in that situation should do the exact same thing."

A third member of the defense team in that case was Anthony Voci -- whom Krasner introduced Tuesday as his new chief of homicide.

While a host of internal employees were bumped up to supervisory positions, Krasner's leadership team was also largely rounded out by outsiders.

DA Krasner promised change. His first full week showed he meant it.

Carolyn Engel Temin, 83, who retired from the Common Pleas bench in 2012 when she hit mandatory retirement age, became his first deputy. She said her age was of "no consequence," and Krasner said her experience would benefit the office.

Nancy Winkelman, in private practice, was appointed to lead the law division. And Arun Prabhakaran, formerly of the Urban Affairs Coalition, was named chief of staff -- a position Krasner believes will help expand the office's connections to the community.

Krasner rounded out the week by suggesting he would not shy away from other campaign stances. Speaking at the Free Library on Thursday, he questioned the lack of prosecutions against police officers who shoot and kill while on duty.

"This ain't fair," he said. "This is biased."

McMahon noted that as Krasner gets his feet, it's important he do so with his own version of the office -- and his priorities -- in place.

"Let him rise and fall with the people he wants," McMahon said. "That's just the way government works. The old goes out and new comes in."

___ (c)2018 Philly.com Visit Philly.com at _www.philly.com_ Distributed by Tribune Content Agency, LLC.

**Load-Date:** January 13, 2018

End of Document

# EXHIBIT D



2 People

Today 10:00 AM

Lawrence Krasner

Thu, Sep 5, 6:18 PM

Somebody told me Carlos is suing you because you fired him because he was too old- old meaning he just had longer to be a lying, cheating scumbag

Thu, Sep 5, 9:31 PM



Fri, Sep 6, 5:20 PM

Read paper about poor Carlos- I'll testify why you fired him - what he did with us in Scott/ Muhammad was a disgrace, plus he lied directly to court. Knowing directly the methods of Carlos it would have been a dereliction of duty to keep him

Fri, Sep 6, 6:59 PM

From Jack McMahon

LK    Jack McMahon   ⊙   >

     iMessage

 

**EXHIBIT**
McMAHON-1
Date: OCTOBER 22, 2020
Stenographer: JEAN WALKER

**SIDKOFF, PINCUS & GREEN, P.C.**
**By: Robert A. Davitch, Esquire**
**Identification No.  23827**
**1101 Market Street**
**2700 Aramark Tower**
**Philadelphia, PA   19107**
**(215) 574-0600**                                    **Attorneys for Plaintiff**

| | | |
|---|---|---|
| **CARLOS VEGA** | : | **CIVIL ACTION** |
| and | : | |
| **JOSEPH WHITEHEAD, JR.** | : | **NO. 19-4039** |
| | : | |
| Plaintiffs, | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| and | : | |
| **LAWRENCE S. KRASNER** | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, Robert A. Davitch, hereby certify that the attached Motion and Memorandum of Law

has been served via electronic service of the Court, and is available for viewing and

downloading on the Court's ECF system, upon the following counsel of record:

Lisa Swiatek, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA  19102

David Smith, Esq.
Anne Kane, Esq.
Samantha Banks, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286

 */s/ Robert A. Davitch*
ROBERT A. DAVITCH
Attorney for Plaintiffs

Dated: July 1,2022