IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARLOS VEGA,  :<br>  :<br>    Plaintiff,  :<br>  :<br>    v.  :<br>  :<br>CITY OF PHILADELPHIA,  :<br>  :<br>    Defendant.  :<br>  : | CIVIL ACTION<br><br>NO. 2:19-cv-04039 |

**DEFENDANT CITY OF PHILADELPHIA'S AMENDED PRETRIAL MEMORANDUM**

**I.   NATURE OF THE ACTION**

Lawrence S. Krasner was elected as the Philadelphia County District Attorney on November 7, 2017 and took office on January 2, 2018. Mr. Krasner made a number of personnel changes in the first few weeks of his administration, including the termination of 33 employees in the District Attorney's office ("DAO"). Plaintiff Carlos Vega was among those whose employment was terminated and who have asserted age discrimination claims under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). However, there is no evidence that Mr. Krasner's legitimate non-discriminatory reasons for terminating Plaintiff were false or a pretext for discrimination.

**II.   COUNTER-STATEMENT OF FACTS**

**A.   Personnel Changes at the DAO**

The DAO attorneys are at-will employees who serve at the pleasure of the District Attorney. That gave Mr. Krasner the right to pick his own team. In the first few weeks of

his administration, Mr. Krasner made a number of personnel changes, including the termination of Mr. Vega's employment.

In making termination decisions, Mr. Krasner considered his own experiences with and knowledge of individual DAO attorneys and sought input from trusted advisors and colleagues regarding the past conduct, reputations and criminal justice philosophies of many others. Mr. Krasner's overarching goal in making termination and retention decisions (i.e., picking his team) was whether each attorney had the skills, dedication and sense of justice needed to support and promote his progressive vision of criminal justice. Although personnel files were made available, Mr. Krasner did not review them because he did not believe that the evaluations were based on the same criteria he was considering. Mr. Krasner also did not seek formal input from supervisors in the outgoing administration or talk to those employees he was considering for termination, because he viewed the office as "tribal" and overly "self-protective."

At the time he took office, Mr. Krasner was 56 years old. Nineteen (19) of the 30 attorneys terminated on January 5, 2018 were under the age of 50, including nine (9) attorneys in their thirties and one attorney in her twenties.

| Age Bracket | Attorneys Terminated on January 5, 2018 |
|---|---|
| Under 40 | 10 |
| Between 40 and 49 | 9 |
| Over 50 | 11 |

In his first week in office and over the next 30 days, Mr. Krasner hired fifteen (15) attorneys, including ten (10) attorneys over 40. Four (4) of these new hires were older than Plaintiff. In fact, the data shows that the number of attorneys in the office over the age of 40 (not including Mr. Krasner) did not materially change during this period.

2

| Age Bracket | DAO Attorney Count as of Jan. 1, 2018 | Jan. 5, 2018 DAO Attorney Terminations | Jan. 2018 Voluntary DAO Attorney Departures | DAO Attorney Hires within 30 days of Jan. 5, 2018 | Net Change |
|---|---|---|---|---|---|
| Under 40 | 198 | -10 | -7 | +4 | -13 |
| Over 40 | 98 | -20 | -5 | +10 | -15 |

By the end of July 2018, Mr. Krasner had hired twenty-two (22) attorneys over the age of 40, including the following:

- Nine (9) attorneys that were 64 or older: Hon. Carolyn Temin (83); Richard Glazer (75); Ronald Simon (70); Charles Cunningham (69); Robert Listenbee (69); Paul George (67); Flo Messier (65); Raymond Roberts (64); and Michael Giampietro (64);

- Four (4) attorneys between the ages of 58 and 59: Vincent Corrigan (59); Patricia McKinney (59); Nancy Winkelman (59); Jeffrey Lindy (58); and

- Nine (9) attorneys between the ages of 40 and 54: Anthony Voci (54); Patricia Cummings (51); Crystal Powell (50); Paul Reddel (47); Joseph Green (46); Noel Ann DeSantis (43); Carrie Wood (41); Varghese Kurian (41); and Tracey Tripp (41).

These attorneys took on a variety of roles in the new administration, ranging from policy-level and supervisory roles to staff attorney unit assignments, including the major trial unit, the special investigations unit, the waiver unit, the conviction integrity unit, the pre-trial unit, and the juvenile unit.

B.     **Mr. Krasner's Decision to Terminate Plaintiff's Employment**

Plaintiff Carlos Vega, an attorney in the Homicide Unit, was one of the 30 DAO attorneys whose employment was terminated on January 5, 2018. Mr. Vega was 61 years old (five years older than Mr. Krasner).

Mr. Krasner has known Mr. Vega for over thirty years. He tried the *Scott/Muhammed* case to verdict against Mr. Vega just two months before Mr. Krasner announced his candidacy for District Attorney. Mr. Krasner's negative opinions regarding Mr. Vega's ethics and trustworthiness were established during the *Scott/Muhammed* case, and formed the principal basis for his decision to terminate Mr. Vega.

The *Scott/Muhammed* case was a "gut-wrenching" capital homicide case that went to trial, after five years of litigation, in December 2016. Mr. Krasner represented Ibrahim Muhammed with co-counsel Anthony Voci. Mr. McMahon represented the defendant Nalik Scott. Messrs. Krasner, Voci and McMahon tried the case as a "team." Mr. Vega's conduct that Mr. Krasner deemed unacceptable included:

- ***Mr. Vega's contacts with defense witnesses during trial and his misrepresentations to the Court regarding those witness contacts***. Mr. Krasner testified that Mr. Vega lied to him and the Court about his interviews with defense witnesses Amber Creamer and Jajal Aljuwaie in the corridor outside the courtroom, during which, according to Mr. Vega, they suddenly became able to identify the defendant. In addition, Mr. Vega told those defense witnesses that they could leave before testifying.

- ***Mr. Vega's attempt to renege on a prior agreement regarding witness identification testimony and to "ambush" the defense at trial***. At trial, Mr.

4

> Krasner told the court that Mr. Vega's proposed witness identification testimony was the "typical ambush we've had the entire trial" and that Mr. Vega was reneging on his prior agreement not to present identification testimony.
>
> - ***The late disclosure of mitigation evidence in the death penalty phase***. Mr. Krasner testified that the prosecution did not turn over critical mitigation evidence until the very end of trial and "far too late for us to give them to our experts to be adequately prepared to testify."
>
> - ***Mr. Vega's abusive behavior during pretrial discovery***. Mr. Krasner testified that Mr. Vega behaved in a petty, abusive, and disrespectful way to him and his staff during pretrial discovery and made it very difficult to obtain copies of discovery materials.

The transcript of the *Scott/Muhammed* trial corroborates Mr. Krasner's testimony and includes his co-counsel Mr. Voci's argument to the Court in the *Scott/Muhammed* case demonstrating defense counsel's belief regarding the dishonesty of Mr. Vega's representation that detectives were with him when he spoke with two defense witnesses.

Mr. Vega does not deny that the *Scott/Muhammed* trial was contentious. He does not believe that he acted unethically during the litigation. Rather, during his deposition, he criticized Mr. Krasner's performance during the trial, questioning his legal aptitude. Most importantly, Mr. Vega admits that Mr. Krasner terminated his employment due to Mr. Vega's conduct during the *Scott/Muhammed* trial. In an unrelated civil claim brought by Carlos Vega against Mr. Krasner's political campaign, Mr. Vega made sworn factual allegations that Mr. Krasner never got over losing to Mr. Vega in the *Scott/Muhammed* trial, Mr. Krasner swore to get revenge against Mr. Vega, and that Mr. Krasner's long-standing malice and resentment of Mr. Vega caused Mr.

Krasner to terminate Mr. Vega's employment in the first week after Mr. Krasner became District Attorney.[1]

Mr. Voci has also testified regarding Mr. Vega's conduct during the *Scott/Muhammed* trial and stated his view that Mr. Vega's conduct was unacceptable and unethical. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. And Mr. Vega's conduct throughout the course of the Commonwealth versus Ibrahim Muhammad and Scott violated the spirit and the letter of Rule 3.8 in a very significant way. It was the antithesis of what Rule 3.8 requires of a prosecutor."

Jack McMahon, who represented the co-defendant Nalik Scott, also testified that he was outraged by Mr. Vega's "disgraceful" conduct in the *Scott/Muhammed* trial. He stated that "all the way through the trial" he believed that Mr. Vega was "playing fast and loose with the rules" and that Mr. Vega's conduct was particularly disturbing in a death penalty case. Mr. McMahon will testify to defense counsel's belief that Mr. Vega lied to the Court during the Scott/Muhammed trial.

Michael Giampietro is a Philadelphia attorney whose opinion is valued by Mr. Krasner. Mr. Krasner consulted with him regarding individual DAO attorneys prior to the January 5, 2018 employment decisions. Mr. Giampietro testified during his deposition that he was aware that Mr. Krasner had had "a very negative experience with Carlos in a case involving him and Jack McMahon."

---

[1] On May 14, 2021, Mr. Vega filed a Complaint against Shaun King, Real Justice PAC, and Lawrence Krasner for DA, a political campaign organization, alleging false light and civil conspiracy claims. Discovery in that case is ongoing, and defendants deny liability on all claims. *See Vega v. King, et al.*, Philadelphia Court of Common Pleas, Case No. 210500305.

C.      **Mr. Krasner's Public Statements Regarding Institutional Change**

In the absence of any actual evidence of age bias, Plaintiff relies on reports of public statements by Mr. Krasner, most of which were made before Mr. Krasner was elected as District Attorney, to demonstrate that he "has a strong bias against and stereotypical views of older Prosecutors" and an "unwavering preference and affinity for young Prosecutors." Plaintiff identified articles and interviews which he asserts support his sweeping and unsupported conclusions about Mr. Krasner.

In his Complaint, Plaintiff quotes out-of-context snippets from an interview of Mr. Krasner, which was conducted before he won the primary and published in the Intercept on May 16, 2017, highlighting certain language. The language quoted in the Complaint omits a more extended discussion that includes Mr. Krasner's statement that the office "*already contains the dissent, meaning people who have been there for years but might have been frustrated for years. I know some of these folks because some of them would call me and tell me what they knew about corrupt cops, but couldn't do anything about it from the inside. Those people need to stay, and in supervisor positions, because they represent the kind of change that should come.*" Mr. Krasner's full answer, with the language omitted by Plaintiff reads:

> If you have a truly progressive DA, there's going to be a certain portion of the DA's office who can't stand the idea of change. They're going to leave. There are other people who are going to be made to leave because you cannot bring about real change and leave people in place who are going to fight change every step of the way. The ones who will leave will tend to be my generation, people who started in this business 30 years ago, which means they'll also tend to be white and male. That results in more openings, opportunities for greater diversity, and if we are to judge by what's happened in other jurisdictions, the office will become a tremendous magnet for new talent, because there are a ton of people who are either coming out of

> law school or who are mid-career who would love to work in a truly progressive DA's office but haven't been able to find any.
>
> ***That means you have really committed, dedicated, talented people who are coming into an organization that already contains the dissent, meaning people who have been there for years but might have been frustrated for years. I know some of these folks because some of them would call me and tell me what they knew about corrupt cops, but couldn't do anything about it from the inside. Those people need to stay, and in supervisor positions, because they represent the kind of change that should come.*** And there are a lot of just malleable, mostly younger attorneys who did what they were told, and always wanted to do the right thing, and with proper training will do the right thing. I think real cultural change is possible.

Mr. Krasner testified he was discussing the challenges of effecting institutional change in his public statements and that he wanted the office to be a "destination for all talent," regardless of chronological age, who wanted to see reforms in the criminal justice system. Specifically, he stated:

> The reality is that what you have had in the Philadelphia DA's office for my entire career is you have had a particular philosophy. And when you have that particular philosophy, which is the same philosophy that has made this country the most incarcerated county in the world, and in many ways has torn apart all of the different things that we try to do to prevent crime, when you have that philosophy it hires people who share that philosophy. It trains people to follow that. It advances people who follow it. It turns into supervisors who follow it. And unfortunately it is a recipe for things to become more and more tribal. That is what happened in that office.

Mr. Krasner further testified that his desire to disrupt the DAO's institutional culture did not reflect a preference for younger attorneys, and that he sought out and hired mid- to late-career and retirement-age attorneys who shared his criminal justice philosophy including Judge Carolyn Engle Temin (83 years old) and Bob Listenbee (69 years old) who serve as his First Assistants and many others, including: Richard Glazer (75); Ronald Simon (70); Charles Cunningham (69); Robert Listenbee (69); Paul George (67); Flo Messier (65); Raymond Roberts (64); Michael

Giampietro (64); Vincent Corrigan (59); Patricia McKinney (59); Nancy Winkelman (59); Jeffrey Lindy (58); Anthony Voci (54); Patricia Cummings (51); Crystal Powell (50); Paul Reddel (47); Joseph Green (46); Noel Ann DeSantis (43); Carrie Wood (41); Varghese Kurian (41); and Tracey Tripp (41). Mr. Krasner further explained:

> When I hired Carolyn [Engel] Temin who was well past a mandatory retirement age as a judge after having been a prosecutor, a public defender, a judge, an international human rights judge, I was hiring someone at 83 years of age who very clearly is not brand new and who is progressive. Same thing when I hired Bob Listenbee, Barack Obama's head of juvenile justice for the United States of America at an age that was close to 70. The same is true when I asked Chip Junod, who had been [in] this office, the DA's office for many years, to come back to the DA's office from other employment. And he was considerably older than me and has now retired. The same thing when I asked Guy Garant, who was in the office for many years, [and] had already retired. And I asked Mr. Garant who is around my age or a bit older, I asked him to come back. He didn't do it only because basically his, he would be working for free giv[en] the situation with his pension. I have repeatedly, repeatedly asked people who are not, quote, young, unquote, to come into this office. I have attracted many of them. Our Chief of the Conviction Integrity Unit was hired from Austin, Texas at about 50 years of age, one of many, many, many examples. Giampietro is a senior person. You know, it is not typical that senior people in prosecution, because of the culture, because of the legislation that was passed, it is not typical that they have progressive views. But it is a fact that there are many senior people who have exactly what we are looking for. And it's not just that we say we would hire them, we have hired them.

Plaintiff also presents out-of-context portions of his own transcriptions of an October 7, 2017 radio interview in which Mr. Krasner used the term "old guard":

> [T]here is no question that the old guard in that [DA's] office is in control and the old guard in that office is not desiring change at all. In fact, one of them went out of his way to say that 'there is nothing wrong with this ship, the ship does not need to be righted and we do not need an outsider telling us what to do.' Well that crowd needs to go.

> <u>They need to get out of the way</u> and let people who are ex-Prosecutors who have been on the other side, let people who have a real moral compass about justice and, you know, <u>let people who are sophisticated and modern and understanding of the mistakes that have been made in the last fifty years. Let them run the show.</u> And if we can really do that, then I think there are those Prosecutors who are open to those ideas and that vision <u>then there are new Prosecutors who are going to be coming mid-career or straight out of law school.</u>
>
> <u>There is an old guard there [in the DA's Office] who actually thinks Lynne Abraham for 19 years was doing the right thing</u> when frankly, she almost never did the right thing at all. You know, <u>there's that crew,</u> they're very loyal to a particular way of doing things. Which is very authoritarian, very unscientific, very political and they are not only going to resist, they are you might say in the throes of trying to resist even now. <u>Those folks got to go. I mean some of them are leaving already which is a good choice and some of them are going to go.</u>
>
> So, yes, there will be turnover . . . <u>and people whose vision is incompatible with the progressive vision of the next District Attorney in Philadelphia,</u> and I hope that person will be me . . . <u>I mean they will be well-served to find another place to work</u>.

The language misleadingly quoted in the Complaint omits the context in which the comments were made:

> ***There are a lot of prosecutors, especially these days, who I think are really fair minded people who absolutely want to do the right thing and have always wanted that in a way that is, you know, directed towards justice and equality and sees the bigger picture***, ***but*** there is no question that the old guard in that office is in control and the old guard in that office is not desiring change at all.
>
> . . .
>
> Well that crowd needs to go. They need to get out of the way ***and let people who are ex prosecutors who have been on the other side, let people who have a real moral compass about justice*** and, you know, let people who are sophisticated and modern and understanding of the mistakes that have been made in the last fifty years. Let them run the show. And if we can really do that, then ***I think there are those prosecutors who are open to those ideas*** and that vision, then there are new prosecutors who are going to be coming mid-career or straight out of law school who have heard the phrase "mass

10

> incarceration" who take seriously the idea of crime prevent as opposed to the DA's office being a political springboard.
>
> . . .
>
> As I said, I think there is an old guard, ***it certainly isn't [] everyone above a certain age, that's not the case []***, but [there] is an old guard there.

Moreover, Mr. Krasner testified that his use of the term "old guard" in this and other interviews has nothing to do with chronological age.

> Q: When you said the old guard needs to go, what did you mean?
>
> A: The reference [is] to the French revolution. Are you not aware of it? Have you looked up what old guard means? It means entrenched . . . It means the entrenched people who have been in control and who are resistant to change. The old guard, Napoleon's guard, were not necessarily old, they were soldiers. In fact, they were rather vigorous soldiers and had to be of a fairly reasonable age in order to fight. That is what old guard refers to. It refers to the people who come from an older philosophy who are in control. They might be senior. They might be young. But either way they are [adherents] to a philosophy and they are unwilling to change.
>
> [W]hen you have any organization that has taken power and that entrenches that power over a period of time there will be some people among them who are older. But it is a question of philosophy. It's not in and of itself just a question of age. As you see cultural shift, as you see a move, for example, from racial segregation in the south to the beginnings of racial integration in the south to more general integration in the south to new attitudes about race, what you are seeing are generational shifts. There are young white supremacists right now who want to go back and refight the Civil War. They're called the Boogaloo Boys. They are old guard. They might be 16 years old but they are old guard.

Mr. Krasner testified that he is committed to retaining and recruiting attorneys, regardless of age, who are committed to criminal justice reform. He has hired numerous people who are older from the outside and fired people who are younger. Mr. Krasner testified that he wants the office "to be a destination for all talent." He further explained that "if you are going to try to change culture then what you have to do is you have to bring in people who have different life experiences who have different perspectives."

11

### III.     MONETARY DAMAGES

See Plaintiff's Memorandum.  Defendant, the City of Philadelphia (the "City"), disputes that punitive damages are available.

### IV.     WITNESSES

1. District Attorney Lawrence Krasner
   3 S. Penn Square, Philadelphia, PA
   Liability

2. Cecilia Madden[2]
   3 S. Penn Square, Philadelphia, PA
   Liability

3. Arun Prabhakaran
   1207 Chestnut Street, Philadelphia, PA
   Liability

4. Shamika Taliaferro, BBA, MPA (or other Board of Pensions representative)
   2 Penn Plaza, 16th Floor, Philadelphia, PA
   Damages

5. Jack McMahon, Esquire
   139 N. Crosky Street, Philadelphia, PA
   Liability

6. Michael Giampietro, Esquire
   3 S. Penn Square, Philadelphia, PA
   Liability

7. Assistant District Attorney Anthony Voci
   3 Penn Square, Philadelphia, PA
   Liability

   *See section VIII (1), infra*

8. Jody Dodd
   3 Penn Square, Philadelphia, PA
   Liability

---

[2]     Cecelia Madden can testify to the statistics and demographics of the Office.

9. Dustin Slaughter
   Philadelphia, PA
   Liability

The City reserves the right to call any witness identified by Plaintiff and any rebuttal witnesses that may become necessary at trial.

## V.     EXHIBITS

See the City's exhibit list was filed at ECF 112. The list below does not include exhibits or documents that the City may use for cross-examination, impeachment, rebuttal, or as demonstrative exhibits. The City reserves the right to identify documents and exhibits for those purposes at a later time. The City also reserves the right to use as an exhibit any document listed on Plaintiff's exhibit list. Additionally, for purposes of cross-examination and rebuttal, the City reserves the right to use any document submitted to plaintiff's expert witnesses, and any document produced in this case.

## VI.    ESTIMATED TIME OF TRIAL

5-7 Days.

## VII.   STIPULATIONS OF COUNSEL

None at this time.

## VIII.  OBJECTIONS TO EXHIBITS AND EVIDENCE

See the City's objections to Plaintiff's exhibit list at **Exhibit A.** Pursuant to the Court's policies and procedures, the City has not identified its objections on the basis of relevance pursuant to F.R. E. 401.

The City also asserts the following objections to the admissibility of evidence expected to be offered:

13

- The City objects to the introduction of transcripts or partial transcripts of interviews or prepared by unknown individuals. (Authenticity, F.R.E. 901, 106)

- The City objects to the introduction of the bar passage rates of any DAO new hires as they may be viewed as prejudicial and are not probative of any matter at issue in this case. (F.R.E. 403)

- The City objects to the introduction of evidence, by documents or third party testimony, regarding commendations for Plaintiff's on-the-job performance. (F.R.E. 403)

- The City objects to the duplicative proposed testimony from six witnesses about Plaintiff's reputation and work performance at the DAO before the Krasner administration. Several of the proposed witnesses left the DAO years before Mr. Krasner terminated Mr. Vega's employment. *See* ECF 110. (F.R.E. 403)

- The City objects to Plaintiff's proposal to read into the record deposition testimony from Rachel Mitchell and Mr. Krasner (other than to the extent the testimony is used for impeachment). *Robert Whitlock v. Allstate Fire and Casualty Insurance Company*, Case No. 2:20-CV-00373-KSM, 2022 WL 9544315, *5 (E.D. Pa. Oct. 13, 2022) ("Federal Rule of Civil Procedure 43(a) embodies the federal courts' preference for live trial testimony: 'At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules or other rules adopted by the Supreme Court provide otherwise.'"). Ms. Mitchell and Mr. Krasner are available to testify at trial, they are not parties to this litigation, and neither of them testified at their depositions as agents or corporate designees on behalf of the City. (F.R.C.P. 32(a)(3); F.R.E. 804).

- The City objects to the introduction of Mr. Krasner's statements to the press during his 2017 campaign for District Attorney because this evidence is inadmissible hearsay,

as it is being introduce for the truth of the matter asserted – allegedly, that Mr. Krasner terminated Mr. Vega's employment due to age bias. (F.R.E. 802, *et. seq*.) Likewise, Mr. Krasner's deposition testimony about his 2017 statements to the press are inadmissible hearsay within hearsay. (F.R.E. 805).

**1. Deposition testimony (including videotaped depositions) to be offered during a party's case-in-chief (with citations to the page and line number), including the opposing party's counter-designations.**

On Sunday, October 30, 2022, the City learned for the first time that Mr. Voci likely will be unavailable for trial due to a family medical emergency. The City will monitor Mr. Voci's situation and confer with Plaintiff's counsel about exchanging deposition designations and counter-designations to be read at trial if Mr. Voci becomes unavailable.

**IX. OTHER MATTERS**

None at this time.

Respectfully submitted,

*/s/ Lisa Swiatek*
Lisa A. Swiatek, Esquire
City of Philadelphia Law Department
Labor and Employment Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

*/s/ David Smith*
David Smith, Esquire
Anne Kane, Esquire
Samantha Banks, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 191013

*Counsel for City of Philadelphia*

Date: October 31, 2022